# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | |
|---|---|
| COALITION FOR INDEPENDENT TECHNOLOGY RESEARCH,<br><br>    Plaintiff,<br><br>  v.<br><br>GREG ABBOTT, in his official capacity as Governor of the State of Texas,<br><br>STEVEN C. MCCRAW, in his official capacity as Director and Colonel of the Texas Department of Public Safety,<br><br>AMANDA CRAWFORD, in her official capacity as Executive Director of the Texas Department of Information Resources and Chief Information Officer of Texas,<br><br>DALE RICHARDSON, in his official capacity as Chief Operations Officer of the Texas Department of Information Resources,<br><br>ASHOK MAGO, LAURA WRIGHT, LINDY RYDMAN, CARLOS MUNGUIA, MARY DENNY, MILTON B. LEE, MELISA DENIS, DANIEL FEEHAN, and JOHN SCOTT JR., in their official capacities as members of the Board of Regents of the University of North Texas System, and<br><br>MICHAEL WILLIAMS, in his official capacity as Chancellor of the University of North Texas System,<br><br>    Defendants. | Civil Action No. 1:23-cv-783<br><br><br><br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.    TikTok is an app used by more than 150 million Americans to share and watch short videos about virtually every topic under the sun. TikTok Inc., the company that operates TikTok, is American, but it is owned by ByteDance, which is incorporated in the Cayman Islands and based in China. In response to concerns about data-collection, disinformation, and the fear that the "Chinese government . . . wields TikTok to attack our way of life," Texas has required all state agencies to bar their officers and employees from downloading or using the app on state-issued devices and state-owned networks, as well as on personal devices used to conduct state business. Perhaps Texas would have good reason to restrict the use of third-party services by state employees who have access to especially sensitive information or locations. But the state's TikTok ban extends much further. Most relevant here, it extends to all faculty at public universities. Unsurprisingly, Texas's decision to restrict public university faculty from accessing a major communications platform is compromising both research and teaching. It is preventing or seriously impeding faculty from pursuing research that relates to TikTok—including research that would illuminate or counter the data-collection and disinformation-related practices that the ban is ostensibly meant to address. It has also made it almost impossible for faculty to use TikTok in their classrooms—whether to teach about TikTok or to use content from TikTok to teach about other subjects.

2.    Plaintiff Coalition for Independent Technology Research ("Coalition") works to advance, defend, and sustain the right to study the impact of technology on society. Its members are academics, journalists, civil society researchers, and community scientists committed to advocating for and organizing in defense of research that is ethical, transparent, and privacy-preserving. Some of its members are faculty at public universities in Texas whose research and teaching have been compromised by Texas's TikTok ban. For example, Jacqueline Vickery is an

Associate Professor in the Department of Media Arts at the University of North Texas whose work focuses on the ways that young people use social media for informal learning, activism, and self-expression. The ban has forced her to suspend research projects and change her research agenda, alter her teaching methodology, and eliminate course materials. It has also undermined her ability to respond to student questions and to review the work of other researchers, including as part of the peer-review process.

3.     Texas's TikTok ban is unconstitutional as applied to faculty at public universities. While faculty are public employees, the government's authority to control their research and teaching is limited by the First Amendment—and the ban cannot survive First Amendment scrutiny. Imposing a broad restraint on the research and teaching of public university faculty is not a constitutionally permissible means of protecting Texans' "way of life" or countering the threat of disinformation. And while Texas has a legitimate interest in protecting Texans' privacy, the ban is not tailored to this interest. Many companies—including Meta (which owns Facebook), Alphabet (which owns Google and YouTube), and X Corp. (which owns Twitter)—collect the kind of information that TikTok collects, but Texas's ban does not restrict access to these companies' platforms. Nor does the ban meaningfully constrain China's ability to collect sensitive data about Americans, because, as the Director of National Intelligence highlighted in a recent report, an immense amount of this data is available for sale from data brokers. That Texas's ban restricts public university faculty from undertaking research that might illuminate privacy risks means that the ban is counterproductive, not simply ineffective. And it is fatal to the ban's constitutionality that Texas could address these risks without effectively barring public university professors from studying, and teaching with, one of the world's most popular and influential communications platforms.

3

4.     For these reasons and those explained further below, the Coalition respectfully asks the Court to declare that Texas's TikTok ban—imposed through a directive from the governor, a model security plan issued by two state agencies, university implementation policies, and a statute—is unconstitutional as applied to faculty at public universities, and to direct Defendants to exempt the Coalition's members from the ban unless and until Defendants provide them with a constitutionally adequate means of accessing TikTok for research and teaching purposes.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under the First and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. § 1983.

6.     This Court has authority to issue declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02. This Court also has authority to award costs and attorneys' fees pursuant to 42 U.S.C. § 1988.

7.     This Court has personal jurisdiction over Defendants, and venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1), (2) because Defendants are public officials in the State of Texas, are sued in their official capacities, and certain Defendants maintain their principal headquarters in this district. A substantial part of the events giving rise to Plaintiff's claims also occurred in the district.

## PARTIES

8.     Plaintiff Coalition for Independent Technology Research is a fiscally sponsored project of Aspiration, a Washington nonprofit public benefit corporation, that works to advance, defend, and sustain the right to study the impact of technology on society. The Coalition's members are academics, journalists, civil society researchers, and community scientists committed to advocating for and organizing in defense of research that is ethical, transparent, and privacy-

4

preserving. Some of the Coalition's members are faculty at public universities in Texas whose research and teaching have been compromised by Texas's TikTok ban.

9.      Defendant Greg Abbott is the Governor of Texas. He serves as the head of Texas's executive branch, controls the budget for the state, and appoints public officials, including the leaders of the Department of Public Safety ("DPS"), the Department of Information Resources ("DIR"), and state university systems. Tex. Const. art IV, §§ 1, 9, 12; Tex. Gov't Code § 411.003; Tex. Gov't Code § 2054.021; Tex. Educ. Code § 105.052. Governor Abbott issued a Directive in December 2022 ("Directive") requiring state agencies, including state university systems, to ban their officers and employees from downloading or using TikTok on state-issued devices. The Directive also required DPS and DIR to develop a model security plan ("Model Plan") to guide agencies in regulating the use of TikTok on personal and state-issued devices and state networks; required state agencies to adopt their own policies implementing the Model Plan; and required that the Model Plan, and all agency policies implementing the ban, be filed with the Governor's office. As noted below, some state universities—including the University of Texas at Austin and the University of North Texas—have indicated a role for the Governor in approving or allowing exceptions to the TikTok ban. On the same date that he issued his Directive, Governor Abbott also sent a letter that called on state legislators to "make permanent" his TikTok ban. The legislature did so, and Governor Abbott signed a bill that codified parts of the ban in June 2023. S.B. 1893, 88th Leg., Reg. Sess. (Tex. 2023) ("S.B. 1893"). Defendant Abbott is sued in his official capacity.

10.      Defendant Steven C. McCraw is the Director and Colonel of DPS. He is "directly responsible" for the conduct of DPS, including DPS's Cybersecurity Division. Tex. Gov't Code § 411.006(a)(1). Governor Abbott's Directive required DPS to co-develop the Model Plan with DIR, and DPS did so. The Directive also required DPS's Cybersecurity Division to review and

approve any agency policy implementing the Model Plan. On information and belief, the Cybersecurity Division has reviewed and approved implementation policies submitted by state university systems and universities, including the University of North Texas ("UNT"). Defendant McCraw is sued in his official capacity.

11.     Defendant Amanda Crawford is the Executive Director of DIR and serves as the Chief Information Officer of Texas. In this role, she "has authority for all aspects of information technology for state agencies," Tex. Gov't Code § 2054.0285(b), and is responsible for the management of DIR specifically. DIR's duties include "develop[ing] and publish[ing] policies, procedures, and standards relating to information resources management by state agencies, and ensur[ing] compliance with those policies, procedures, and standards," *id.* § 2054.051(b), including by requiring non-compliant agencies to develop "corrective action plans" that specify the manner in which deficiencies will be corrected, *id.* § 2054.102(c). Governor Abbott's Directive required DIR to co-develop the Model Plan with DPS, and DIR did so. The Model Plan requires agencies to report to DIR any exceptions they grant for the use of TikTok on state devices. The Model Plan also indicates that DIR's Cybersecurity Operations Team has blocked access to TikTok on "the state network." Defendant Crawford is sued in her official capacity.

12.     Defendant Dale Richardson is the Chief Operations Officer of DIR. He has operational responsibility for the Cybersecurity Operations Team. Defendant Richardson is sued in his official capacity.

13.     Defendants Ashok Mago, Laura Wright, Lindy Rydman, Carlos Munguia, Mary Denny, Milton B. Lee, Melisa Denis, Daniel Feehan, and John Scott Jr. are members of the Board of Regents of the UNT System. The Board of Regents is responsible for the "organization, control, and management" of the UNT System and each component institution, which includes UNT. Tex.

Educ. Code §§ 105.001(1), 105.051. After Governor Abbott's December Directive, the UNT System Administration prohibited all UNT employees from using TikTok on state-issued or -managed devices. It also banned employees from accessing TikTok on UNT networks. The UNT System Administration is authorized to impose penalties on employees who violate the system's information security policies, "including but not limited to disciplinary action, loss of access and usage, termination, prosecution, and/or civil action[.]" UNT System, Information Security Handbook (Oct. 2022). Defendant members of the Board of Regents are sued in their official capacities.

14.     Defendant Michael Williams is the Chancellor of the UNT System. As the Chief Executive Officer of the UNT System, he is responsible for all aspects of the UNT System's operations, Tex. Educ. Code § 105.102; Tex. Admin. Code § 211.20(a), including the implementation of the Directive, Model Plan, and S.B. 1893. Chancellor Williams must approve any exception that would allow employees of the UNT System to use TikTok—authority that, under the Directive and Model Plan, cannot be delegated. Defendant Williams is sued in his official capacity.

## FACTUAL ALLEGATIONS

### *TikTok*

15.     TikTok is a social media platform that allows users to create, edit, and share short videos. The platform can be accessed using a web browser, desktop application, or mobile phone application. In the early days of TikTok, videos were restricted to a length of fifteen seconds. Now, uploaded videos can be up to ten minutes long, but most videos are less than sixty seconds. The usual way in which a TikTok user interacts with the platform is through a home page—called the "For You" page—which shows one video at a time in an endless feed curated by TikTok's

recommendation algorithms. The screenshot below shows a user's home page as displayed on TikTok's mobile app:



16.     Although it was launched only six years ago, TikTok is now one of the most popular social media platforms globally, with over one billion monthly active users, including more than 150 million in the United States. In 2021, its website was the most visited website on the internet, and last year its app was the most downloaded app. A 2022 Pew Research study found that over two thirds of American teenagers use TikTok.

17.     There are many reasons for TikTok's popularity, but one of them is the diversity of the content it hosts. The platform is perhaps especially well-known for its lighthearted dance videos. But the platform also hosts videos that tell stories, or call attention to injustice, or propose ways of helping people in need. It hosts countless videos relating to music, literature, public health,

art, journalism, education, law, social justice, human rights, and international relations, many of which have been viewed thousands or even millions of times. A video of Black Lives Matter protesters joyfully singing and dancing to a Michael Jackson song has been viewed more than 2 million times. A video about a military veteran working at Walmart amassed 3.5 million views and spurred TikTok users to raise more than $170,000 to help him retire. In the early stages of the COVID-19 pandemic, one TikTok user's *a capella* ode to the Pixar film Ratatouille snowballed into a platform-wide collaboration that over 250 million people engaged with and contributed to, creating choreography, full-length songs, scenic design, and a playbill. Seeing the impact the musical was having on TikTok, Broadway producers staged a full version of "Ratatouille: The TikTok Musical" for a benefit concert that raised more than two million dollars.

18.     The platform has become a forum for all kinds of political speech. Ahead of the 2020 presidential election, TikTok accounts that represented groups of liberal and conservative content creators used TikTok's "duet" feature to stage political debates. (The duet feature allows users to post their own videos side-by-side with videos from other TikTok creators.) The musical group the Jonas Brothers collaborated with President Biden to create a video promoting COVID-19 vaccines; when it was posted on TikTok, it was viewed almost 17 million times. In October 2022, trans rights advocate Dylan Mulvaney's TikTok series about her experience transitioning earned her an invitation to the White House as part of the Now This Presidential Forum. A group called "The Media Nuns" has used TikTok to bring their Catholic faith to new audiences, with one of their videos, about life as a nun, having been viewed more than 19 million times. A group called "Mothers Against Greg Abbott" has 110,200 followers. The conservative news site The Daily Wire has 3 million followers and posts several videos a day.

19.     Some TikTok users have used the platform for political organizing. For example, a TikTok campaign that called on influencers to boycott partnerships with Amazon until the company improved its employment practices signed up more than 70 content creators with a collective 51 million followers. (Influencers are content creators with large followings who generally use their accounts to grow ever-larger audiences, often with the goal of influencing public opinion or advertising commercial products.) A video that shows TikTok user @YelloPain rapping about the structure of government and urging viewers to vote in the midterm elections has been viewed 8.3 million times. Videos with the hashtag #BlackLivesMatter have 36 billion views, while the hashtag #MAGA has 10.8 billion. In 2023, students used TikTok to organize school walkouts to protest gun violence, including one in the city of Uvalde, Texas. These are screenshots of two videos relating to those school walkouts:

 

20.     Candidates for public office use TikTok to communicate with voters, and public officials use TikTok to communicate with their constituents and the general public. A stroke forced then-Senate-candidate John Fetterman to leave the campaign trail in May 2020, but Fetterman was able to continue reaching voters through his TikTok account, which had more than two hundred thousand followers. In the lead up to the 2022 midterm elections, nearly thirty percent of all major-party Senate candidates had TikTok accounts, according to one study. Now, the list of politicians with TikTok accounts includes U.S. Representative Jeff Jackson from North Carolina (2.2 million followers), U.S. Senator Bernie Sanders (1.4 million followers), Michigan Governor Gretchen Whitmer (210,900 followers), presidential candidate Robert F. Kennedy, Jr. (242,700 followers), and U.S. Representatives Alexandria Ocasio-Cortez (808,600 followers) and Jamaal Bowman (216,700 followers) from New York.

21.     TikTok is similar in some respects to other social media platforms, but the combination of its design, features, user base, and content make TikTok distinctive. The platform's video and audio editing features allow content creators to easily record or edit video clips, add cinematic effects like slow motion or special transitions, and enhance their videos with an ever-expanding library of augmented reality and interactive filters. The platform provides a Sound Library, which allows creators to browse different audio clips and automatically sync them to the background of their videos. It also offers innovative tools like duets and "stitches," which allow users to build on others' content and, as a result, promote dynamic interaction. (TikTok's "stitch" feature allows users to take a clip from someone else's TikTok video and incorporate it into their own.)

22.     The platform delivers content to users principally through a recommendation algorithm. A user who opens TikTok's app is brought initially to a "For You" page, which displays

11

one video at a time in an endless feed based on the user's perceived interests. When one video comes to an end, or when a user swipes through a video, the next recommended video begins automatically. Users can also seek out content on the platform by searching for usernames or keywords, by following specific accounts, or by viewing collections of other videos that use the same audio tracks or "hashtags." Users can interact with one another by commenting on videos, "like"-ing them, or creating new videos that refer to or incorporate them.

23.     In part because of TikTok's affordances, the platform's users are able to organize themselves into communities—many of them quite niche and unique to the platform—and to create networks that are not easily transportable or replicable elsewhere. These communities range from the massive collection of readers on "BookTok," to hashtags that gather Texas beekeepers, nonbinary middle school teachers, and parents of children with extremely rare diseases like Schinzel-Giedion syndrome, of which there are only about 50 reported cases worldwide. The existence of these communities makes TikTok an important site for socialization, identity formation, activism, and learning.

24.     In recent years, academic researchers and many others—including some Coalition members—have raised concerns about TikTok's data collection practices and about the prevalence of mis- and disinformation on the platform. These concerns mainly mirror those that have been raised about other major commercial platforms, including American platforms like Facebook, Twitter, and YouTube. All of these platforms collect large amounts of data about their users (and sometimes non-users as well), and all of them have been faulted for not having taken sufficient measures to counter mis- and disinformation. Some of the concerns that have been raised about TikTok, however, relate to TikTok's connection to China, and to the perceived risk that China's government will access TikTok's data at some point in the future, or that China will hijack

TikTok's algorithm in the service of a future disinformation campaign. These concerns are speculative, but even if they were grounded in evidence, they could not justify the application of Texas's TikTok ban to faculty at public universities, for the reasons summarized in the Cause of Action section below.

### Texas's TikTok Ban

### The Directive

25.     On December 7, 2022, citing concerns about data collection, disinformation, and the risk that China "wields TikTok to attack our way of life," Governor Abbott directed all state agencies to ban their officers and employees from downloading or using TikTok on state-issued devices.[1] Under Texas law, state university systems and institutions of higher education are state agencies. Tex. Gov't Code § 572.002(10)(B); Tex. Educ. Code § 61.003.

26.     The Directive provided that the ban "must be strictly enforced by [each agency]'s IT department." Although the Directive stated that agency heads could grant exceptions "to enable law-enforcement investigations and other legitimate uses of TikTok," it provided that this authority could not be delegated. It also stated that exceptions must be "narrow" and must be reported to the Office of the Governor.

27.     In addition to requiring agencies to ban the use of TikTok on state devices, the Directive ordered DPS and DIR to jointly develop a model plan to guide state agencies in regulating the use of TikTok on both state-issued and personal devices. The Directive provided that the model plan should address, among other things, the "[u]se of personal devices by agency employees or contractors to conduct state business"; "[n]etwork-based restrictions to prevent the use of TikTok on any personal device while it is located on agency property"; and "[w]hether this

---

[1] A true and correct copy of the Directive is attached hereto as Attachment 1.

model plan should incorporate other technology providers besides TikTok, including any apps, services, hardware, or software."

28.     The Directive required DPS and DIR to present the model plan to the Office of the Governor and circulate it to all other state agencies by January 15, 2023. Each agency was instructed to develop its own policy implementing the plan, and to present this policy to the Office of the Governor and DPS by February 15, 2023. The Directive charged DPS's Cybersecurity Division with approving agency policies and required agencies to "promptly implement" their policies after approval.

### Model Plan

29.     DPS and DIR issued the Model Plan on January 26, 2023.[2]  The plan required agencies to prohibit employees from using TikTok-enabled personal devices to conduct state business, including to access any state-owned data, applications, or email accounts. It also required agencies to prohibit TikTok-enabled personal devices from accessing agency networks, and to adopt network-based restrictions that block such access.

30.     The Model Plan also provided agencies with further guidance with respect to state-issued devices and state networks. For example, the plan required state agencies to conduct ongoing surveillance to ensure that TikTok is not downloaded or used on state-issued devices; configure agency network firewalls to block access to TikTok on both local and virtual private networks; and implement certain security controls for state-issued devices, including restricting access to app stores, maintaining the ability to remotely wipe "non-compliant" or "compromised" devices, and maintaining the ability to remotely uninstall TikTok in the event it is downloaded.

---

[2] A true and correct copy of the Model Plan is attached hereto as Attachment 2.

31.     Like the Directive, the Model Plan indicated that agency heads could grant exceptions to the ban "to enable law-enforcement investigations or other legitimate business uses." However, it stated that any exception must be approved by the head of the agency and limited to a "specific use case," and it required the use of TikTok to be confined to non-state networks or "specifically designated separate networks." The Model Plan also stated that, "for personal devices used for state business, exceptions should be limited to extenuating circumstances and only granted for a pre-defined period of time."

32.     The Model Plan also confirmed that each state agency was "required to develop its own security policy to support the implementation of this plan," and to submit this policy to DPS by February 15, 2023.

*State Universities' Implementation of the Directive and Model Plan*

33.     State university systems and universities began taking steps to comply with the Directive immediately after it was issued. They informed faculty and staff that they were prohibited from installing or using TikTok on university-issued devices. Many university systems and universities also started taking measures to enforce this ban, by, for example, deploying management software on university-issued devices, blocking access to TikTok on university networks, or both.

34.     For example, on December 8, 2022, the UNT System Information Technology office sent an email to all UNT System employees stating that, "[p]er Governor Abbott's order, all faculty and staff across all UNT member institutions and UNT System Administration, must immediately cease using or downloading TikTok on any institutionally issued and/or managed devices." The email stated that this was "a mandatory request that [would] be strictly enforced by IT across all institutions." The UNT System repeated the same language in an official newsletter on December 15, 2022.

35.     In January 2023, the chief communications officer for the UNT System explained in response to press inquiries that the UNT System Administration had leveraged management software and network-based restrictions to enforce the ban. By deploying management software, the university system was able to block the installation of TikTok on university-issued devices, to remove TikTok from university-issued devices where it had already been installed, and to prevent university-issued devices from communicating with TikTok's servers. Meanwhile, blocking TikTok at the network level prevented faculty and staff from downloading or using TikTok on any device, including by accessing the service through a web browser.

36.     After the Model Plan was issued, state university systems—including the UNT System—submitted policies implementing the plan to DPS and the Office of the Governor. While the details of these policies vary in some respects, they generally bar faculty and other university employees from installing or using TikTok on university-issued devices or on personal devices that are also used to conduct university business. They also prohibit the use of TikTok on university-run networks. On information and belief, university implementation policies including UNT's have been reviewed and approved by DPS's Cybersecurity Division.

37.     Perhaps because the Model Plan contemplates exceptions only for "law-enforcement" and "business" purposes, many university systems have not established any process by which faculty can request exceptions from the ban. UNT, for its part, has informed its employees that "faculty and staff cannot use [TikTok] on university-owned equipment, for any reason," and that absent "softer guidance" from the Governor's office, requests for exceptions will not be considered. The few university systems willing to consider exceptions have failed to provide basic information about how exceptions can be requested, on what grounds exceptions will be granted or denied, or the timeframe within which exception requests will be decided. For example,

the University of Texas at Austin's exceptions policy states only that faculty must submit requests for an exception through the University's Information Security Office, and that all exceptions "must ultimately be reviewed and approved by the President, UT System Chancellor, and Governor's office."

### S.B. 1893

38.     On June 14, 2023, the Texas legislature passed S.B. 1893, a bill entitled "an act relating to prohibiting the use of certain social media applications and services on devices owned or leased by governmental entities."[3] The law codifies certain aspects of Texas's TikTok ban. Most importantly, the law requires that every state agency, including institutions of higher education, adopt a policy prohibiting the installation or use of TikTok on any state-owned device, and requiring the removal of TikTok from those devices. It also requires DPS and DIR to jointly develop a "model policy" for agencies to use in developing their own policies. Unlike the Directive and Model Plan, the new state law does not contemplate any exceptions for "legitimate business uses." It provides only that agencies "may" allow exceptions "to the extent necessary for" law enforcement or "developing or implementing information security measures."

39.     Governor Abbott signed the bill into law on June 14, 2023, and it became effective upon his signing it.

### The TikTok Ban in its Current Form

40.     Together, the Directive, Model Plan, university implementation policies, and S.B. 1893 impose a broad ban on the use of TikTok by public university faculty. Faculty are prohibited from installing TikTok on university-owned or -issued devices, and from using it on university-owned networks. They are also prohibited from installing or using TikTok on personal devices

---

[3] A true and correct copy of S.B. 1893 is attached hereto as Attachment 3.

that are also used to conduct university business, for example to access university email systems. The prohibition against the use of TikTok on university-owned or -issued devices is categorical; no exceptions are available. At some university systems, including UNT, the prohibition against using TikTok on university-operated networks and personal devices used for university business also appears to be categorical.

### Impact of the Ban

41.     The Coalition for Independent Technology Research is a nonprofit membership organization founded in 2022 to advance, defend, and sustain the right to study the impact of technology on society. The Coalition was formed after Facebook sent a letter to two researchers at New York University—Damon McCoy and Laura Edelson—demanding that they cease their research into the spread of disinformation on Facebook's platform. Since then, the Coalition has served as a home for academics, journalists, civil society researchers, and community scientists committed to advocating for and organizing in defense of research that is ethical, transparent, and privacy-preserving.

42.     The Coalition advances its mission in a variety of ways—by organizing in the mutual defense of independent researchers whose work comes under threat, by articulating and defending the importance of research that is independent of technology companies, by contributing to the development of ethical and privacy standards for independent research, and by convening researchers to collaborate in the development of best practices and shared resources. For instance, in the wake of Reddit's recent decision to restrict access to data on its platform, the Coalition publicly called upon Reddit to develop a mechanism for independent researchers to continue work that depended on that access to data and organized a survey of affected researchers whose work was disrupted by Reddit's decision.

43.     The Coalition now has more than 300 individual members and 40 organizational members. Among its members are some of the most prominent organizations and research institutions illuminating the ways in which new technology is shaping society, including, for example, the Citizens and Technology Lab at Cornell University; the Dangerous Speech Project; New York University's Cybersecurity for Democracy and its Center for Social Media & Politics; the Social Science Research Council; the Stanford Internet Observatory; the Center for Ethics, Society, and Computing at the University of Michigan; the University of California at Berkeley's D-Lab; the University of Texas at Austin's Center for Media Engagement; and the Media & Democracy Data Cooperative.

44.     The Coalition's members engage in wide-ranging work, all directed in one way or another at helping the public understand how technology is changing society and how to address societal challenges created or exacerbated by new technology. This sort of independent research into new technology is essential because technology companies have immense power to observe, shape, and intervene in people's everyday lives. While society benefits greatly from the digital communication and connection these companies provide, some of the companies' technologies are associated with profound social harms. Society needs trustworthy, independent research to expose and mitigate these harms. Research can help us understand these technologies more clearly, identify problems, hold power accountable, imagine a better world, and test ideas for change. Independent research is particularly important because, while major technology companies have large teams of talented researchers, the companies share their own research only inconsistently. Moreover, the companies' research reflects their own needs rather than those of society more broadly.

45.     Independent research relating to TikTok is particularly urgent. Despite the platform's meteoric rise in popularity, its influence on public discourse, politics, culture, teen behavior, mental health, and much more is poorly understood. Independent research into TikTok is also critical to evaluating some of the risks that U.S. government officials have highlighted. The question of whether the Chinese government is using TikTok to disseminate disinformation is best answered by allowing independent researchers to investigate the platform's engineering, operation, and content. Likewise, independent research into TikTok's data practices is necessary to understand what data TikTok collects, how the data is used, and how the data is shared.

46.     Texas's TikTok ban has imposed significant burdens on Coalition members at multiple public universities in Texas. For example, Coalition member Jacqueline Vickery is a digital media scholar based at UNT. Her work focuses on how young people use digital and social media for informal learning, self-expression, and activism. She studies issues of media literacy and equity, and how they affect the ways in which young people interact with media. She also researches social media and youth privacy, as well as "moral panics" that instill fear about young people's digital media practices. Nearly all of her current research focuses on TikTok, as does much of her teaching.

47.     The TikTok ban seriously compromises Professor Vickery's ability to continue her research. This research relies on Professor Vickery being able to collect and analyze large numbers of TikTok videos, as well as the comments, metadata, and statistics that accompany those videos, the profiles of the videos' creators, and any "stitches" made using those videos. Prior to the ban, Professor Vickery relied nearly exclusively on her university-owned laptop, university-owned on-campus desktop, and university-managed internet networks to do this work. These avenues for research, however, are no longer available to her, and she has not been able to find a satisfactory

workaround. UNT administrators have told her that applications for exceptions to the ban will not be considered. Professor Vickery does not have a personal laptop or desktop. While she has a personal cellphone, the Model Plan appears to foreclose her from using it because she also uses it to access her university email and calendar, Sharepoint, Canvas, Microsoft Office, and university Zoom account. In any event, it is difficult and indeed practically infeasible for Professor Vickery to pursue her scholarly research using only a personal cellphone.

48.     As a result of the ban, Professor Vickery has been forced to suspend research projects and alter her research agenda. Even reading the TikTok-related work of other scholars has become challenging, because authors often support their claims by including links to TikTok videos that Professor Vickery cannot open on her work computer or the university's network.

49.     The ban has also required Professor Vickery to make significant changes to her teaching. Professor Vickery teaches courses like "Digital Media & Society," "Teen Media," "Social Media Strategies," "Media in a Global Pandemic," and "Researching Gen Z Media," all of which relate directly to TikTok. Because of the ban, she can no longer teach lessons that require live interaction with TikTok's recommendation algorithm, search functions, or platform design. The ban also precludes her from assigning students in-class work that requires them to access TikTok, makes it impossible for her to pull up TikTok videos that students reference during class discussions, and interferes with her ability to use examples of TikTok content to illustrate the concepts she is teaching. When students choose to discuss TikTok in their assignments for class, the ban also makes it difficult for Professor Vickery to view videos they have cited or discussed and to grade their work.

50.     Texas's TikTok ban also burdens Coalition members outside Texas who would otherwise benefit from the research of public university researchers within the state. As the

sociologist Robert Merton famously observed nearly eighty years ago, science is a communal public good—each contribution draws from prior work and strengthens collective knowledge.[4] Texas's TikTok ban, however, deprives Coalition members outside Texas—including Dr. Rebekah Tromble, Associate Professor in the School of Media and Public Affairs and Director of the Institute for Data, Democracy, and Politics at George Washington University—of the scholarship and insights that would otherwise be produced by public-university researchers within the state.

### CAUSE OF ACTION: FIRST AMENDMENT

### Texas's TikTok Ban Violates the First Amendment as Applied to Public University Faculty

51.     Texas's TikTok ban—imposed through a directive from the governor, a model security plan issued by two state agencies, policies implemented by public universities, and a statute—violates the First Amendment.

52.     The ban imposes a profound burden on speech. It severely compromises the ability of public university faculty to teach with and about TikTok, as well as to undertake research relating to TikTok, which in turn compromises the First Amendment interests of students (who are impeded from learning), other researchers (who are impeded from collaborating with, and learning from, public university faculty in Texas), and the public at large (which is denied the benefit of the scholarship that public university professors in Texas would otherwise have produced).

53.     The interests that Texas has invoked to defend the ban cannot justify the burden the ban imposes. The imposition of a broad, ex ante restraint on the research and teaching of public university faculty is not a constitutionally permissible means of protecting Texans' "way of life" or countering disinformation. And while Texas surely has a legitimate interest in protecting

---

[4] Robert K. Merton, *A Note on Science and Democracy*, 1 J. Legal & Pol. Socio. 115 (1942).

Texans' privacy, the ban is both underinclusive and overbroad in relation to this interest. Most importantly, it is fatal to the ban's constitutionality that Texas could achieve its legitimate goals without effectively barring public university professors from studying, and teaching with, one of the world's most popular and influential communications platforms. Indeed, Texas has many options that would not require a ban of this nature. For example, it could make dedicated laptops available to faculty who wish to study TikTok, while establishing a separate WiFi network on which those laptops can operate. It could also pass privacy legislation that would restrict TikTok and other platforms from collecting users' sensitive information. In light of the availability of these less-burdensome options, the extension of the TikTok ban to public university faculty is unconstitutional.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court:

A.    Declare that Texas's TikTok ban violates the First Amendment as applied to public university faculty who seek to access TikTok for research or teaching purposes.

B.    Direct Defendants to exempt Plaintiff's members from the ban unless and until Defendants provide them a constitutionally adequate means of accessing TikTok for research and teaching purposes.

C.    Award costs, including reasonable attorney's fees.

D.    Grant any additional relief as the Court deems just and proper.

Dated: July 13, 2023                        Respectfully submitted,

 /s/ *Peter B. Steffensen*                       /s/ *Jameel Jaffer*
Peter B. Steffensen                          Jameel Jaffer*
Texas Bar No. 24106464                       Ramya Krishnan*
SMU Dedman School of Law                     Stacy Livingston*
First Amendment Clinic

P.O. Box 750116
Dallas, TX 75275
(214) 768-4077
psteffensen@smu.edu

Knight First Amendment Institute
 at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
jameel.jaffer@knightcolumbia.org

*Counsel for Plaintiff*

*Application for Admission Pro Hac Vice
Forthcoming*