**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

|  |  |
|---|---|
| COALITION FOR INDEPENDENT TECHNOLOGY RESEARCH,<br><br>            Plaintiff,<br><br>   v.<br><br>GREG ABBOTT, in his official capacity as Governor of the State of Texas, *et al.*,<br><br>          Defendants. | Civil Action No. 1:23-cv-783 |

**PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

Peter B. Steffensen
Texas Bar No. 24106464
SMU Dedman School of Law
  First Amendment Clinic
P.O. Box 750116
Dallas, TX 75275
(214) 768-4077
psteffensen@smu.edu

Jameel Jaffer (*Pro Hac Vice*)
Ramya Krishnan (*Pro Hac Vice*)
Xiangnong Wang (*Pro Hac Vice*)
Knight First Amendment Institute
  at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
jameel.jaffer@knightcolumbia.org

*Counsel for Plaintiff*

**Table of Contents**

Table of Authorities ...................................................................................................... ii

Introduction .................................................................................................................... 1

Background ..................................................................................................................... 2

Argument ........................................................................................................................ 4

    I.      The Coalition is substantially likely to succeed in establishing that the TikTok ban violates the First Amendment as applied to public university faculty. .................. 5

        A.      The TikTok ban is unconstitutional as applied unless it survives scrutiny under *NTEU*. ................................................................................. 5

        B.      The TikTok ban fails *NTEU* scrutiny ............................................................. 8

            1.      The ban imposes a heavy burden on teaching and research, compromising the First Amendment interests of faculty, students, researchers around the country, and the general public........................................................................................................ 8

            2.      The burden the ban imposes on First Amendment rights is not "outweighed" by the harms that Texas has cited, and the ban does not alleviate the harms in "a direct and material way."............. 12

                    a.      Texas has not demonstrated that its ban will serve its interests "as an employer," or that the harms it seeks to address are "real, not merely conjectural." ............................. 12

                    b.      Suppression of speech is generally not a constitutionally permissible means of countering the threat of disinformation........................................................... 13

                    c.      The ban is ineffective in addressing concerns about Texans' privacy.................................................................... 15

                    d.      Any legitimate government interests could be accommodated through less-restrictive means. ...................... 17

    II.     The other requirements for preliminary relief are also satisfied here. ......................... 19

    III.    The Court should waive the security requirement. ..................................................... 20

Conclusion ................................................................................................................... 20

## Table of Authorities

**Cases**

*Amalgamated Transit Union Loc. 85 v. Port Auth.*, 39 F.4th 95 (3d Cir. 2022) ......................... 19

*Amawi v. Pflugerville Indep. Sch. Dist.*, 373 F. Supp 3d 717 (W.D. Tex. 2019) .......................... 7

*Booth v. Galveston Cty.*, No. 3:18-CV-00104, 2019 WL 4305457 (S.D. Tex. Sept. 11, 2019) ..................................................................................................................... 20

*Brown v. Ent. Merch, Ass'n*, 564 U.S. 786 (2011) ....................................................... 15

*Buchanan v. Alexander*, 919 F.3d 847 (5th Cir. 2019) ................................................. 6

*City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084 (5th Cir. Unit B 1981) .................................................................................................... 20

*Clarke v. Commodity Futures Trading Comm'n*, No. 22-51124, 2023 WL 4677542 (5th Cir. July 21, 2023) .................................................................... 19

*Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014) ........................................................... 5

*Dep't of Texas, Veterans of Foreign Wars of U.S. v. Texas Lottery Comm'n*, 760 F.3d 427 (5th Cir. 2014) ................................................................................ 15

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) ............................................................... 5, 6

*Hartford Courant Co., LLC v. Carroll*, 986 F.3d 211 (2d Cir. 2021) ........................ 20

*Hays Cnty. Guardian v. Supple*, 969 F.2d 111 (5th Cir. 1992) .................................. 17

*Heim v. Daniel*, No. 22-1135, 2023 WL 5597837 (2d Cir. Aug. 30, 2023) ................. 5

*Hoover v. Morales*, 164 F.3d 221 (5th Cir. 1998) ..................................................... 13

*In re Dinnan*, 661 F.2d 426 (5th Cir. 1981) ............................................................... 6

*Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31*, 138 S.Ct. 2448 (2018) ........................................................................................................... 7

*Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624 (5th Cir. 1996) ....................................... 20

*Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967) .................................................. 2, 6

*Kleindienst v. Mandel*, 408 U.S. 753 (1972) ............................................................. 12

*Lamont v. Postmaster Gen. of United States*, 381 U.S. 301 (1965) ........................... 14

*Lane v. Franks*, 573 U.S. 228 (2014) ................................................................. 5, 7, 12

*McDonald v. Longley*, 4 F.4th 229 (5th Cir. 2021) ................................................. 19

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) ............................................. 5, 6

*Moore v. City of Kilgore, Tex.*, 877 F.2d 364 (5th Cir. 1989) ................................ 13

*Nken v. Holder*, 556 U.S. 418 (2009) ...................................................................... 19

*Opulent Life Church v. City of Holly Springs*, 697 F.3d 279 (5th Cir. 2012) .......... 5, 19

*Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968) ..................................................... 5, 7

*Porter v. Bd. of Tr. of N.C. State Univ.*, No. 2201712, 2023 WL 4359474 (4th Cir. July 6, 2023) ....................................................................................................... 5

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500 (D.C. Cir. 2016) ................................................................................................................... 20

*Schultz v. Medina Valley Indep. Sch. Dist.*, No. SA-11-CA-422-FB, 2011 WL 13234770 (W.D. Tex. June 1, 2011) .................................................................. 20

*Serafine v. Branaman*, 810 F.3d 354 (5th Cir. 2016) ............................................. 14

*Smith v. Acevedo*, A-09-CA-620-SS, 2010 WL 11512363 (W.D. Tex., Sept. 20, 2010) .................................................................................................................. 13

*Swartzwelder v. McNeilly*, 297 F.3d 228 (3d. Cir. 2002) ....................................... 20

*Sweezy v. New Hampshire*, 354 U.S. 234 (1957) ................................................... 6, 12

*Tech. Automation Servs. Corp. v. Liberty Surplus Ins. Corp.*, 673 F.3d 399 (5th Cir. 2012) ......................................................................................................... 6

*Trudeau v. Univ. of N. Tex.*, 861 F. App'x 604 (5th Cir. 2021) .............................. 6

*United States v. Alvarez*, 567 U.S. 709 (2012) ...................................................... 13, 17

*United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454 (1995) ..................... passim

**Statutes**

Texas Gov't Code. § 620.003 .................................................................................. 4

Texas Gov't Code. § 620.004 .................................................................................. 4

**Other Authorities**

Eugene Volokh, *When Are Lies Constitutionally Protected?*, 22-10 Knight First
    Amend. Inst. (Oct. 19, 2022), https://perma.cc/4PWU-FWUT ............................................... 14

H.B. 4, 88th Leg. Sess. (2023) ...................................................................................................... 18

Platform Accountability and Transparency Act, S.B. 1876, 118th Cong. (2023) ....................... 17

*Report to the Director of National Intelligence*, Office of the Dir. of Nat. Intel.
    Senior Advisory Grp., Panel on Commercially Avail. Info. (Jan. 27, 2022).......................... 16

*Securing Network Infrastructure Devices*, Cybersecurity & Infrastructure Security
    Agency Blog (last visited Jul. 19, 2023), https://perma.cc/8Q8R-PMRJ .............................. 18

*TikTok Blocked on University Network*, IT@UT (Jan. 17, 2023),
    https://perma.cc/L72J-XSGN ................................................................................................... 4

**Introduction**

Plaintiff the Coalition for Independent Technology Research ("Coalition") commenced this litigation on July 13, 2023, asserting that Texas's TikTok ban violates the First Amendment as applied to faculty at public universities. The ban, which prevents public university faculty from using TikTok on state devices and networks, and on personal devices that are used to access state data and applications, is already having far-reaching effects. It is requiring faculty to suspend research projects, alter their research agendas, change their teaching methodologies, eliminate course materials, and limit their engagement with research produced by other scholars. Accordingly, the Coalition now moves the Court for preliminary relief—specifically, a declaration that the ban is unconstitutional as applied to public university faculty, and an injunction requiring Defendants to exempt the Coalition's members from the ban unless and until Defendants provide them with a constitutionally adequate means of accessing TikTok for research and teaching purposes.

The Coalition is substantially likely to succeed on the merits. Every circuit to have squarely addressed the question has recognized that the core research and teaching activities of public university faculty are protected by the First Amendment. Because the TikTok ban operates as a broad, ex ante restraint on these activities, it can be upheld only if Texas's asserted justifications for the ban outweigh the costs imposed on First Amendment rights—not just the rights of public university faculty in Texas, but those of students, other researchers inside and outside Texas, and the public at large. But Texas's asserted justifications—which relate to data-collection, disinformation, and the fear that the "Chinese government . . . wields TikTok to attack our way of life"—are plainly insufficient here. The imposition of a broad, ex ante restraint on the research and teaching of public university faculty is not a constitutionally permissible means of countering

1

disinformation. And while Texas surely has a legitimate interest in protecting its citizens' privacy, the ban is both underinclusive and overbroad in relation to this interest. Most importantly, it is fatal to the ban's constitutionality that Texas could achieve its legitimate goals without imposing a near-categorical ban on public university faculty's study and use of one of the world's most popular communications platforms.

The other requirements for preliminary relief are satisfied here, too. In the absence of preliminary relief, public university faculty, including the Coalition's members, will be impeded or altogether prevented from engaging in activities that are not merely constitutionally protected but of urgent importance to students, other researchers, and the public at large. It is black-letter law that the deprivation of First Amendment rights, even for short periods of time, causes injury that is irreparable. Moreover, the injury that the Coalition would suffer in the absence of preliminary relief outweighs any harm that the grant of such relief would cause to Defendants, particularly because, again, Texas can achieve its legitimate goals without a categorical ban. Finally, the grant of preliminary relief would not disserve the public interest. As the Supreme Court recognized half a century ago, academic freedom is of "transcendent value to all of us." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967). The public interest would be served by ensuring that public university faculty can, within disciplinary boundaries, study the topics they believe are worthy of study, and teach as they see fit.

## Background

As explained at greater length in the Complaint, *see* Compl. ¶¶ 25–40, the TikTok ban stems from a directive issued by Governor Abbott, a Model Security Plan issued by the Department of Public Safety ("DPS") and the Department of Information Resources ("DIR"), implementation policies issued by public universities, and a recently enacted statute. This constellation of legal

instruments has the effect of imposing a near-total ban on the use of TikTok by public university faculty.

Governor Abbott issued his directive on December 7, 2022 ("Directive"). Citing concerns about data collection, disinformation, and the risk that China "wields TikTok to attack our way of life," the Directive required all state agencies—including public universities—to ban their officers and employees from downloading or using TikTok on state devices. Compl. Attach. 1. The Directive also required the DPS and DIR to prepare a "Model Security Plan" to guide other agencies in the implementation of the ban. The plan that DPS and DIR issued on January 26, 2023 required agencies to block access to TikTok on agency networks, and to prohibit employees from using TikTok on personal devices used to conduct state business, including to access "state-owned data, applications, email accounts, and non-public facing communications." Compl. Attach. 2. The Security Plan also provided that agencies could grant narrow, case-specific exceptions to the ban, but only for "law enforcement" or "legitimate business uses," and only if the exceptions were approved by the heads of the relevant agencies.

Public universities have now implemented the TikTok ban, prohibiting their faculty from accessing TikTok on university devices and networks, and on personal devices used to conduct university business. Initially, some university systems informed faculty that exceptions to the ban might be granted. Others informed their faculty that requests for exceptions would not even be considered. The University of North Texas ("UNT"), for example, stated that faculty "cannot use [TikTok] on university-owned equipment, for any reason," and that requests for exceptions would not be considered absent "'softer guidance' from the Governor's office." Vickery Decl. ¶ 46.[1]

---

[1] The few university systems that indicated that they were willing to consider requests for exceptions did not provide basic information about how exceptions could be requested, on what grounds exceptions would be granted, or on what timeframe exception requests would be decided.

Earlier this summer, in response to Governor Abbott's request that state legislative leaders make his Directive "permanent," Compl. Attach. 3, Texas enacted Senate Bill 1893 ("S.B. 1893"). The new law requires governmental entities, including public universities, to prohibit the installation or use of TikTok on state devices. Texas Gov't Code. § 620.003(a). Effectively, the bill codifies the TikTok ban with respect to such devices while leaving in place other aspects of the ban, such as the prohibition on the use of TikTok on state networks and certain personal devices. Critically, the bill eliminated whatever possibility previously existed for the grant of exceptions to public university faculty for the use of TikTok on state devices. *See id.* § 620.004(a). Under the new law, exceptions are permitted only "to the extent necessary" for "law enforcement" or the development of "information security measures." *Id.*

In its current form, the TikTok ban categorically prohibits public university faculty from using TikTok on university devices for research and teaching purposes, without any possibility of exceptions being made. At many university systems—including UNT—the prohibition against using TikTok on university networks, and on personal devices used for university business, also appears to be categorical. As explained further below, the ban severely restricts the ability of public university faculty in Texas to study the platform, and to teach with and about it. It operates as a broad, ex ante restraint on activity that is at the core of the First Amendment's concern.

## Argument

To obtain a preliminary injunction, the Coalition must show: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted;

---

For example, the University of Texas at Austin's exceptions policy stated only that faculty should submit exception requests to the University's Information Security Office, and that all exceptions would have to be "reviewed and approved by the President, UT System Chancellor, and Governor's office." *TikTok Blocked on University Network*, IT@UT (Jan. 17, 2023), https://perma.cc/L72J-XSGN.

(3) that the threatened injury outweighs any harm that the injunction might cause to the defendant; and (4) that the injunction will not disserve the public interest." *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 288 (5th Cir. 2012). Each of these factors weighs strongly in the Coalition's favor.

I.      **The Coalition is substantially likely to succeed in establishing that the TikTok ban violates the First Amendment as applied to public university faculty.**

        A.      **The TikTok ban is unconstitutional as applied unless it survives scrutiny under *NTEU*.**

Texas's TikTok ban is subject to First Amendment scrutiny because it burdens the ability of public university faculty to engage in teaching and research on matters of public concern. As the Supreme Court has recognized, "citizens do not surrender their First Amendment rights by accepting public employment." *Lane v. Franks*, 573 U.S. 228, 231 (2014) (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). Rather, public employees retain their right, as citizens, to "comment[] upon matters of public concern." *Id.* at 235–36. In *Garcetti*, the Supreme Court held that, as a general matter, public employees speak as employees, rather than as citizens, when they speak "pursuant to their official duties," but the Court expressly reserved the question whether this rule should apply to public university faculty engaged in "scholarship or teaching." *Garcetti v. Ceballos*, 547 U.S. 410, 421, 425 (2006). Every circuit to have addressed the question since *Garcetti* has concluded that it does not. *See Meriwether v. Hartop*, 992 F.3d 492, 505 (6th Cir. 2021) ("[P]rofessors at public universities retain First Amendment protections at least when engaged in core academic functions, such as teaching and scholarship."); *see also Demers v. Austin*, 746 F.3d 402, 412 (9th Cir. 2014) (similar); *Porter v. Bd. of Tr. of N.C. State Univ.*, No. 2201712, 2023 WL 4359474, at *5 (4th Cir. July 6, 2023) (similar); *Heim v. Daniel*, No. 22-1135, 2023 WL 5597837, at *12 (2d Cir. Aug. 30, 2023) (similar); *see also Buchanan v. Alexander*, 919

F.3d 847, 852 (5th Cir. 2019) (suggesting that *Garcetti*'s "official duties" rule does not apply to public university faculty, writing that "classroom discussion" is protected by the First Amendment).[2]

The reason why *Garcetti*'s "official duties" rule does not apply to the core teaching and research activities of public university faculty is, of course, that applying the rule in this context would threaten academic freedom, which is "a special concern of the First Amendment." *Keyishian*, 385 U.S. at 603; *see also Garcetti*, 547 U.S. at 425; *id.* at 438–39 (Souter, J., dissenting). The Supreme Court explained the importance of academic freedom to our democracy, and to our society, in *Sweezy v. New Hampshire*:

> The essentiality of freedom in the community of American universities is almost self-evident. . . . To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation. . . . Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die.

354 U.S. 234, 250 (1957). Since *Sweezy*, both the Supreme Court and the lower courts have repeatedly reaffirmed the value of academic freedom and the necessity of protecting it against government encroachment. *See, e.g., Keyishian*, 385 U.S. at 603 ("the First Amendment . . . does not tolerate laws that cast a pall of orthodoxy over the classroom"); *Meriwether*, 992 F.3d at 506 ("If professors lacked free-speech protections when teaching, a university would wield alarming power to compel ideological conformity."); *see also In re Dinnan*, 661 F.2d 426, 430 (5th Cir. 1981).

---

[2] A panel of the Fifth Circuit arguably suggested, in a terse footnote to a later opinion, that the court had not yet fully resolved the question of whether public university faculty are covered by *Garcetti*'s "official duties" rule. *Trudeau v. Univ. of N. Tex.*, 861 F. App'x 604, n.5 (5th Cir. 2021). But that opinion was unpublished and therefore without precedential value, 5th Cir. R. 47.5.4, and it would not control even if it had been published, *Tech. Automation Servs. Corp. v. Liberty Surplus Ins. Corp.*, 673 F.3d 399, 405 (5th Cir. 2012) (discussing prior-panel-precedent rule).

Because Texas's ban burdens the teaching and research activities of public university faculty on matters of public concern, *see infra* Part I.B.1 at 12, it is subject to First Amendment scrutiny. The nature of that scrutiny is dictated by the nature of the burden. As the Supreme Court explained in *Lane*, the First Amendment protection of public employees' speech requires a "careful balance." 573 U.S. at 231. When an employee challenges a post hoc disciplinary action, courts balance "the interests of [the employee], as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the services it performs through its employees." *Pickering*, 391 U.S. at 568. But where the challenge is to a broad, ex ante restraint on speech, a more demanding test applies—one that "more closely resembles exacting scrutiny than traditional *Pickering* analysis." *Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31*, 138 S.Ct. 2448, 2472 (2018) (discussing *United States v. Nat'l Treasury Emps. Union* (*NTEU*), 513 U.S. 454, 468 (1995)); *accord Amawi v. Pflugerville Indep. Sch. Dist.*, 373 F. Supp 3d 717 (W.D. Tex. 2019), *vacated as moot*, 956 F.3d 816 (5th Cir. 2020).

The TikTok ban operates as a broad, ex ante restraint, and accordingly the relevant analytical framework is the one the Supreme Court set out in *NTEU*. Under that framework, the State "must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *NTEU*, 513 U.S. at 468 (quoting *Pickering*, 391 U.S. at 571). It must also "demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Id.* at 475 (quoting *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 624 (1994)). For the reasons discussed below, Texas cannot satisfy these requirements here.

**B.    The TikTok ban fails *NTEU* scrutiny.**

     **1.    The ban imposes a heavy burden on teaching and research, compromising the First Amendment interests of faculty, students, researchers around the country, and the general public.**

Texas's TikTok ban imposes a heavy burden on activities that are at the heart of academic freedom. It impedes public university faculty from pursuing research that relates to TikTok. It undermines the ability of faculty to supervise student work. It compromises their ability to access and review the scholarship of other researchers, including as part of the peer-review process. It has made it nearly impossible for them to use TikTok in their classrooms—whether to teach about TikTok or to use content from TikTok to teach about other subjects. The ban has sweeping implications for the First Amendment interests of faculty, students, researchers in Texas and beyond, and the general public.

The declarations that the Coalition has submitted in support of this Motion explain why the burden that the TikTok ban imposes on scholarly research is so substantial, and why the implications of the ban are so far-reaching.[3] As a general matter, independent research about social media platforms is important to helping the public understand the practices of "technology companies [that] have immense power to observe, shape, and intervene in people's everyday lives." Zuckerman Decl. ¶ 9; *see also* Literat Decl. ¶ 25. Studies by researchers and scholars who are independent of the technology companies have been "crucial to informing public debate about the platforms and to illuminating the impact of the platforms on democratic institutions."

---

[3] The Coalition has submitted declarations from: (1) Ethan Zuckerman, a member of the Coalition's board and a Professor at the University of Massachusetts at Amherst; (2) Jacqueline Vickery, a member of the Coalition and a Professor at the University of North Texas; (3) Ioana Literat, a leading scholar of social media and an Associate Professor at Teachers College, Columbia University; and (4) Bruce Schneier, one of the nation's foremost experts on computer security and a Fellow at the Berkman Klein Center for Internet & Society at Harvard University.

Zuckerman Decl. ¶ 12; *see also* Literat Decl. ¶ 25. Independent research has shed light on platforms' privacy practices, as well as on the role that platforms have played in the spread of mis- and disinformation online. Zuckerman Decl. ¶¶ 14–15. Research about TikTok is especially urgent because the platform is very popular globally and because its "influence on public discourse, politics, culture, teen behavior, mental health, and much more is poorly understood." *Id.* ¶ 18. The TikTok ban impedes this research. Because it forecloses public university faculty from using or downloading TikTok on state devices and networks, and even on personal devices that are used to conduct university business, it makes it difficult or even impossible for faculty to pursue research projects that relate to TikTok—including projects that would shed light on the data-collection and disinformation risks that ostensibly motivated the ban. *Id.* ¶ 24.

Professor Jacqueline Vickery's experience is illustrative. Professor Vickery—a member of the Coalition, Vickery Decl. ¶ 1—is an Associate Professor in the Department of Media Arts at UNT whose work focuses on how young people use digital and social media for informal learning, self-expression, and activism. *Id.* ¶ 2. Much of her current research focuses on TikTok. *Id.* ¶¶ 24, 38. To carry out this research, she collects and analyzes large numbers of TikTok videos, as well as the comments, metadata, and statistics that accompany those videos, the profiles of video creators, and any clips linked to the original video using TikTok's "stitch" feature. *Id.* ¶ 53. Professor Vickery previously did this work almost exclusively on UNT-owned computers and internet networks. *Id.* ¶ 50. Now that the ban is in place, she can no longer use these devices and networks to conduct this research. *Id.* ¶ 49. The ban also appears to foreclose her from using her personal cellphone for this purpose, since she uses that cellphone to access her university accounts, including her email account. *Id.* ¶ 51 (Professor Vickery does not have a personal laptop or desktop. *Id.* ¶ 49.) As Professor Vickery explains at length, it would not be feasible for her to

conduct her scholarly research using only a cellphone, in any event. *Id.* ¶¶ 52–56. In sum, the ban makes it much more difficult, if not impossible, for Professor Vickery to undertake scholarly research in the field of most relevance and importance to her. *Id.* ¶ 56.

The First Amendment costs of constraining the research activities of public university faculty in Texas are borne not just by the faculty who are subject to the ban, but by others as well. As Professor Zuckerman explains:

> Research is a collective and collaborative enterprise; researchers who study TikTok or other social media platforms generally stay abreast of the research in their field to make sure they're aware of and account for the latest science relevant to their own work, and to learn from and hopefully improve upon the methodologies used by others. They also participate in the process of peer review, which furthers collective understanding and maintains the high standards to which scientific research is subject.

Zuckerman Decl. ¶ 29. The TikTok ban stymies this process, both by frustrating the ability of faculty to participate in the process of peer review, Vickery Decl. ¶ 59, and by depriving the research community of research that the ban deters or forecloses, Schneier Decl. ¶¶ 39–42. It also deprives the public of insights and information that are important to public discourse about TikTok, social media more generally, and the advisability of various possible regulatory interventions. *See* Zuckerman Decl. ¶¶ 12–16. The ban denies the public the right "to read and hear what [scholars subject to the ban] would otherwise have written and said." *NTEU*, 513 U.S. at 470.

The ban's implications for teaching are equally significant, compromising the First Amendment interests of faculty and students alike. Because it precludes faculty from using TikTok on university devices and networks, the ban makes it impracticable for them to show content from TikTok in class. Zuckerman Decl. ¶ 25; Vickery Decl. ¶¶ 60–65. It also makes it more difficult for them to grade student work that relies on TikTok. Zuckerman Decl. ¶ 25. Again, Professor Vickery's experience is illustrative. Before the ban was imposed, Professor Vickery used TikTok-

related examples in her lectures, gave TikTok-related assignments and readings, and responded to TikTok-related examples when students raised them in class or in assignments. Vickery Decl. ¶¶ 33–36, 60. All of this is now more difficult because she can "no longer use [her] university-owned laptop or university-owned desktop to source TikTok links to include in [her] lecture slides," "no longer open TikTok links on the university-owned classroom computer," and "no longer share the links with students by posting them on Canvas, [the] course management system." *Id.* ¶ 60. Indeed, some aspects of her lesson plans have been made entirely unworkable. Professor Vickery explains:

> Lessons about TikTok's search results, algorithmic recommendations, trends and memes, comments and user interactions, user interfaces and affordances, hyperlinks, and sound libraries all require actual, real-time engagement with the platform and the ability to click on links, scroll, and search. These functions cannot be captured or downloaded ahead of time. As such, I have had to abandon this aspect of my teaching all together.

*Id.* ¶ 61.

All of this has obvious implications for the First Amendment interests of students. Because of the ban, students "are denied classroom instruction in, or that makes use of, one of the most popular social media platforms of the day." Zuckerman Decl. ¶ 26; *see also* Literat Decl. ¶¶ 17–23 (describing the important role TikTok plays in informing and shaping public discourse and culture). Because teachers are no longer able to readily access TikTok videos in class, classroom discussion is "more difficult to steer and engage with." Vickery Decl. ¶ 64. "[Students] are also deterred—if not effectively prevented—from studying TikTok as part of their academic pursuits, because their supervisors may be unable to meaningfully review or grade their work." Zuckerman Decl. ¶ 26. Half a century ago, in *Kleindienst v. Mandel*, the Supreme Court observed that the "right to receive information and ideas" is "nowhere more vital than in our schools and

11

universities," 408 U.S. 753, 762–63 (1972) (quotation marks omitted). It is precisely this right that Texas's TikTok ban curtails.

All of this is to say that the costs that Texas's TikTok ban imposes on First Amendment interests are substantial and far-reaching, especially once one considers the ongoing and future effects of the ban on students, researchers inside and outside Texas, and the general public. *See NTEU*, 513 U.S. at 468 (assessing the "interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression"). TikTok is one of the most popular communications platforms in the world, and it has become especially popular with young Americans. Literat Decl. ¶ 15. Academic speech relating to TikTok—including speech relating to the operation of the platform, the problems associated with the platform, and proposed interventions to address those problems—is of immense public concern. It is speech that "lies at the heart of the First Amendment, which was 'fashioned to assure unfettered interchange of ideas for the bringing about political and social changes desired by the people.'" *Lane*, 573 U.S. at 235–36 (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)). As discussed below, Texas's asserted interests are not sufficient to justify the burden on First Amendment rights.

> ## 2. The burden the ban imposes on First Amendment rights is not "outweighed" by the harms that Texas has cited, and the ban does not alleviate the harms in "a direct and material way."
>
> ### a. Texas has not demonstrated that its ban will serve its interests "as an employer," or that the harms it seeks to address are "real, not merely conjectural."

A threshold problem with the interests that Texas has cited in defense of the TikTok ban is that these interests are not the kinds of interests that can justify restrictions on the First Amendment rights of *public employees*. As the Fifth Circuit has observed, "the *only* state interest acknowledged by *Pickering* and its progeny, which may outweigh a state employee's right to speak on matters of

public concern, is the State's interest, 'as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Hoover v. Morales*, 164 F.3d 221, 226 (5th Cir. 1998) (quoting *Pickering*, 391 U.S. at 568) (emphasis added). But Texas's principal defenses of the TikTok ban have nothing at all to do with the efficient delivery of government services. Indeed, the record shows that the ban undermines Texas's interests as an employer by making it significantly more time-consuming and difficult for faculty to fulfill their professional responsibilities. Compl. ¶¶ 46–59; Vickery Decl. ¶¶ 48–67.

Likewise, Texas has not satisfied its burden to show that the harms it seeks to address are "real, not merely conjectural." *NTEU*, 513 U.S. at 475. As the Court explained in *NTEU*, Texas "must do more than simply posit the existence of the disease sought to be cured." *Id.*; *see also Moore v. City of Kilgore, Tex.*, 877 F.2d 364, 375 (5th Cir. 1989); *Smith v. Acevedo*, A-09-CA-620-SS, 2010 WL 11512363, at *5 (W.D. Tex., Sept. 20, 2010). Here, Texas has barely even identified "the disease." Compl. ¶¶ 24–25; Schneier Decl. ¶¶ 18–25.

### b. Suppression of speech is generally not a constitutionally permissible means of countering the threat of disinformation.

A further defect in Texas's defense of the ban is that the suppression of speech is not a constitutionally permissible means of countering disinformation. As a general matter, the First Amendment forecloses the government from suppressing speech on the basis of its truth or falsity. *United States v. Alvarez*, 567 U.S. 709, 718–19 (2012) (plurality); *id.* at 730–31 (Breyer, J., concurring).[4] As the Supreme Court has long recognized, "the remedy for misleading speech is

---

[4] There are important exceptions to this rule, but none of them has any application here. *See generally* Eugene Volokh, *When Are Lies Constitutionally Protected?*, 22-10 Knight First Amend. Inst. (Oct. 19, 2022), https://perma.cc/4PWU-FWUT.

'more speech, not forced silence.'" *Serafine v. Branaman*, 810 F.3d 354, 361–62 (5th Cir. 2016) (quoting *Brown v. Hartlage*, 456 U.S. 45, 61 (1982)).

This principle holds even if Texas's concern is about foreign propaganda specifically, and not mis- or disinformation more generally. In *Lamont v. Postmaster General of United States*, the Supreme Court struck down a law that required individuals who wanted to receive "Communist political propaganda" to notify the Post Office in advance, holding that this obligation unconstitutionally burdened recipients' First Amendment right to receive information and ideas. 381 U.S. 301, 305 (1965). That case controls here. Indeed, the TikTok ban is in some respects more oppressive than the law the Court considered in *Lamont*. Whereas the law the Court addressed in *Lamont* imposed only an indirect burden on speech, the TikTok ban directly curtails it. And whereas the law addressed in *Lamont* burdened access to materials that were concededly foreign Communist propaganda, the TikTok ban restricts access to an entire communications platform and to an immense amount of content that could not possibly be described as foreign propaganda or even mis- or disinformation.

To say that Texas cannot address concerns about disinformation by closing off access to the platform is not, of course, to say that Texas's concerns about disinformation are baseless. There is no dispute that mis- and disinformation are common on TikTok, just as they are on other major social media platforms. Schneier Decl. ¶ 32. Foreign governments have used social media platforms to disseminate propaganda in the past, and they are likely to do so again, even if Texas has pointed to no substantial evidence that China intends to use TikTok for this purpose. *Id.* ¶ 33. Concerns about mis- and disinformation on social media platforms are legitimate ones, but the First Amendment requires that Texas address these concerns with means other than outright censorship.

14

c.      **The ban is ineffective in addressing concerns about Texans'
privacy.**

Texas has also sought to justify the ban by invoking a general interest in protecting its

citizens' privacy. As noted above, this interest is not a cognizable interest under *Pickering* and its

progeny. In any event, but the ban does not actually serve it.

For one thing, the fact that the ban protects only state employees means that the ban is

vastly underinclusive in relation to this interest—underinclusive in a way that "raises serious

doubts about whether the government is in fact pursuing the interest it invokes." *Brown v. Ent.

Merch, Ass'n*, 564 U.S. 786, 802 (2011); *see also Dep't of Texas, Veterans of Foreign Wars of

U.S. v. Texas Lottery Comm'n*, 760 F.3d 427, 440 (5th Cir. 2014). Indeed, the ban is underinclusive

even with respect to state employees, because it leaves undisturbed TikTok's ability to track public

employees' online activities when they are using personal devices (unless the devices are used to

access state accounts), or when they are using third-party apps or visiting websites that share data

with TikTok. Schneier Decl. ¶¶ 19–20.

More fundamentally, the ban is underinclusive because it restricts data collection only by

TikTok and a handful of other platforms linked to China. TikTok does collect a great deal of

information about its users—but many other platforms do as well. Schneier Decl. ¶ 18

("Government officials are right to be concerned about the ability of private companies—including

TikTok—to collect, aggregate, and use sensitive user data. But TikTok is not distinctive in its data-

collection practices."). Because Texas's ban focuses narrowly on TikTok, it is radically

underinclusive—and accordingly ineffective. *Id.*; *see also id.* ¶ 17 ("Texas's TikTok ban does not

effectively protect the data privacy of Texans because it does nothing to address the root of the

issue: the intrusive data collection practices themselves."); *id.* ¶ 21 (endorsing argument of former

general counsel to the National Security Agency that even a federal TikTok ban would "sidestep

a broader problem—our nation's overall failure to address concerns over the huge amount of personal data collected in our digital lives.").

Importantly, the ban is ineffective even if one assumes that data collection by TikTok is tantamount to collection by China, and that collection by China poses distinct and especially serious risks.[5] This is because the ban does nothing to restrict China's ability to *purchase* Americans' data—including data similar in character to that collected by TikTok—on the open market. *Id*. ¶ 24–25. As Professor Schneier explains:

> Data brokers typically have access to basic information like a person's demographic details and IP address history, but they often also have access to additional information that is more sensitive, including records of the person's specific locations, biometric identifiers, sleep patterns, browsing histories, political preferences, social networks, personal interests, and purchases.

*Id*. ¶ 26. All of this data is available for purchase. *Id*. ¶ 24. As a result, Texas's ban does essentially nothing to protect the privacy of Texans, or even of state employees. *Id*. ¶ 24. As Professor Schneier writes: "Even if the Chinese government did have access to TikTok's data, it would likely provide little, if any, additional value beyond what the Chinese government could acquire through commercially available data sold by data brokers." *Id*.; *see also Report to the Director of National Intelligence*, Office of the Dir. of Nat. Intel. Senior Advisory Grp., Panel on Commercially Avail. Info. (Jan. 27, 2022), at 7–14, 17 (explaining that commercially available information "can provide significant intelligence value" and is readily available to foreign adversaries (cited in Schneier Decl. ¶¶ 26, 28)).

---

[5] There is reason to doubt the first of these propositions, at least. *See* Schneier Decl. ¶ 23 ("[T]he suggestion that China has unfettered access to TikTok's data is at least questionable . . . . [T]he idea that providing any data to TikTok is synonymous with providing that data to the Chinese government is too simplistic.").

For all of these reasons, Texas's ban fails to address risks associated with data-collection in "a direct and material way." *NTEU*, 513 U.S. at 475. Indeed, in at least one respect, the ban is altogether counterproductive. This is because the ban's effect is to impede the ability of public university faculty to study the very risks that Texas has invoked to justify it. As explained above, much of what we know about the data-collection and disinformation risks associated with major social media platforms is the result of independent research. Zuckerman Decl. ¶¶ 9–22; Schneier Decl. ¶¶ 40–41. And more such research is needed to determine what kinds of interventions—by the platforms themselves, or by regulators—might effectively mitigate those risks. Schneier Decl. ¶ 42; *see also* Literat Decl. ¶ 25. Texas's ban deters or forecloses exactly this kind of research. As a result, the ban does not merely fail to serve Texas's asserted interests; it undermines them.

> **d.      Any legitimate government interests could be accommodated through less-restrictive means.**

A further—and independently fatal—problem with the TikTok ban is that it is not "reasonably necessary" to serve Texas's purported goals. *NTEU*, 513 U.S. at 474.

To the extent Texas's interests are legitimate, they can be accommodated without a broad prior restraint on academic expression. Concerns about disinformation could be mitigated or addressed with government "counterspeech," *see Alvarez*, 567 U.S. at 726–27; or by requiring platforms to disclose more data to the public or to researchers, *see, e.g.,* Platform Accountability and Transparency Act, S.B. 1876, 118th Cong. (2023) (requiring that platforms share certain categories of data with independent researchers, and establishing new legal protections for researchers and journalists). Concerns about data-collection could be addressed by regulating the platforms' data-collection practices. Schneier Decl. ¶ 17; *id.* ¶ 47; *cf. Hays Cnty. Guardian v. Supple*, 969 F.2d 111, 119 (5th Cir. 1992) (concluding that university anti-solicitation rules were not "reasonably well fitted" to the university's interests where narrower and more direct

interventions would have imposed a lesser burden on First Amendment rights). Indeed, Texas appears to have recognized the need for privacy regulation, having passed a state-level privacy law in June of this year. H.B. 4, 88th Leg. Sess. (2023).

Texas has not sought to justify the TikTok ban by reference to concerns about network or information security, but these concerns, too, could be addressed without a broad ban on studying and teaching with TikTok. For example, Texas could address concerns about network security by requiring faculty who use TikTok in their research or teaching to do so on dedicated state devices and separate networks, Schneier Decl. ¶ 49; *see also Securing Network Infrastructure Devices*, Cybersecurity & Infrastructure Security Agency Blog (last visited Jul. 19, 2023), https://perma.cc/8Q8R-PMRJ (recommending physical and virtual separation to protect sensitive information from attackers (cited in Schneier Decl. ¶ 49)). The State could also engage in additional auditing to understand and patch security vulnerabilities in its devices and networks. Schneier Decl. ¶ 50. And it could address concerns about information security by restricting the use of TikTok by state employees who have access to especially sensitive categories of information. *Id.* ¶ 48; *cf. Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 678 (1989) (finding that "apparent discrepancy" between employees covered by drug-testing program and those "likely to gain access to sensitive information" begged question whether government had defined the category of covered employees "more broadly than is necessary.").

In sum, Texas could address any legitimate state interests relating to disinformation, data-collection, and security with mechanisms that would impose a much less significant burden on First Amendment rights.

**II.      The other requirements for preliminary relief are also satisfied here.**

For reasons detailed above, the Coalition is substantially likely to succeed on the merits. The other requirements for preliminary relief are satisfied here as well.

The Coalition has established that it will suffer irreparable injury in the absence of preliminary relief, because the deprivation of First Amendment rights, even for short periods of time, constitutes irreparable injury. *See Opulent Life Church*, 697 F.3d at 295; *McDonald v. Longley*, 4 F.4th 229, 255 (5th Cir. 2021) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). Here, the Coalition has established that the TikTok ban has already curtailed its members' teaching and research activities, and that, absent preliminary relief, the ban will continue to curtail those activities in the future. Zuckerman Decl. ¶¶ 23–29 Vickery Decl. ¶¶ 48–67. This is more than sufficient. *See Amalgamated Transit Union Loc. 85 v. Port Auth.*, 39 F.4th 95, 108 (3d Cir. 2022) ("When a government employer's restrictions on employee speech tread on First Amendment interests, those restrictions work irreparable injury.").

The final two preliminary injunction factors—the balance of the equities and the public interest—also decisively favor the Coalition. As the Supreme Court and Fifth Circuit have observed, these two factors "merge when the Government is an opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see also Clarke v. Commodity Futures Trading Comm'n*, No. 22-51124, 2023 WL 4677542, at *10 (5th Cir. July 21, 2023). In a First Amendment case, moreover, these factors are easy to satisfy because "[i]njunctions protecting First Amendment freedoms are always in the public interest." *Opulent Life Church*, 697 F.3d at 298 (quoting *Christian Legal Soc'y v. Walker,* 453 F.3d 853, 859 (7th Cir. 2006)). Indeed, the State's inability to apply a regulation in a manner that violates a plaintiff's First Amendment rights "is really 'no harm at all.'" *See McDonald*, 4 F.4th at 255 (quoting *Christian Legal Soc'y,* 453 F.3d at 867)*; see also Pursuing*

*Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016); *Hartford Courant Co., LLC v. Carroll*, 986 F.3d 211, 224 (2d Cir. 2021). This is certainly true here, where the preliminary relief that the Coalition requests would leave Texas free to pursue its legitimate interests with means that are "better tailored." *Swartzwelder v. McNeilly*, 297 F.3d 228, 242 (3d. Cir. 2002). As discussed above, the State has many such means at its disposal. *See supra* I.B.2.d.

## III.    The Court should waive the security requirement.

If the Court grants preliminary relief, the Coalition respectfully asks that the Court also exercise its discretion to waive the security requirement set forth in Fed. R. Civ. P. 65(c). *See Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996). Waiver is appropriate because the Coalition is a non-profit organization with limited resources and has brought this public interest litigation to vindicate constitutional rights. *See City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. Unit B 1981); *Schultz v. Medina Valley Indep. Sch. Dist.*, No. SA-11-CA-422-FB, 2011 WL 13234770, at *2 (W.D. Tex. June 1, 2011) (waiving security requirement "[b]ecause this suit seeks to enforce fundamental constitutional norms"); *Booth v. Galveston Cty.*, No. 3:18-CV-00104, 2019 WL 4305457, at *2 (S.D. Tex. Sept. 11, 2019) (same).

## Conclusion

For the foregoing reasons, the Court should issue a preliminary injunction directing Defendants to exempt the Coalition's members from the TikTok ban unless and until Defendants provide them with a constitutionally adequate means of accessing TikTok for teaching and research purposes.[6]

---

[6] Pursuant to Local Rule CV-7(g), counsel for Plaintiff conferred with counsel for Defendants, who represented that Defendants oppose the motion for a preliminary injunction, including on the grounds that "(1) Plaintiff lacks standing; (2) Plaintiff's claims are barred by sovereign immunity; (3) Plaintiff has not pled a viable First Amendment claim; (4) the status quo is in favor of Defendants; and (5) there is no need for emergency relief here."

Dated: September 7, 2023

Respectfully submitted,

 /s/ *Peter B. Steffensen*

Peter B. Steffensen
Texas Bar No. 24106464
SMU Dedman School of Law First
  Amendment Clinic
P.O. Box 750116
Dallas, TX 75275
(214) 768-4077
psteffensen@smu.edu

 /s/ *Jameel Jaffer*

Jameel Jaffer (*Pro Hac Vice*)
Ramya Krishnan (*Pro Hac Vice*)
Xiangnong Wang (*Pro Hac Vice*)
Knight First Amendment Institute
  at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
jameel.jaffer@knightcolumbia.org

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of September, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Todd A. Dickerson

Office of the Attorney General of Texas

P.O. Box 12548-Capitol Station

Austin, TX 78701

Dated: September 7, 2023

/s/ *Jameel Jaffer*

Jameel Jaffer (*Pro Hac Vice*)
Knight First Amendment Institute
 at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
jameel.jaffer@knightcolumbia.org

*Counsel for Plaintiff*

22