# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| COALITION FOR INDEPENDENT TECHNOLOGY RESEARCH,<br>　　　*Plaintiff*, | §<br>§<br>§<br>§ | |
| v. | §<br>§ | No. 1:23-cv-00783 |
| GREG ABBOTT, in his official capacity as Governor of the State of Texas, STEVEN C. MCCRAW, in his official capacity as Director and Colonel of the Texas Department of Public Safety, AMANDA CRAWFORD, in her official capacity as Executive Director of the Texas Department of Information Resources and Chief Information Officer of Texas, DALE RICHARDSON, in his official capacity as Chief Operations Officer of the Texas Department of Information Resources, ASHOK MAGO, LAURA WRIGHT, LINDY RYDMAN, CARLOS MUNGUIA, MARY DENNY, MILTON B. LEE, MELISA DENIS, DANIEL FEEHAN, and JOHN SCOTT, JR., in their official capacities as members of the Board of Regents of the University of North Texas System, and MICHAEL WILLIAMS, in his official capacity as Chancellor of the University of North Texas System,<br>　　　*Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | |

---

## DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT

---

ANGELA COLMENERO
Provisional Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

KIMBERLY GDULA
Deputy Chief, General Litigation Division

RYAN KERCHER
Deputy Chief, General Litigation Division

TODD A. DICKERSON
Attorney-in-Charge

JAMES LLOYD
Interim Deputy Attorney General for Civil
Litigation

Assistant Attorney General
Texas Bar No. 24118368
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120 | FAX: (512) 320-0667
Todd.Dickerson@oag.texas.gov
**COUNSEL FOR DEFENDANTS**

# TABLE OF CONTENTS

Table of Contents .................................................................................................................iii

Table of Authorities.............................................................................................................iv

Introduction...........................................................................................................................1

Background.............................................................................................................................2

    I.    TikTok Is a Unique Threat to the United States' Security Interests.............................2

        A.    TikTok Has Deep Ties to the Chinese Government. ..........................................2

        B.    The CCP Has Tremendous Power Over Chinese-Based Companies, and It Can
            Wield that Power to Devastating Effect...........................................................2

        C.    The Chinese Government Codified its Power to Access TikTok's User Data and
            that of Other Private Companies........................................................................3

        D.    ByteDance Covertly Tracked U.S. Reporters Using TikTok, and TikTok May Be
            Using Malicious Software to Collect User Data. ...............................................4

    II.    Numerous States and Countries Restrict Access to TikTok......................................5

    III.  An Overview of Texas's Partial TikTok Ban. ...........................................................6

    IV.  An Overview of Coalition's Complaint. ...................................................................7

Standard of Review...............................................................................................................7

Rule 12(b)(1) Arguments ......................................................................................................8

    I.    An Overview of *Ex parte Young* and Article III Standing.......................................8

    II.    Coalition's Only Justiciable Claims are Those Against Chancellor Williams. ............9

    III.  Coalition's Claims Are Limited to UNT Due to Justiciability Issues. .....................10

Rule 12(b)(6) Arguments ....................................................................................................11

    I.    The Forum Analysis Applied Here, and an Overview of this Analysis. ..................11

    II.    UNT's IT Resources Are Nonpublic Forums. .....................................................12

        A.    UNT Heavily Regulates its IT Resources.......................................................13

        B.    The "Nature of the Government Property" Further Supports a Finding that
            UNT's IT Resources Are Nonpublic Forums. ...............................................14

    III.  The Partial TikTok Ban Is Reasonable in Light of the Forums' Purposes...............15

    IV.  Texas's Partial TikTok Ban Would Survive Even the More Rigorous Scrutiny Applied
           to Designated and Traditional Public Forums. ................................................18

Conclusion...........................................................................................................................20

## TABLE OF AUTHORITIES

### Cases

*Abdullah v. Paxton,*
    65 F.4th 204 (5th Cir. 2023) .................................................................................................9

*Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.,*
    851 F.3d 507 (5th Cir. 2017) ...............................................................................................9

*Anderson* v. *Valdez,*
    845 F.3d 580 (5th Cir. 2016) ...............................................................................................8

*Ark. Educ. Television Comm'n v. Forbes,*
    523 U.S. 666 (1998) ..................................................................................................... 13, 14

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ..............................................................................................................8

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.,*
    627 F.3d 547 (5th Cir. 2010) .............................................................................................10

*Benak ex rel. All. Premier Growth Fund v. All. Capital Mgmt. L.P.,*
    435 F.3d 396 (3d Cir. 2006) ................................................................................................8

*Block v. Tex. Bd. of Law Exam'rs,*
    952 F.3d 613 (5th Cir. 2020) ...............................................................................................7

*Chiu v. Plano Indep. Sch. Dist.,*
    260 F.3d 330 (5th Cir. 2001) ....................................................................................... 11, 15

*City of Austin v. Paxton,*
    943 F.3d 993 (5th Cir. 2019) ...............................................................................................9

*City of Los Angeles v. Alameda Books, Inc.,*
    535 U.S. 425 (2002) ............................................................................................................18

*Coleman v. Dretke,*
    409 F.3d 665 (5th Cir. 2005) .............................................................................................13

*Collins v. Morgan Stanley Dean Witter,*
    224 F.3d 496 (5th Cir. 2000) ...............................................................................................8

*Collins v. Putt,*
    No. 3:17-CV-01621(AVC), 2019 WL 8501541 (D. Conn. Mar. 28, 2019) .........................15

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,*
    473 U.S. 788 (1985) ....................................................................................... 12, 14, 15, 17

*Ctr. for Individual Freedom v. Carmouche,*
    449 F.3d 655 (5th Cir. 2006) .............................................................................................10

*Davis v. Fed. Election Comm'n,*
    554 U.S. 724 (2008) ..............................................................................................................9

*Davis v. Scherer,*
    468 U.S. 183 (1984) ............................................................................................................10

*Doe I v. Landry,*
909 F.3d 99 (5th Cir. 2018) ............................................................................................. 19

*Dorsey v. Portfolio Equities, Inc.,*
540 F.3d 333 (5th Cir. 2008) ............................................................................................. 8

*Fla. Bar v. Went For It, Inc.,*
515 U.S. 618 (1995) ......................................................................................................... 18

*Freedom From Religion Found. v. Abbott,*
955 F.3d 417 (5th Cir. 2020) ........................................................................................... 12

*Freedom From Religion Found., Inc. v. Mack,*
4 F.4th 306 (5th Cir. 2021) ................................................................................................ 8

*Gibson v. Collier,*
920 F.3d 212 (5th Cir. 2019) ........................................................................................... 18

*Globe Newspaper Co. v. Superior Court for Norfolk Cnty.,*
457 U.S. 596 (1982) ......................................................................................................... 11

*Haverkamp v. Linthicum,*
6 F.4th 662 (5th Cir. 2021) ............................................................................................. 10

*Hous. Chron. Pub. Co. v. City of League City,*
488 F.3d 613 (5th Cir. 2007) ........................................................................................... 18

*In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.,*
928 F.3d 42 (D.C. Cir. 2019) ........................................................................................... 16

*Int'l Soc. for Krishna Consciousness, Inc. v. Lee,*
505 U.S. 672 (1992) ......................................................................................................... 11

*Kitty Hawk Aircargo, Inc. v. Chao,*
418 F.3d 453 (5th Cir. 2005) ...................................................................................... 8, 13

*Lewis v. Scott,*
28 F.4th 659 (5th Cir. 2022) .............................................................................................. 8

*Loving v. Boren,*
956 F. Supp. 953 (W.D. Okla. 1997) .............................................................................. 15

*MDPhysicians & Assoc., Inc. v. State Bd. of Ins.,*
957 F.2d 178 (5th Cir. 1992) .............................................................................................. 7

*Mi Familia Vota v. Abbott,*
977 F.3d 461 (5th Cir. 2020) ........................................................................................... 10

*Minn. Voters All. v. Mansky,*
138 S. Ct. 1876 (2018) ........................................................................................ 11, 12, 13

*Moore v. Bryant,*
853 F.3d 245 (5th Cir. 2017) .............................................................................................. 7

*Morris v. Livingston,*
739 F.3d 740 (5th Cir. 2014) .............................................................................................. 8

*NAACP v. City of Philadelphia,*
   834 F.3d 435 (3d Cir. 2016) ................................................................12

*NAACP. v. City of Kyle,*
   626 F.3d 233 (5th Cir. 2010) ..............................................................10

*NetChoice, LLC v. Paxton,*
   49 F.4th 439 (5th Cir. 2022) ..............................................................15

*Nickolas v. Fletcher,*
   No. 3:06 CV 00043 KKC, 2007 WL 1035012 (E.D. Ky. Mar. 30, 2007) .............15

*O'Toole v. Northrop Grumman Corp.,*
   499 F.3d 1218 (10th Cir. 2007) ..........................................................13

*OCA-Greater Houston v. Texas,*
   867 F.3d 604 (5th Cir. 2017) ..............................................................10

*Packsys, S.A. de C.V. v. Exportadora de Sal, S.A. de C.V.,*
   899 F.3d 1081 (9th Cir. 2018) ..............................................................8

*Peavy v. WFAA-TV, Inc.,*
   221 F.3d 158 (5th Cir. 2000) ..............................................................18

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n,*
   460 U.S. 37 (1983) ..............................................................15, 17, 18

*Pichelmann v. Madsen,*
   31 Fed. Appx. 322 (7th Cir. 2002) ......................................................15

*Rhines v. Salinas Const. Techs., Ltd.,*
   No. CIV.A. C-11-262, 2011 WL 4688706 (S.D. Tex. Oct. 3, 2011) ................8

*The Estate of Lockett by & through Lockett v. Fallin,*
   841 F.3d 1098 (10th Cir. 2016) ............................................................8

*U.S. WeChat Users All. v. Trump,*
   488 F. Supp. 3d 912 (N.D. Cal. 2020) ..................................................19

*United States v. Am. Libr. Ass'n, Inc.,*
   539 U.S. 194 (2003) ..............................................................13, 15, 16

*United States v. Green,*
   293 F.3d 855 (5th Cir. 2002) ..............................................................18

*Ward v. Rock Against Racism,*
   491 U.S. 781 (1989) ..........................................................................19

*Witzke v. Bouchard,*
   No. 22-13070, 2023 WL 3919303 (E.D. Mich. June 9, 2023) ....................15

**<u>Statutes</u>**

Tex. Gov't Code §§ 620.001-.006 ............................................................6

Tex. Gov't Code § 620.001(1) ................................................................6

Tex. Gov't Code § 620.003(a) ............................................................6, 7

## Other Authorities

Alex Hern, *Canada Bans TikTok on Government Devices over Security Risks*, GUARDIAN (Feb. 28, 2023)...5

*Anatomy of a Typical Cyberattack*, CLOUD COMPUTING LEGAL DESKBOOK § 4:3....................................19

Andrew Adams, *Updated: Where is TikTok Banned? Tracking State by State*, GOV'T TECH. ........................5

*Atlanta U.S. Attorney Charges Iranian Nationals for City of Atlanta Ransomware Attack*, DOJ (Dec. 5, 2018)....................................................................................................................................17

*Belgium Bans TikTok from Government Phones After US, EU*, APNEWS (Mar. 10, 2023) ............................5

Cecilia Kang, *ByteDance Inquiry Finds Employees Obtained User Data of 2 Journalists*, N.Y. TIMES (Dec. 22, 2022) .........................................................................................................................................4

Charlie Campbell, *Where is Alibaba Founder Jack Ma? What the Saga of One of the World's Richest Men Reveals About China Under Xi Jinping*, TIME (Jan. 4, 2021) .........................................................3

*China Criticizes Possible US Plan to Force TikTok Sale*, APNEWS (Mar. 23, 2023) ...................................5

*City of Dallas Invests $4M in Cybersecurity After Ransomware Attack*, FOX 4 KDFW (June 29, 2023)........17

Danielle Drora Greenstein, *A Landlord's Obligation to Protect the Sensitive Information of Potential and Current Lessees' from Identity Theft*, 28 U. FLA. J.L. & PUB. POL'Y 519, 523 (2017)................................4

Emily Baker-White, *A China-Based ByteDance Team Investigated TikTok's Global Security Chief, Who Oversaw U.S. Data Concerns*, FORBES (Oct. 25, 2022) ...............................................................................4

Emily Baker-White, *Exclusive: TikTok Spied on Forbes Journalists*, FORBES (Dec. 22, 2022) ................ 2, 4

Emily Baker-White, *LinkedIn Profiles Indicate 300 Current TikTok and ByteDance Employees Used to Work for Chinese State Media—and Some Still Do*, FORBES (Aug. 11, 2022)..........................................4

Emily Baker-White, *TikTok is Bleeding U.S. Execs Because China is Still Calling the Shots, Ex-Employees Say*, FORBES (Sept. 21, 2022)....................................................................................................................4

Emily Stewart, *Hackers have been Holding the City of Baltimore's Computers Hostage for 2 Weeks*, VOX (May 21, 2019) ......................................................................................................................................17

Executive Order 13942, 85 FR 48637 (Aug. 6, 2020) ...........................................................................5

*Feb. 27, 2023 Memorandum for the Heads of Executive Departments and Agencies*, OFF. MGMT. & BUDGET ................................................................................................................................................5

*Former Exec at TikTok's Parent Company Says Communist Party Members had a 'God Credential' that let them Access Americans' Data*, BUS. INSIDER (June 7, 2023) ..................................................................2

Glenn Thrush and Sapna Maheshwari, *Justice Dept. Investigating TikTok's Owner Over Possible Spying on Journalists*, N.Y. TIMES (Mar. 17, 2023) ..........................................................................................4

*High-Impact Ransomware Attacks Threaten U.S. Businesses and Organizations*, FBI (Oct. 2, 2019)..............16

*Jack Ma Isn't Back*, WIRED (June 15, 2023)..........................................................................................3

Jeanne Whalen, *Chinese Government Acquires Stake in Domestic Unit of TikTok Owner ByteDance in Another Sign of Tech Crackdown*, WASH. POST (Aug. 17, 2021) ...............................................................3

Julie Jargon, *TikTok Brain Explained: Why Some Kids Seem Hooked on Social Video Feeds*, WALL ST. J. (Apr. 2, 2022) .........................................................................................................................................6

Julie Jargon, *TikTok Feeds Teens a Diet of Darkness*, WALL ST. J. (May 13, 2023) .......................................6

Kate McGee, *Stephen F. Austin State University Students Grow Anxious About Falling Behind as School Reels from Cyberattack Last Week*, TEX. TRIB. (June 21, 2023) ......................................................17

Kelvin Chan, *Here are the Countries that have Bans on TikTok*, APNEWS (Apr. 4, 2023) ..........................5

Laura He, *China Still Wants to Control Big Tech, It's Just Pulling Different Strings*, CNN (Jan. 27, 2023)......3

Lingling Wei, *China's New Way to Control Its Biggest Companies: Golden Shares*, WALL ST. J. (Mar. 8, 2023)........................................................................................................................................2

*Malicious Technology*, BLACK'S LAW DICTIONARY (11th ed. 2019) ..............................................................20

Manny Fernandez et al., *Ransomware Attack Hits 22 Texas Towns, Authorities Say*, N.Y. TIMES (Aug. 20, 2019) ..................................................................................................................................17

Mark Sweney, *Alibaba Founder Jack Ma Hiding Out in Tokyo, Reports Say*, GUARDIAN (Nov. 29, 2022)........................................................................................................................................3

Mark Sweney, *China to Take 'Golden Shares' in Tech Firms Alibaba and Tencent*, GUARDIAN (Jan. 13, 2023)........................................................................................................................................3

*Methods and Tools for Cyberattacks*, 1 DATA SEC. & PRIVACY LAW § 1:35 (2022–23) ................................20

*Methods and Tools for Cyberattacks—Worms*, 1 DATA SEC. & PRIVACY LAW § 1:48 (2022–23).................20

Michelle Toh, *Jack Ma Loses More than Half of His Wealth After Criticizing Chinese Regulators*, CNN (July 12, 2023) .........................................................................................................................3

Mike Corder, *Dutch Gov't Staff Discouraged from Apps such as TikTok*, APNEWS (Mar. 21, 2023) .............5

*Minister Jarvan: TikTok to be Banned on State Officials' Work Phones*, ERR (Mar. 29, 2023) .........................5

*National Security Agency and Department of Homeland Security Name UNT a Center for Academic Excellence in Cyber Defense Research*, UNT (Mar. 19, 2015) ......................................................16

Nicholas Ronaldson, *Hacking: The Naked Age Cybercrime, Clapper & Standing, and the Debate Between State and Federal Data Breach Notification Laws*, 16 NW. J. TECH. & INTELL. PROP. 305 (2019)..........19

Paul Mozur et al., *TikTok Browser Can Track Users' Keystrokes, According to New Research*, N.Y. TIMES (Aug. 19, 2022)........................................................................................................... 4, 5

*Phishing*, FTC ........................................................................................................................................20

*Privacy Policy*, TIKTOK (last updated May 22, 2023)....................................................................................4

*Ransomware Attack will Cost Baltimore City $18M, Councilmember Says*, CBS NEWS (May 30, 2019) .........17

Salvador Rodriguez, *TikTok Insiders Say Social Media Company is Tightly Controlled by Chinese Parent ByteDance*, CNBC (June 25, 2021)...............................................................................................2

Sapna Maheshwari and Amanda Holpuch, *Why Countries are Trying to Ban TikTok*, N.Y. TIMES (Aug. 16, 2023)........................................................................................................................5

Sapna Maheshwari et al., *Bans on TikTok Gain Momentum in Washington and States*, N.Y. TIMES (Dec. 20, 2022)................................................................................................................... 2, 5

Sapna Maheshwari, *Montana Governor Signs Total Ban of TikTok in the State*, N.Y. TIMES (May 17, 2023)........................................................................................................................................11

*Spear Phishers: Angling to Steal Your Financial Info*, FBI (Apr. 1, 2009) .........................................................20

*Spying with Technology*, 2020 TXCLE-AFL 34-III, 2020 WL 5608154 ......................................................4

Tasha Tsiaperas, *Dallas City Sites Still Down After Cyberattack*, AXIOS (May 16, 2023)...........................17

*The TikTok Wars—Why the US and China are Feuding Over the App*, GUARDIAN (Mar. 16, 2023)............3

*TikTok Banned on U.S. Government Devices, and the U.S. is Not Alone. Here's Where the App is Restricted*, CBSNEWS (Mar. 1, 2023) ............................................................................................................5

*TikTok: Why do Countries Think Chinese Tech Firms are a Security Risk?*, BBC (Mar. 24, 2023)..................4

UNT Board of Board of Regents Rule § 2.202 ...........................................................................................10

UNT Board of Regents Rule § 4.202.........................................................................................................10

*US Justice Department Announces Indictment Against REvil Ransomware Suspect Behind 2019 Ransomware Attack on Texas Municipalities*, TEX. DIR (Nov. 8, 2021) .....................................................17

*Which Countries have Banned TikTok and Why?*, EURONEWS (Apr. 4, 2023) ...........................................5

**Rules**

Fed. R. Civ. P. 12(b)(1)............................................................................................................... 7, 8

Fed. R. Civ. P. 12(b)(6).......................................................................................................... iii, 8, 11

**Regulations**

Tex. Admin. Code § 202.20(a) .........................................................................................................7

Tex. Admin. Code § 202.70(a) ...................................................................................................... 7, 9

## INTRODUCTION

*Question:* What do the United States, Australia, Belgium, Britain, Canada, Denmark, Estonia the European Union, India, Latvia, Netherlands, New Zealand, Norway, and Taiwan have in common? *Answer:* They all recently banned access to TikTok on government devices due to national-security concerns. Within the United States, the list of governments restricting TikTok includes both the Trump and Biden Administrations and 36 states, including Texas.

The Coalition for Independent Technology Research sued Texas over its partial TikTok ban on First Amendment grounds. Yet Coalition ignores the fact that many of the best intelligence agencies in the world have classified TikTok as a security threat, largely due to the company's deep ties to the Chinese government. And Texas's ban is practically indistinguishable from those imposed by other states and foreign governments.

Coalition has failed to plead a plausible First Amendment claim. Texas's partial ban reaches only nonpublic forums (state-owned devices and networks), so it need only be "reasonable" to be constitutional. Texas's ban easily meets this light standard as it: (1) tracks the restrictions imposed by other states and countries; (2) plugs a vulnerability to state agencies' systems and networks; (3) focuses on a company with troubling ties to a foreign adversary; and (4) leaves open ample methods for communication.

Coalition also has justiciability problems. Due to the nature of Texas's ban and the limited scope of Coalition's claims, the only Defendant here with an enforcement connection to the ban is University of North Texas ("UNT") System's Chancellor, Michael Williams. Coalition's claims against the other Defendants fail on sovereign immunity grounds as they do not have the particular duty to enforce the ban in question.

Further, Coalition challenges the partial ban as it applies to all Texas public universities. Yet Coalition does not have standing to challenge other Texas universities' implementations of this ban,

mainly because it did not (1) allege that it has members at any universities other than UNT or (2) sue any officials from universities other than UNT. For these and other reasons discussed below, this Court should grant Defendants' motion and dismiss Coalition's complaint in its entirety.

**BACKGROUND**

**I.      TikTok Is a Unique Threat to the United States' Security Interests.**

**A.      TikTok Has Deep Ties to the Chinese Government.**

It is no secret that the Chinese Communist Party ("CCP") looms large over *any* Chinese-based company. And it has exploited its authority over Chinese tech companies in the past.[1] Here. the CCP has the capacity to exert state power over TikTok through its corporate structure. TikTok is owned by ByteDance, a Chinese-based company.[2] ByteDance's executives are "heavily involved in TikTok's decision-making," so much so that the two companies' boundaries are "almost non-existent."[3] ByteDance, in turn, has deep ties to the Chinese government. For instance, one former ByteDance executive reported that the CCP has a "superuser credential" at ByteDance, giving it access to "all data collected by ByteDance including those of U.S. users."[4] And Forbes found that 300 ByteDance employees "previously worked for Chinese state media publications."[5]

**B.      The CCP Has Tremendous Power Over Chinese-Based Companies, and It Can Wield that Power to Devastating Effect.**

The "Douyin" and "Jack Ma" incidents highlight the CCP's broad power over Chinese companies. In 2021, the Chinese government took a 1% stake in Douyin, which is China's version of

---

[1] Lingling Wei, *China's New Way to Control Its Biggest Companies: Golden Shares*, WALL ST. J. (Mar. 8, 2023), https://tinyurl.com/587yf2e8.

[2] Sapna Maheshwari et al., *Bans on TikTok Gain Momentum in Washington and States*, N.Y. TIMES (Dec. 20, 2022), http://tinyurl.com/2nyv8nxt.

[3] Salvador Rodriguez, *TikTok Insiders Say Social Media Company is Tightly Controlled by Chinese Parent ByteDance*, CNBC (June 25, 2021), http://tinyurl.com/53rcytbf.

[4] *Former Exec at TikTok's Parent Company Says Communist Party Members had a 'God Credential' that let them Access Americans' Data*, BUS. INSIDER (June 7, 2023), http://tinyurl.com/3pywsfbb.

[5] Emily Baker-White, *Exclusive: TikTok Spied on Forbes Journalists*, FORBES (Dec. 22, 2022), http://tinyurl.com/y426c6p8.

2

TikTok run by another ByteDance subsidiary.[6] This is known as a "golden share," a nominal interest that "allow[s] government officials to be directly involved in [the business]."[7] Through this 1% interest, the Chinese government controlled *one-third* of the subsidiary's board seats, meaning the CCP could exert influence well beyond its small equity stake.[8]

The Chinese government can devastate even its richest private citizens. Take Jack Ma, the founder of the wildly successful tech company Alibaba. Ma lightly criticized Chinese regulations during a speech in October 2021.[9] He was "summoned by Chinese authorities for questioning" a week later.[10] The day after that, the Chinese government nixed a record-breaking IPO for one of Ma's companies, despite approving it earlier.[11] Ma disappeared from public life for years after this incident, and his fortune has since been cut in half.[12] Following two years of "hefty fines and sanctions," the CCP took its "golden share" of Alibaba.[13] Ma ceded control of the company soon after.[14]

### C. The Chinese Government Codified its Power to Access TikTok's User Data and that of Other Private Companies.

In 2017, the CCP implemented a law that "requires companies to give the government any personal data relevant to the country's national security."[15] As FBI Director Christopher Wray explained, this law forces Chinese companies "to do whatever the government wants them to do in

---

[6] Jeanne Whalen, *Chinese Government Acquires Stake in Domestic Unit of TikTok Owner ByteDance in Another Sign of Tech Crackdown*, WASH. POST (Aug. 17, 2021), http://tinyurl.com/yf233pbw.
[7] Laura He, *China Still Wants to Control Big Tech, It's Just Pulling Different Strings*, CNN (Jan. 27, 2023), http://tinyurl.com/3ab2r23n.
[8] Whalen, *supra* note 6.
[9] Charlie Campbell, *Where is Alibaba Founder Jack Ma? What the Saga of One of the World's Richest Men Reveals About China Under Xi Jinping*, TIME (Jan. 4, 2021), http://tinyurl.com/4jv7cjz3.
[10] *Id.*
[11] *Id.*
[12] Michelle Toh, *Jack Ma Loses More than Half of His Wealth After Criticizing Chinese Regulators*, CNN (July 12, 2023), http://tinyurl.com/2p4zjcb7; *Jack Ma Isn't Back*, WIRED (June 15, 2023), http://tinyurl.com/2p9w7txk; Mark Sweney, *Alibaba Founder Jack Ma Hiding Out in Tokyo, Reports Say*, GUARDIAN (Nov. 29, 2022), http://tinyurl.com/5cbccw3r.
[13] Mark Sweney, *China to Take 'Golden Shares' in Tech Firms Alibaba and Tencent*, GUARDIAN (Jan. 13, 2023), http://tinyurl.com/58zx37su.
[14] *Id.*
[15] *The TikTok Wars—Why the US and China are Feuding Over the App*, GUARDIAN (Mar. 16, 2023), http://tinyurl.com/2a8kejuz.

terms of showing them information or serving as a tool for the Chinese government."[16]

This means the extensive data TikTok collects on its users is at the CCP's fingertips. This includes: (1) messages you send on TikTok; (2) your credit card information; (3) your phone and social network contacts; (4) what videos you watch; (5) your search history; (6) your "keystroke patterns or rhythms"; and (7) your location.[17]

### D. ByteDance Covertly Tracked U.S. Reporters Using TikTok, and TikTok May Be Using Malicious Software to Collect User Data.

In late 2022, Forbes published a series of articles exposing TikTok's ties to the CCP.[18] ByteDance responded by secretly tracking Forbes journalists' user data from TikTok to unearth the source of the leaks.[19] ByteDance later admitted "that its employees had inappropriately obtained the data" of the American users in question.[20] Nothing stops the Chinese government from doing the same tracking, and perhaps even more, by exploiting its access to TikTok's user data.

In fact, recent media reports indicate that "[t]he web browser used within the TikTok app can track every keystroke made by its users."[21] This practice, also known as "keylogging," is often used by hackers to "intercept a victim's usernames, passwords, and other sensitive information."[22] Per the New York Times, it is "not common" for a major commercial application to contain this invasive

---

[16] *TikTok: Why do Countries Think Chinese Tech Firms are a Security Risk?*, BBC (Mar. 24, 2023), http://tinyurl.com/crreue7w.
[17] *Privacy Policy*, TikTok (last updated May 22, 2023), http://tinyurl.com/27rbp89v.
[18] *See* Emily Baker-White, *A China-Based ByteDance Team Investigated TikTok's Global Security Chief, Who Oversaw U.S. Data Concerns*, FORBES (Oct. 25, 2022), http://tinyurl.com/5n7ty5vp; Emily Baker-White, *TikTok is Bleeding U.S. Execs Because China is Still Calling the Shots, Ex-Employees Say*, FORBES (Sept. 21, 2022), http://tinyurl.com/eyj5azef; Emily Baker-White, *LinkedIn Profiles Indicate 300 Current TikTok and ByteDance Employees Used to Work for Chinese State Media—and Some Still Do*, FORBES (Aug. 11, 2022), http://tinyurl.com/5c6tnump.
[19] *Exclusive: TikTok Spied on Forbes Journalists*, *supra* note 5; Cecilia Kang, *ByteDance Inquiry Finds Employees Obtained User Data of 2 Journalists*, N.Y. TIMES (Dec. 22, 2022), http://tinyurl.com/r3bk3btw.
[20] Glenn Thrush and Sapna Maheshwari, *Justice Dept. Investigating TikTok's Owner Over Possible Spying on Journalists*, N.Y. TIMES (Mar. 17, 2023), http://tinyurl.com/3wa3rayn.
[21] *See, e.g.*, Paul Mozur et al., *TikTok Browser Can Track Users' Keystrokes, According to New Research*, N.Y. TIMES (Aug. 19, 2022), http://tinyurl.com/2bfyv7rh.
[22] Danielle Drora Greenstein, *A Landlord's Obligation to Protect the Sensitive Information of Potential and Current Lessees' from Identity Theft*, 28 U. FLA. J.L. & PUB. POL'Y 519, 523 (2017); *Spying with Technology*, 2020 TXCLE-AFL 34-III, 2020 WL 5608154 ("Keystroke logger spyware is a malicious program used by hackers. This program is designed to steal personal information by logging the actual keystrokes you type on your computer. When you enter a PIN, password, or credit card number the keyword logger records it for the hacker.").

function.[23]

Let that sink in. It's possible that, through the Trojan horse of an addictive social media platform, the CCP has effectively tricked over 100 million Americans into downloading malicious hacking software that can be used to invade their most intimate secrets and ruin their lives. Even a remote chance of this being true would surely send foreign governments scrambling to limit access to TikTok. And it turns out, that is *exactly* what has happened recently.

## II.     Numerous States and Countries Restrict Access to TikTok.

Both the Biden and Trump Administrations banned TikTok on government devices due to national-security concerns.[24] And 36 states in this country have similarly restricted TikTok.[25] As Representative Raja Krishnamoorthi explained, there is "widespread concern [about TikTok] at this point—it's not just Republicans, it's not just Democrats."[26]

Looking beyond our nation's borders, each of the "five eyes" intelligence-sharing partners— U.S., Canada, Britain, New Zealand, and Australia—banned TikTok on governmental devices within weeks of each other.[27] So too did Belgium,[28] Denmark,[29] Estonia,[30] the European Union,[31] India,[32] Latvia,[33] Netherlands,[34] Norway,[35] and Taiwan.[36]

---

[23] Paul Mozur et al., *supra* note 21.

[24] Executive Order 13942, 85 FR 48637 (Aug. 6, 2020); *Feb. 27, 2023 Memorandum for the Heads of Executive Departments and Agencies*, OFF. MGMT. & BUDGET, *available at* http://tinyurl.com/4mw7s48e.

[25] Andrew Adams, *Updated: Where is TikTok Banned? Tracking State by State*, GOV'T TECH. (last updated Apr. 6, 2023), https://tinyurl.com/bdfu46tf.

[26] *Bans on TikTok Gain Momentum in Washington and States*, *supra* note 2.

[27] *Which Countries have Banned TikTok and Why?*, EURONEWS (Apr. 4, 2023), http://tinyurl.com/2fwa732h.

[28] *Belgium Bans TikTok from Government Phones After US, EU*, APNEWS (Mar. 10, 2023), http://tinyurl.com/mrxr832k.

[29] *Id.*

[30] *Minister Jarvan: TikTok to be Banned on State Officials' Work Phones*, ERR (Mar. 29, 2023), http://tinyurl.com/yc2ucfnj.

[31] Alex Hern, *Canada Bans TikTok on Government Devices over Security Risks*, GUARDIAN (Feb. 28, 2023), http://tinyurl.com/r35kp6fn.

[32] Sapna Maheshwari and Amanda Holpuch, *Why Countries are Trying to Ban TikTok*, N.Y. TIMES (Aug. 16, 2023), http://tinyurl.com/3uad5h58.

[33] Kelvin Chan, *Here are the Countries that have Bans on TikTok*, APNEWS (Apr. 4, 2023), http://tinyurl.com/5hybrh3w.

[34] Mike Corder, *Dutch Gov't Staff Discouraged from Apps such as TikTok*, APNEWS (Mar. 21, 2023), http://tinyurl.com/ms65d4k2.

[35] *China Criticizes Possible US Plan to Force TikTok Sale*, APNEWS (Mar. 23, 2023), http://tinyurl.com/yc8knfdv.

[36] *TikTok Banned on U.S. Government Devices, and the U.S. is Not Alone. Here's Where the App is Restricted*, CBSNEWS (Mar. 1, 2023), http://tinyurl.com/3c3jux3j.

Texas is not jumping at its shadow. TikTok is a worldwide danger for reasons well beyond it being an addictive social media application.[37] It is alarming that the countries noted above—backed by some of the finest intelligence agencies on the planet—all agree on this point.

## III.   An Overview of Texas's Partial TikTok Ban.

In December 2022, Governor Abbott banned the use of TikTok on state-issued devices.[38] In this Directive, he explained that news media reports had exposed TikTok's close ties to the CCP and revealed that this application was a threat to Texas's "sensitive information and critical infrastructure."[39] Governor Abbott also instructed the Department of Information Resources ("DIR") and the Department of Public Safety ("DPS") "to develop a model plan that other state agencies can deploy" covering whether the ban should extend to personal devices.[40]

DIR and DPS issued the Model Plan in January 2023.[41] The plan proposed that the TikTok ban should be extended to personal devices used "to conduct state business."[42] The plan defined "state business" to "include[] accessing any state-owned data, applications, email accounts, or non-public facing communications."[43]

The Texas Legislature recently passed SB 1893, which codified most of the Directive.[44] Under SB 1893, government entities must adopt a policy "prohibiting the installation or use of [TikTok] on any device owned or leased by the governmental entity and requiring the removal of covered applications from these devices."[45] Taken together, state employees are barred from accessing TikTok

---

[37] *See, e.g.*, Julie Jargon, *TikTok Feeds Teens a Diet of Darkness*, WALL ST. J. (May 13, 2023), https://tinyurl.com/ee3wmcuz; Julie Jargon, *TikTok Brain Explained: Why Some Kids Seem Hooked on Social Video Feeds*, WALL ST. J. (Apr. 2, 2022), https://tinyurl.com/2w52cr2w.
[38] ECF 1-2, 2.
[39] *Id.*
[40] *Id.* at 3.
[41] ECF 1-3.
[42] *Id.* at 6.
[43] *Id.*
[44] Tex. Gov't Code §§ 620.001 *et seq.*
[45] *Id.* at § 620.003(a); *see also id.* at § 620.001(1).

on (1) state-issued devices and (2) personal devices used to connect to state networks. The Directive, Model Plan, and SB 1893 contemplate that state agencies are responsible for banning TikTok at their respective agencies.[46] This tracks Tex. Admin. Code § 202.20(a), which states: "The agency head of each state agency is ultimately responsible for the agency's information resources." Tex. Admin. Code § 202.70(a) similarly provides: "The agency head of each state institution of higher education is ultimately responsible for the security of state information resources."

## IV.    An Overview of Coalition's Complaint.

Coalition claims that Texas's partial TikTok ban violates the First Amendment as applied to public-university faculty.[47] Coalition alleges that one of its members, UNT professor Jacqueline Vickery, wants to conduct research and teach about TikTok.[48] Yet it did not dispute that Vickery could access TikTok on her personal device, so long as that device was not used to connect to UNT's network. Nor did Coalition distinguish Texas's partial TikTok ban from those adopted by many other states and countries.

## STANDARD OF REVIEW

The standing and sovereign immunity issues go to the court's jurisdiction over the dispute and thus are subject to a Fed. R. Civ. P. 12(b)(1) motion to dismiss.[49] On such a motion, the "trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case."[50]

---

[46] *See* ECF 1-2, 3 (stating that the TikTok ban on state-issued devices "must be strictly enforced by your agency IT department" and that the agency head has nondelegable authority to grant exceptions to this ban); ECF 1-3, 4 ("Each agency is responsible for the implementation of the plan as outlined in this document, including any changes to meet specific agency needs."); *id.* at 8 ("It is the responsibility of each agency to implement the removal and prohibition of any offending technology."); *id.* at 9 ("Each agency is required to develop its own security policy to support the implementation of this plan."); Tex. Gov't Code § 620.003(a)("[A] governmental entity shall adopt a policy prohibiting the installation or use of a covered application on any device owned or leased by the governmental entity and requiring the removal of covered applications from these devices.").

[47] ECF 1, pg. 23 (Prayer for Relief).

[48] *See id.* at ¶¶ 46–47.

[49] *See, e.g., Block v. Tex. Bd. of Law Exam'rs*, 952 F.3d 613, 616–17 (5th Cir. 2020); *Moore v. Bryant*, 853 F.3d 245, 248–49 (5th Cir. 2017).

[50] *MDPhysicians & Assoc., Inc. v. State Bd. of Ins.*, 957 F.2d 178, 181 (5th Cir. 1992) (quotations omitted).

The remaining issues are analyzed under Fed. R. Civ. P. 12(b)(6).[51] Such a motion turns on whether the plaintiff pled a "plausible" claim for relief.[52] On a Rule 12(b)(6) motion, the court can rely on: (1) the complaint; (2) the complaint's attachments; (3) a defendant's attachments that were referenced in the complaint and central to the plaintiff's claim; and (4) judicially-noticeable matters.[53] "Government websites are presumptively reliable and subject to judicial notice."[54] A court may also "take judicial notice of newspaper articles for the fact of their publication without transforming the motion into one for summary judgment."[55]

### RULE 12(b)(1) ARGUMENTS

The key points here are: (1) Coalition asserted justiciable claims only against Chancellor Williams; (2) the remaining Defendants are entitled to sovereign immunity as they are not the "enforcement officers" for the laws and policies in question; and (3) Coalition's claims are limited to UNT as it lacks standing to sue any other Texas universities.

## I.    An Overview of *Ex parte Young* and Article III Standing.

State entities and officials are generally entitled to sovereign immunity unless an exception applies.[56] Coalition relies on the *Ex parte Young* exception here. This exception requires the defendant being sued to have "a sufficiently close connection to the unlawful conduct."[57] This means that the state official must have "the particular duty to enforce" the statute or policy in question and a "demonstrated willingness to exercise that duty."[58]

---

[51] *Anderson* v. *Valdez*, 845 F.3d 580, 589 (5th Cir. 2016).

[52] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[53] *See, e.g.*, *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008); *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000).

[54] *Rhines v. Salinas Const. Techs., Ltd.*, No. CIV.A. C-11-262, 2011 WL 4688706, at *2 n.2 (S.D. Tex. Oct. 3, 2011) (citing *Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 457 (5th Cir. 2005)).

[55] *Benak ex rel. All. Premier Growth Fund v. All. Capital Mgmt. L.P.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006); *Packsys, S.A. de C.V. v. Exportadora de Sal, S.A. de C.V.*, 899 F.3d 1081, 1087 n.2 (9th Cir. 2018); *The Estate of Lockett by & through Lockett v. Fallin*, 841 F.3d 1098, 1111 (10th Cir. 2016).

[56] *Lewis v. Scott*, 28 F.4th 659, 663 (5th Cir. 2022).

[57] *Freedom From Religion Found., Inc. v. Mack*, 4 F.4th 306, 311–12 (5th Cir. 2021).

[58] *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014) (quotations omitted).

For Article III standing, the plaintiff must show that it suffered: (1) an injury in fact; (2) that is fairly traceable to the defendants' actions; (3) that is likely to be redressed by a favorable outcome.[59] "[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought."[60] The standing and *Ex parte Young* analyses "significant[ly] overlap."[61]

## II.     Coalition's Only Justiciable Claims are Those Against Chancellor Williams.

The justiciability issues here are best understood through *Ex parte Young's* "enforcement" requirement, although the same general arguments apply to Article III's traceability prong.

Chancellor Williams is a proper enforcement officer. The Directive, Model Plan, SB 1893, and Tex. Admin. Code § 202.70(a) all contemplate that each agency, or the "agency head," is responsible for enforcing the partial TikTok ban at their respective agencies.[62] Thus, Defendants do not dispute that Chancellor Williams is a proper party to this lawsuit.

But Coalition did not establish an enforcement connection for the other Defendants. "Where a state actor or agency is statutorily tasked with enforcing the challenged law and a different official is the named defendant, our *Young* analysis ends."[63] This principle bars the claims against all Defendants except Chancellor Williams and UNT's Board of Regents.[64] In short, Coalition's claims against Governor Abbott, DPS Director McCraw, DIR Director Crawford, and DIR Chief Operations Officer Richardson are nonjusticiable as these are not the identified officials responsible for enforcing the partial TikTok ban at Texas public universities.

Coalition's claims against UNT's Board of Regents fail for slightly different reasons. Coalition sued UNT's Board because "the UNT System Administration prohibited all UNT employees from

---

[59] *Abdullah v. Paxton*, 65 F.4th 204, 208 (5th Cir. 2023).

[60] *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (quotations omitted).

[61] *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 513–14 (5th Cir. 2017).

[62] *Supra*, 6–7.

[63] *City of Austin v. Paxton*, 943 F.3d 993, 998 (5th Cir. 2019).

[64] The UNT Board of Regents Defendants are Ashok Mago, Laura Wright, Lindy Rydman, Carlos Munguia, Mary Denny, Milton B. Lee, Melisa Denis, Daniel Feehan, and John Scott Jr.

using TikTok on state-issued or -managed devices."[65] Coalition missed that UNT's Board of Regents Rules "delegate authority to the Chancellor to develop and adopt System Administration policies" such as this.[66] Put simply, UNT's Board was not involved in UNT's implementation of the partial TikTok ban, and Coalition alleges no facts plausibly suggesting otherwise.

Finally, Defendants' alleged role in enacting the disputed policies does not make them enforcement officers under *Ex parte Young*. The Fifth Circuit has been clear on this point: "formulating and promulgating the [disputed] policy does not subject [the official] to suit under *Ex parte Young*."[67]

## III.   Coalition's Claims Are Limited to UNT Due to Justiciability Issues.

While Coalition challenges Texas's ban "as applied to public university faculty,"[68] it lacks standing to assert a claim against Texas universities other than UNT. First, Coalition did not sue officials from any universities other than UNT. As explained above, this would be needed to establish *Ex parte Young's* "enforcement connection" requirement and for traceability reasons. Second, Coalition relies on associational standing, as it did not assert an organizational injury.[69] Yet Coalition cannot claim associational standing to sue Texas universities other than UNT because it did not allege that it has members at these other colleges.[70] Finally, a party generally cannot "challenge a statute as-applied unless the statute has been applied to him."[71] Coalition cannot contest other schools' bans as it did not allege that these bans were ever "applied" to any of its members.

---

[65] ECF 1, ¶ 13.

[66] *See* UNT Board of Board of Regents Rule § 2.202; *see also* UNT Board of Regents Rule § 4.202 ("The System Administration consists of the Chancellor and such Vice Chancellors and employees as the Chancellor may require to accomplish the duties and responsibilities assigned to the System Administration by the Board."). Copies of these rules are attached as Exhibits 1–2. They are publicly available at the following website: http://tinyurl.com/2zm5zf3c.

[67] *Haverkamp v. Linthicum*, 6 F.4th 662, 670 (5th Cir. 2021); *Mi Familia Vota v. Abbott*, 977 F.3d 461, 467–68 (5th Cir. 2020) (finding that Governor Abbott was not the enforcement officer for his executive orders as the "statutory authority . . . to issue, amend or rescind an Executive Order is not the power to enforce it") (quotations omitted).

[68] ECF 1, pg. 23 (Prayer for Relief).

[69] *See id.* at ¶¶ 46–50; *cf. OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017); *NAACP. v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010).

[70] *See Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (explaining that, to have associational standing, the plaintiff must show that "its members would . . . have standing to sue in their own right").

[71] *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 659 (5th Cir. 2006); *see also Davis v. Scherer*, 468 U.S. 183, 189 (1984) ("As the current state statute was never applied to appellee, he lacks standing to question its constitutionality.").

For the justiciability reasons above, this Court should dismiss Coalition's claims against all Defendants except Chancellor Williams and find that Coalition's claims are limited to UNT.

### RULE 12(b)(6) ARGUMENTS

Coalition's First Amendment claims fail on the merits. Here, the relevant government property—UNT's devices and networks—are nonpublic forums, which trigger lighter constitutional scrutiny. Texas's partial TikTok ban easily survives this lenient test. In fact, due to the nature of the problem and the ban's limited scope, Texas's ban would be constitutional under even the more rigorous scrutiny applied to designated and traditional public forums.

## I.  The Forum Analysis Applied Here, and an Overview of this Analysis.

First Amendment rights are more limited in the context of government-owned property. "Where the government is acting as a proprietor, managing its internal operations, . . . its action will not be subjected to the heightened review to which its actions as a lawmaker may be subject."[72] The Supreme Court devised a "forum analysis" to review First Amendment restrictions on government property.[73] This analysis applies here as Texas's partial ban extends only to state-owned property, such as state-issued laptops and personal devices used to access state networks.[74]

Courts generally "recognize three types of government-controlled spaces: traditional public forums, designated public forums, and nonpublic forums."[75] "Traditional public forums are places that by long tradition or by government fiat have been devoted to assembly or debate."[76] Designated public forums are "spaces that have not traditionally been regarded as a public forum but which the government has intentionally opened up for that purpose."[77] Nonpublic forums are spaces that "[are]

---

[72] *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992).

[73] *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018).

[74] The analysis would be different if Texas fully banned TikTok, like the Montana legislature recently did. *See* Sapna Maheshwari, *Montana Governor Signs Total Ban of TikTok in the State*, N.Y. TIMES (May 17, 2023), http://tinyurl.com/47rx3fs8; *Globe Newspaper Co. v. Superior Court for Norfolk Cnty.*, 457 U.S. 596, 607 n.17 (1982).

[75] *Mansky*, 138 S. Ct. at 1885.

[76] *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 344 (5th Cir. 2001) (quotations omitted).

[77] *Mansky*, 138 S. Ct. at 1885 (quotations omitted).

not by tradition or designation a forum for public communication."[78]

The level of scrutiny turns on the type of forum involved. In traditional and designated forums, "the government may impose reasonable time, place, and manner restrictions on private speech, but restrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited."[79] Yet the government "has much more flexibility" to limit speech in nonpublic forums.[80] There, "[t]he government may reserve such a forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view."[81]

## II.    UNT's IT Resources Are Nonpublic Forums.

When defining the forum, the focus is "on the access sought by the speaker."[82] Coalition alleges that UNT professor Vickery cannot use her "university-owned laptop" or her "university-owned on-campus desktop" to access TikTok on "university-managed internet networks."[83] And it alleges that Vickery cannot use TikTok on her personal cellphone because she "also uses it to access" UNT services such as her "university email" and "university Zoom account."[84] All these devices fall under the umbrella of "IT resources."[85] Thus, we analyze whether UNT's IT resources are traditional, designated, or nonpublic forums.

UNT's IT resources are not traditional public forums. This category is limited to forums that

---

[78] *Id.* (quotations omitted). Some courts call nonpublic forums "limited public forum[s]." *See NAACP v. City of Philadelphia*, 834 F.3d 435, 441 (3d Cir. 2016); *see also Freedom From Religion Found. v. Abbott*, 955 F.3d 417, 426 (5th Cir. 2020).
[79] *Mansky*, 138 S. Ct. at 1885.
[80] *Id.*
[81] *Id.* (quotations omitted).
[82] *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 801–02 (1985).
[83] ECF 1, ¶¶ 46–49.
[84] *Id.* at ¶ 47. Vickery alleges that it is "infeasible" for her to use her phone to perform scholarly research and that she "does not have a personal laptop or desktop." *Id.* Thus, she apparently was not harmed by the portion of the ban extending to personal devices. Even if she was, it does not meaningfully change the forum analysis here.
[85] *See* Ex. 3, 9 (defining "information resources" as "[t]he procedures, equipment, and software employed, designed, built, operated, and maintained to collect, record, process, store, retrieve, display, and transmit information and associated personnel including consultants and contractors.").

"immemorially" have been held open for First Amendment purposes.[86] But government-issued devices have *never* been thought of as fora for freewheeling public debate. For one thing, such devices are not open to the public at all—being instead a privilege often given to government employees alone. In any event, even government employees who do have access are given those tools to perform the work of the government, not to amplify their private views in a digital public square.

Thus, the question is whether UNT's IT resources are designated or nonpublic forums. As we will show, the restrictions UNT places on these resources, the fora's nature, and the relevant caselaw all support the conclusion that only a nonpublic forum is implicated here.

###### A.    UNT Heavily Regulates its IT Resources.

The government creates only a nonpublic forum when it requires individuals to "obtain permission" to access its property[87] or otherwise regulates use of that property.[88] Supreme Court caselaw "illustrate[s] the distinction between 'general access,' which indicates the property is a designated public forum, and 'selective access,' which indicates the property is a nonpublic forum."[89]

UNT heavily regulates its IT resources. Judicially noticeable documents, such as UNT's Information Security Handbook and its formal policies[90] show that UNT:

- specifies that its "information resources are a non-public forum" by default;[91]
- allows only "authorized" users and networks to access its IT resources;[92]
- retains the "sole discretion" to "revoke authorization at any time" and to "limit the use

---

[86] *United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 205–06 (2003); *see also Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 678 (1998).

[87] *Ark. Educ. Television Comm'n*, 523 U.S. at 679–80.

[88] *Mansky*, 138 S. Ct. at 1886 (finding that a polling place was a nonpublic forum in part because "[r]ules strictly govern who may be present [at a polling place], for what purpose, and for how long").

[89] *Ark. Educ. Television Comm'n*, 523 U.S. at 679 (citations omitted).

[90] *See, e.g.*, *Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 457 (5th Cir. 2005) (taking judicial notice of information posted on the National Mediation Board's website); *Coleman v. Dretke*, 409 F.3d 665, 667 (5th Cir. 2005) ("[W]e fail to see any merit to an objection to the panel taking judicial notice of the state agency's own website."); *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007) ("It is not uncommon for courts to take judicial notice of factual information found on the world wide web.").

[91] Ex. 4, 2–3. This policy is publicly available at the following website: http://tinyurl.com/mff4p5un.

[92] Ex. 3, 18 ("Access agreements must be established prior to granting employee and contractor access to institutional information and information resources."); *see also id.* at 24, 40. UNT System's Information Security Handbook is publicly available at the following website: http://tinyurl.com/488rfn6v.

of Information Resources to specific research, teaching missions or other purposes";[93]

- bars users from "sending spam messages," using its resources "for a personal commercial purpose," and taking various other acts;[94]

- prohibits the "introduction of network devices or information resources that negatively affect the behavior or security of the network or violate university policies";[95] and

- reserves the right to sanction users who violate its access and use policies.[96]

Thus, UNT restricts use of and access to its IT resources, which means the nonpublic forum analysis applies here.[97] Coalition alleges no facts that would plausibly change this conclusion.

**B.      The "Nature of the Government Property" Further Supports a Finding that UNT's IT Resources Are Nonpublic Forums.**

In *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, the Supreme Court noted that forums at a government workplace are more likely to be considered nonpublic. The Court explained that "[t]he Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs."[98] This principle applies here. Coalition admits that UNT provides IT resources to professors like Vickery to facilitate their work for UNT.[99] The fact that UNT is largely acting in its capacity as an employer in this regard "strengthens the conclusion" that UNT's IT resources are nonpublic forums.[100]

Relevant caselaw shows that UNT's IT resources are nonpublic forums. In *United States v. American Library Association Inc.*, the Supreme Court found that a public library's system of computers furnishing internet access was a nonpublic forum. First, the forum under the microscope was not "the internet" writ large, but rather *the library-owned devices* capable of accessing the internet, which the library

---

[93] Ex. 4, 3.

[94] *Id.* at 7–9.

[95] Ex. 3, 40.

[96] *Id.* at 64.

[97] *See, e.g.*, *Ark. Educ. Television Comm'n*, 523 U.S. at 679–80.

[98] *Cornelius*, 473 U.S. at 805 (quotations omitted).

[99] *See* ECF 1, ¶¶ 46–49.

[100] *See Cornelius*, 473 U.S. at 805.

provided for patrons.[101] Second, the Court explained that a library does not furnish computers "to create a public forum for Web publishers to express themselves."[102] Rather, it does so "to facilitate research, learning, and recreational pursuits by furnishing materials of requisite and appropriate quality."[103] *American Library* shows that school-provided internet and other IT resources are best thought of as tools to facilitate a school's mission; they are not public forums open to free expression.

Indeed, courts have found the following to be nonpublic forums: a school's internal mail system (including email);[104] a prison's electronic system for communicating with inmates;[105] a college's electronic system for attending virtual classes and submitting assignments;[106] state computer internet terminals;[107] and university computer services.[108] This Court should follow all others and find that UNT's IT resources are nonpublic forums.

### III.   The Partial TikTok Ban Is Reasonable in Light of the Forums' Purposes.

TikTok users undoubtedly may use the program to express a variety of views.[109] But Texas's partial ban makes no distinction based on users' viewpoints—or even based on viewpoints that TikTok itself might convey on its platform.[110] Thus, the question is whether this ban is "reasonable in light of the purpose served by the forum[s]."[111] It clearly is.

UNT provides IT resources mainly "for the purpose of conducting University business."[112] While UNT allows some use of its IT resources for personal reasons, this is incidental to UNT's

---

[101] *Am. Libr. Ass'n, Inc.*, 539 U.S. at 206.

[102] *Id.* at 206–07.

[103] *Id.*

[104] *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46–48 (1983); *Chiu*, 260 F.3d at 350; *Pichelmann v. Madsen*, 31 Fed. Appx. 322, 327 (7th Cir. 2002).

[105] *Witzke v. Bouchard*, No. 22-13070, 2023 WL 3919303, at *6 (E.D. Mich. June 9, 2023).

[106] *Collins v. Putt*, No. 3:17-CV-01621(AVC), 2019 WL 8501541, at *1, 4 (D. Conn. Mar. 28, 2019).

[107] *Nickolas v. Fletcher*, No. 3:06 CV 00043 KKC, 2007 WL 1035012, at *1, 5–6 (E.D. Ky. Mar. 30, 2007).

[108] *Loving v. Boren*, 956 F. Supp. 953, 954 (W.D. Okla. 1997).

[109] *See NetChoice, LLC v. Paxton*, 49 F.4th 439, 459–60 (5th Cir. 2022).

[110] *See id.* at 462.

[111] *Cornelius*, 473 U.S. at 806.

[112] Ex. 4, 3.

primary motive.[113] Indeed, UNT *must* provide these services to fulfill its mission of "advancing educational excellence and preparing students to become thoughtful, engaged citizens of the world."[114]

Other "purposes" logically include the need for privacy, the safety of its users, and the security of the system. UNT's IT resources would be useless if shut down by a cyberattack. And individuals would not utilize these resources if use carried a significant risk of being hacked.

The partial TikTok ban is reasonably related to these purposes. Again, the CCP has the power to, at any time, use its access to TikTok or its 2017 national security law to exploit users' location data, personal messages, passwords, and other sensitive data.[115] This ever-present threat carries obvious dangers. Stolen passwords could be used to gain access to UNT's network. Sensitive cyber-defense research could be funneled directly to the CCP. (After all, both the NSA and the Department of Homeland Security have designated UNT a national cyber-defense-research center.[116]) Hacked messages could be used to coerce UNT students and employees. Pilfered location data could be used to track down critics of the CCP. And so on.

The risks are especially salient for government entities, which are "particularly visible targets" for cyberattacks according to the FBI.[117] Examples of such high-profile hacks include:

- *2013-14:* Hackers accessed the U.S. Office of Personnel Management's network and stole millions of records, including social security numbers.[118] Some affected individuals

---

[113] *See id.* ("University students may use University information resources for school- related and personal purposes in accordance with this policy and other applicable University policies, and state and federal law, provided personal use does not result in any additional costs to the University."); *id.* ("University employees and authorized individuals may use Information Resources in accordance with this policy and other applicable University policies . . . . Incidental personal use of Information Resources by employees and authorized individuals is permitted, subject to review and reasonable restrictions by the employee's supervisor, provided the use does not interfere with the performance of job responsibilities and does not result in any additional costs to the University."); *id.* ("The University may limit the use of Information Resources to specific research, teaching missions or other purposes at its sole discretion . . . .").

[114] Ex. 5. This policy is publicly available at the following website: http://tinyurl.com/mrh9wjx2. *See also Am. Libr. Ass'n, Inc.*, 539 U.S. at 206–07.

[115] *Supra*, 2–6.

[116] *National Security Agency and Department of Homeland Security Name UNT a Center for Academic Excellence in Cyber Defense Research*, UNT (Mar. 19, 2015), https://tinyurl.com/28sa2jvp.

[117] *High-Impact Ransomware Attacks Threaten U.S. Businesses and Organizations*, FBI (Oct. 2, 2019), http://tinyurl.com/2axw4r53.

[118] *In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 50–51 (D.C. Cir. 2019).

had their identities stolen and were subjected to financial fraud following the breach.[119]

- *March 2018:* Hackers hit nearly 4,000 computers belonging to the city of Atlanta.[120] The attack "disrupted" city operations and led to millions of dollars in losses for the city.[121]

- *May 2019:* Hackers seized around 10,000 Baltimore government computers, freezing certain city operations for two weeks.[122] One council member estimated that the city would have to spend $18 million to recover from this attack.[123]

- *August 2019:* A coordinated cyberattack crippled over 20 Texas entities for multiple days.[124]

- *May 2023:* A cyberattack took down Dallas city services, with some remaining offline for nearly two weeks.[125]

- *June 2023:* A cyberattack against Stephen F. Austin State University "caused serious disruptions" to the school for over a week.[126]

Texas's partial ban is reasonably aimed at closing a vulnerability to its IT system. Texas was not constitutionally required to wait for the CCP to hack state agencies before acting to prevent this threat: "[T]he Government need not wait until havoc is wreaked to restrict access to a nonpublic forum."[127]

Also, Texas's partial ban leaves open ample alternative channels for communication, which further supports a reasonableness finding.[128] State employees and students can still use TikTok on any personal devices that do not connect to state networks. And they can use practically any other social media application other than TikTok.

Finally, Texas was allowed to credit the wisdom and judgment of the many other

---

[119] *Id.* at 50.

[120] *Atlanta U.S. Attorney Charges Iranian Nationals for City of Atlanta Ransomware Attack*, DOJ (Dec. 5, 2018), http://tinyurl.com/2s39sht.

[121] *Id.*

[122] Emily Stewart, *Hackers have been Holding the City of Baltimore's Computers Hostage for 2 Weeks*, VOX (May 21, 2019), http://tinyurl.com/mr252vjv.

[123] *Ransomware Attack will Cost Baltimore City $18M, Councilmember Says*, CBS NEWS (May 30, 2019), http://tinyurl.com/hyy84ebr.

[124] *US Justice Department Announces Indictment Against REvil Ransomware Suspect Behind 2019 Ransomware Attack on Texas Municipalities*, TEX. DIR (Nov. 8, 2021), http://tinyurl.com/mrydap69; Manny Fernandez et al., *Ransomware Attack Hits 22 Texas Towns, Authorities Say*, N.Y. TIMES (Aug. 20, 2019), http://tinyurl.com/3k44xw3n.

[125] *City of Dallas Invests $4M in Cybersecurity After Ransomware Attack*, FOX 4 KDFW (June 29, 2023), http://tinyurl.com/4ysuw4yx; Tasha Tsiaperas, *Dallas City Sites Still Down After Cyberattack*, AXIOS (May 16, 2023), http://tinyurl.com/39dwdwy3.

[126] Kate McGee, *Stephen F. Austin State University Students Grow Anxious About Falling Behind as School Reels from Cyberattack Last Week*, TEX. TRIB. (June 21, 2023), http://tinyurl.com/57tjmjvy.

[127] *Cornelius*, 473 U.S. at 810.

[128] *See Perry Educ. Ass'n*, 460 U.S. at 53–54.

governments—state, federal, and foreign—that have also restricted access to TikTok.[129] As the Fifth Circuit noted in *Gibson v. Collier:* "There is no reason why—as a matter of either common sense or constitutional law—one state cannot rely on the universally shared experiences and policy determinations of other states."[130] *Gibson's* statement has more force here. Our federal government and its allies—with their sophisticated intelligence resources and network of confidential sources—classify TikTok as a national security threat. A ruling against Defendants here amounts to a finding that these governments are *all* being unreasonable. Coalition alleges no facts that plausibly support such a conclusion.

## IV.    Texas's Partial TikTok Ban Would Survive Even the More Rigorous Scrutiny Applied to Designated and Traditional Public Forums.

Coalition's claims fail under even the higher scrutiny applied to designated and traditional public forums. Coalition does not allege that Texas's partial TikTok ban regulates speech based on viewpoint or content. Thus, the question is whether this ban is "narrowly tailored to serve a significant government interest[] and leave[s] open ample alternative channels of communication."[131]

Texas's ban serves at least three interests: privacy, security, and public safety. Binding precedent holds that these are significant government interests.[132] And the substantial consensus that TikTok poses a security threat, coupled with media reports showing the CCP's troubling ties to this company, satisfy the government's light burden on the "interest" issue.[133]

---

[129] *See Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 628 (1995) ("[W]e have permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even, in a case applying strict scrutiny, to *justify restrictions based solely on history, consensus, and simple common sense.*") (citations omitted) (emphasis added).

[130] 920 F.3d 212, 224 (5th Cir. 2019).

[131] *Perry Educ. Ass'n*, 460 U.S. at 45; *see also Mansky*, 138 S. Ct. at 1885.

[132] *Hous. Chron. Pub. Co. v. City of League City*, 488 F.3d 613, 622 (5th Cir. 2007) (public safety is a compelling interest); *United States v. Green*, 293 F.3d 855, 859 n.20 (5th Cir. 2002) (national security is a substantial interest); *Peavy v. WFAA-TV, Inc.*, 221 F.3d 158, 192 (5th Cir. 2000) (confidentiality of private communications is a substantial interest).

[133] *See, e.g., City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438 (2002) ("[A] municipality may rely on any evidence that is reasonably believed to be relevant for demonstrating a connection between speech and a substantial, independent government interest.") (quotations omitted); *Went For It, Inc.*, 515 U.S. at 628 ("[W]e have permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even, in a case

Moving on to the tailoring analysis, Texas's partial ban is narrowly tailored for the same reasons it is "reasonable."[134] As one court recently explained, limiting a security-related restriction to government devices is the "obvious alternative" to fully banning a Chinese-based application.[135] Texas did not violate the First Amendment when it adopted the "obvious alternative" here.

Coalition's argument that Texas's ban should be limited to "state employees who have access to especially sensitive information or locations"[136] is meritless. In this context, a First Amendment restriction "will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative."[137] Thus, Coalition cannot base its claim on an argument that Texas could carve out a narrow exception for certain university professors. More importantly, Coalition's proposed exception is unworkable. University employees and students who do not handle confidential information still deserve protection against hackers. Coalition never explains why it believes otherwise.

Further, Coalition overlooks that once hackers establish a "beachhead" to one part of a network, they can exploit that access to infiltrate the system's more sensitive areas.[138] For instance, once one government device is compromised, a hacker can "seek to increase his or her current privileges by overwhelming the system memory and injecting new code."[139] This method, called "privilege escalation," "allows a hacker to move freely through the network architecture" and gain access to areas of the system beyond that of the initial compromised user.[140] Similarly, the hacker could

---

applying strict scrutiny, to justify restrictions based solely on history, consensus, and simple common sense.") (citations omitted); *Doe I v. Landry*, 909 F.3d 99, 109 (5th Cir. 2018) ("The evidentiary burden to support the governmental interest is light."); *id.* at 110 ("[W]e have allowed such regulations to be justified by evidence that may not have been presented to the enacting officials and was only produced at the time of trial.").

[134] *Supra*, 15–18.

[135] *U.S. WeChat Users All. v. Trump*, 488 F. Supp. 3d 912, 917, 927 (N.D. Cal. 2020).

[136] ECF 1, ¶ 1.

[137] *Ward v. Rock Against Racism*, 491 U.S. 781, 800 (1989).

[138] *See* Nicholas Ronaldson, *Hacking: The Naked Age Cybercrime, Clapper & Standing, and the Debate Between State and Federal Data Breach Notification Laws*, 16 NW. J. TECH. & INTELL. PROP. 305, 307 (2019).

[139] *Anatomy of a Typical Cyberattack*, CLOUD COMPUTING LEGAL DESKBOOK § 4:3.

[140] *Id.*

use the initial access to install a "worm," a harmful program that spreads to other parts of the network or other users' computers.[141] A third option would be to "spear phish" other users by sending them messages from the hacked employee's email account containing links to malicious software.[142]

These are just a few obvious ways a moderately-competent hacker could exploit vulnerabilities in a network. But, of course, we wouldn't be dealing with "moderately-competent" hackers if the concerns about TikTok end up being justified. These would be government-sponsored cyberterrorists, doing the CCP's bidding. Absent the protections state law now provides, the CCP—with its hands on TikTok's puppet strings—would be able to prey on *any* weaknesses in a state agency's network to wreak havoc on the state.

It is hard to imagine how Texas could be *too* vigilant in defending against this looming threat. At the least, there is no plausible grounds here for finding that Texas's limited TikTok ban violates the First Amendment, regardless of the type of forum involved.

## CONCLUSION

This Court should grant Defendants' motion and dismiss this lawsuit in its entirety.

Date: September 8, 2023                  Respectfully Submitted.

ANGELA COLMENERO
Provisional Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

JAMES LLYOD
Interim Deputy Attorney General for Civil Litigation

---

[141] *Methods and Tools for Cyberattacks*, 1 DATA SEC. & PRIVACY LAW § 1:35 (2022–23); *Methods and Tools for Cyberattacks—Worms*, 1 DATA SEC. & PRIVACY LAW § 1:48 (2022–23); *Malicious Technology*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "malware" as "[a]ny electronic or mechanical means, esp. software, used to monitor or gain access to another's computer system without authorization for the purpose of impairing or disabling the system").

[142] *Spear Phishers: Angling to Steal Your Financial Info*, FBI (Apr. 1, 2009), http://tinyurl.com/ybstppa6; *Phishing*, FTC, http://tinyurl.com/3m7cmzhf.

KIMBERLY GDULA
Deputy Chief, General Litigation Division

RYAN KERCHER
Deputy Chief, General Litigation Division

/s/ Todd Dickerson
TODD A. DICKERSON
Attorney-in-Charge
Texas Bar No. 24118368
Todd.Dickerson@oag.texas.gov
Assistant Attorney General
Office of the Attorney General
P.O. Box 12548-Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2120
Fax: (512) 320-0667
**COUNSEL FOR DEFENDANTS**

### CERTIFICATE OF SERVICE

I hereby certify that on September 8, 2023, a true and correct copy of the foregoing instrument has been served electronically through the electronic-filing manager to:

Peter B. Steffensen
SMU Dedman School of Law
First Amendment Clinic
P.O. Box 750116
Dallas, TX 75275
(214) 768-4077
psteffensen@smu.edu

Jameel Jaffer
Ramya Krishnan
Stacy Livingston
Knight First Amendment Institute
at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
jameel.jaffer@knightcolumbia.org
*Counsel for Plaintiff*

/s/ Todd Dickerson