# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

|  |  |
|---|---|
| COALITION FOR INDEPENDENT TECHNOLOGY RESEARCH,<br><br>Plaintiff,<br><br>v.<br><br>GREG ABBOTT, in his official capacity as Governor of the State of Texas, *et al.*,<br><br>Defendants. | Civil Action No. 1:23-cv-783 |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Peter B. Steffensen
Texas Bar No. 24106464
SMU Dedman School of Law
  First Amendment Clinic
P.O. Box 750116
Dallas, TX 75275
(214) 768-4077
psteffensen@smu.edu

Jameel Jaffer (*Pro Hac Vice*)
Ramya Krishnan (*Pro Hac Vice*)
Xiangnong Wang (*Pro Hac Vice*)
Knight First Amendment Institute
  at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
jameel.jaffer@knightcolumbia.org

*Counsel for Plaintiff*

## Table of Contents

Table of Authorities ......................................................................................................... ii

Introduction ...................................................................................................................... 1

Argument .......................................................................................................................... 2

    I.     The Coalition's claims are justiciable. ............................................................. 2

        A.     None of the Defendants is immune from suit. ................................... 2

        B.     The Coalition has standing to challenge the ban. ............................. 5

    II.    The Coalition has stated a First Amendment claim. ...................................... 8

        A.     The ban is unconstitutional as applied unless it survives scrutiny under *NTEU*. ....................................................................................... 8

        B.     The ban fails *NTEU* scrutiny ......................................................... 11

        C.     This is a public-employee speech case, not a public forum case. .................... 13

        D.     The ban fails even under forum analysis. ....................................... 16

Conclusion ..................................................................................................................... 19

## Table of Authorities

**Cases**

*Air Evac EMS, Inc. v. Texas, Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507 (5th Cir. 2017) .................................................................................................. 2, 3, 5

*Amawi v. Pflugerville Indep. Sch. Dist.*, 373 F. Supp 3d 717 (W.D. Tex. 2019), *vacated as moot*, 956 F.3d 816 (5th Cir. 2020) ...................................... 10

*Anderson v. Valdez*, 845 F.3d 580 (5th Cir. 2016) ........................................ 11

*Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666 (1998) ................................... 14

*Bruni v. City of Pittsburgh*, 824 F.3d 353 (3d Cir. 2016) ................................. 11

*Buchanan v. Alexander*, 919 F.3d 847 (5th Cir. 2019) ....................................... 9

*Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330 (5th Cir. 2001) .............................. 14, 16

*City of Austin v. Paxton*, 943 F.3d 993 (5th Cir. 2019) ........................................ 2, 3

*City of Ladue v. Gilleo,* 512 U.S. 43 (1994) ....................................................... 11, 18

*Collins v. Putt*, No. 3:17-CV-01621, 2019 WL 8501541 (D. Conn. Mar. 28, 2019) ................. 14

*Cornelio v. Connecticut*, 32 F.4th 160 (2d Cir. 2022) .................................. 11

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788 (1985)..................... 14, 15, 19

*Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014)............................................. 9

*Ex parte Young*, 209 U.S. 123 (1908)......................................................... 2

*Feds for Med. Freedom v. Biden*, 63 F.4th 366 (5th Cir. 2023) .............................. 7, 8

*Flege v. Williamstown Indep. Sch.*, No. 06-47-DLB, 2007 WL 679022 (E.D. Ky. Mar. 1, 2007)...................................................................................... 14

*Freedom From Religion Found., Inc. v. Abbott*, 955 F.3d 417 (5th Cir. 2020)............... 14, 16, 17

*Freedom From Religion Found., Inc. v. Mack*, 4 F.4th 306 (5th Cir. 2021) ................... 2

*Fusilier v. Landry*, 963 F.3d 447 (5th Cir. 2020) ........................................ 7

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) ................................................ 8, 9, 13

*Gilio ex rel. J.G. v. Sch. Bd. of Hillsborough Cnty.*, 905 F. Supp. 2d 1262 (M.D. Fla. 2012)....................................................................................... 14

*Hoover v. Morales*, 164 F.3d 221 (5th Cir. 1998) .................................................. 7, 12

*Hope v. Harris*, 861 F. App'x 571 (5th Cir. 2021), *cert. denied*, 143 S. Ct. 1746 (2023).................................................................................................................. 2, 5

*In re Dinnan*, 661 F.2d 426 (5th Cir. 1981)........................................................... 10

*Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672 (1992) ...................... 14

*Jackson v. Wright*, 82 F.4th 362 (5th Cir. 2023)................................................... 2, 3

*Jackson Women's Health Org. v. Dobbs*, 945 F.3d 265 (5th Cir. 2019), *rev'd on other grounds,* 142 S. Ct. 2228 (2022) ................................................................ 8

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448 (2018)..................................................................................................................... 10

*Johnson v. Poway Unified Sch. Dist.*, 648 F.3d 954 (9th Cir. 2011) ........................... 13

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99 (3d Cir. 2013) ......... 13

*K.P. v. LeBlanc*, 627 F.3d 115 (5th Cir. 2010) ................................................... 2, 4

*Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (2022)................................... 13, 15

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589 (1967)................. 9

*Lane v. Franks*, 573 U.S. 228 (2014)............................................................. 8, 10, 15

*Linmark Assocs., Inc. v. Twp. of Willingboro*, 431 U.S. 85 (1977) ............................. 18

*Loving v. Boren*, 133 F.3d 771 (10th Cir. 1998).................................................... 15

*Loving v. Boren*, 956 F. Supp. 953 (W.D. Okla. 1997) ........................................ 14, 18

*Malin v. Orleans Parish Commc'ns Dist.*, 718 F. App'x 264 (5th Cir. 2018)............... 13

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) ............................................. 8, 9

*Minn. Voters All. v. Mansky*, 138 S. Ct. 1876 (2018) ................................................ 14

*Missouri v. Biden*, No. 23-30445, 2023 WL 6425697 (5th Cir. Oct. 3, 2023), *cert. granted sub nom.*, *Murthy v. Missouri*, No. 23-411, 2023 WL 6935337 (U.S. Oct 20, 2023) ..................................................................................................... 7

*NAACP v. City of Philadelphia*, 834 F.3d 435 (3d Cir. 2016)................................... 14

*Nat'l Press Photographers Ass'n v. McCraw*, 594 F. Supp. 3d 789 (W.D. Tex. 2022) ............................................................................................................... 4

*Nickolas v. Fletcher*, No. 3:06-CV-00043, 2007 WL 1035012 (E.D. Ky. Mar. 30, 2007) ............................................................................................................. 14

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37 (1983) ............................... 14, 19

*Pichelmann v. Madsen*, 31 F. App'x 322 (7th Cir. 2002) ............................................................. 14

*Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968) ................................................................... 10, 16

*Porter v. Bd. of Tr. of N.C. State Univ.*, 72 F.4th 573 (4th Cir. 2023) ...................................... 9

*Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995) .............................. 17

*Sanjour v. EPA*, 56 F.3d 85 (D.C. Cir. 1998) ......................................................................... 8, 16

*Smith v. Acevedo*, No. A-09-CA-620-SS, 2010 WL 11512363 (W.D. Tex. Sept. 20, 2010) ............................................................................................................ 12

*Sweezy v. New Hampshire*, 354 U.S. 234 (1957) ......................................................................... 9

*Tech. Automation Servs. Corp. v. Liberty Surplus Ins. Corp.*, 673 F.3d 399 (5th Cir. 2012) .............................................................................................................. 9

*Tex. Democratic Party v. Abbott*, 978 F.3d 168 (5th Cir. 2020) ............................................ 2, 4

*Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 777 F.2d 1046 (5th Cir. 1985) ............................................................................................................... 13

*Trudeau v. Univ. of N. Tex.*, 861 F. App'x 604 (5th Cir. 2021) .................................................. 9

*Tucker v. State of Cal. Dep't of Educ.*, 97 F.3d 1204 (9th Cir. 1996) ...................................... 13

*U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114 (1981) ........................ 16

*United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194 (2003) ................................................ 14

*United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454 (1995) ........................... 1, 10, 11, 12

*Witzke v. Bouchard*, No. 22-13070, 2023 WL 3919303 (E.D. Mich. June 9, 2023) ................... 14

**Statutes**

Tex. Educ. Code § 105.051 ............................................................................................................ 3

Tex. Gov't Code § 2054.051 ......................................................................................................... 4

Tex. Gov't Code § 2054.102 ......................................................................................................... 5

Tex. Gov't Code § 2054.104 ......................................................................................................... 5

**Other Authorities**

American Association of University Professors, *In Defense of Knowledge and Higher Education* (Jan. 2020), https://perma.cc/U5CX-MA2D ............................................ 17

UNT Sys. Bd. of Regents Rules, Rule 04.101 (2007), https://perma.cc/W8KK-T9PT ...................................................................................................................... 3

**Rules**

5th Cir. R. 47.5.4.................................................................................................................... 9

## Introduction

Plaintiff the Coalition for Independent Technology Research ("Coalition") commenced this litigation on July 13, 2023, asserting that Texas's TikTok ban violates the First Amendment as applied to faculty at public universities. Defendants moved to dismiss the Complaint on September 8, 2023, contending that all but one of them is immune from suit; that the Coalition lacks standing to seek the relief it requests; and that the Coalition has failed to state a claim.

None of the Defendants' arguments has merit. First, all of the Defendants are amenable to suit because all of them play a role in the enforcement of the ban. Second, the Coalition has standing to seek relief against Defendants because the Coalition's members' injuries are traceable to Defendants' actions and would be redressed by the relief they request. Defendants' argument to the contrary is based principally on a misconception about the relief the Coalition is seeking. Finally, the Coalition has stated a claim because the ban cannot survive scrutiny under the framework the Supreme Court set out in *United States v. National Treasury Employees Union* (*NTEU*), 513 U.S. 454 (1995), which applies to rules that—like the ban at issue here—impose broad, ex ante restrictions on the speech of public employees. Defendants' argument that the ban is consistent with the First Amendment relies almost entirely on factual assertions that the Court cannot credit on a motion to dismiss, and that in any event do not actually establish that the ban is effective, necessary, or tailored to Texas's asserted interests. And Defendants' argument that the ban should be evaluated under public forum doctrine is misguided because this case does not involve a restriction on the general public's access to government property but a restraint on the speech of public employees who have lawful access. The argument is also irrelevant because the ban cannot survive scrutiny even under the framework that Defendants misguidedly urge the Court to adopt.

For all of these reasons, the Coalition respectfully urges the Court to deny Defendants' Motion to Dismiss.

## Argument[1]

**I.    The Coalition's claims are justiciable.**

### A.    None of the Defendants is immune from suit.

Texas contends that all of the Defendants except Chancellor Williams are immune from suit. Texas is incorrect. All of the Defendants are amenable to suit because all of them have "some connection" to the enforcement of the challenged ban. *Ex parte Young*, 209 U.S. 123, 157 (1908).[2]

The Fifth Circuit has said that *Ex parte Young*'s exception to sovereign immunity is available with respect to officials who have a "sufficiently close connection to the unlawful conduct." *Freedom From Religion Found., Inc. v. Mack*, 4 F.4th 306, 312 (5th Cir. 2021). While the court has not defined this requirement precisely, it has said repeatedly that a mere "scintilla of enforcement by the relevant state official" is sufficient. *Tex. Democratic Party v. Abbott* (*TDP*), 978 F.3d 168, 179 (5th Cir. 2020) (quotation marks omitted); *see also Jackson v. Wright*, 82 F.4th 362, 367 (5th Cir. 2023). "Enforcement" in this context means "compulsion or constraint." *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010). Accordingly it is not necessary that a defendant be engaged in "direct enforcement" of a particular law, *Air Evac EMS, Inc. v. Texas, Dep't of Ins.,*

---

[1] For a summary of the relevant factual background, the Coalition respectfully refers the Court to pages 2–4 of its Motion for a Preliminary Injunction ("PI Mot."). ECF No. 20.

[2] Texas suggests that because the ban invests agency heads like Chancellor Williams with enforcement authority, the remaining Defendants necessarily lack it. *See* MTD 9. The Fifth Circuit has never suggested, however, that regulatory schemes can have only one enforcer. Here, multiple officials are "task[ed]" with enforcement of the ban, as explained further below. *City of Austin v. Paxton*, 943 F.3d 993, 998 (5th Cir. 2019); *see also, e.g., Hope v. Harris*, 861 F. App'x 571, 578 (5th Cir. 2021) (holding that inmate who sued over conditions of confinement could permissibly sue seven different prison officials, since each had some connection to the challenged practices), *cert. denied*, 143 S. Ct. 1746 (2023).

*Div. of Workers' Comp.* (*Air Evac*), 851 F.3d 507, 519 (5th Cir. 2017); it is enough that the plaintiff show that the defendant "constrain[s]" the plaintiff in some way, *id.*; *see also City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019). The analysis "substantially overlap[s]" with the standing analysis, because if it is determined that "an official can act, and there's a significant possibility that he or she will act to harm a plaintiff, the official has engaged in enough 'compulsion or constraint' to apply the *Young* exception." *City of Austin*, 943 F.3d at 1002.

All of the Defendants are amenable to suit because all of them have a role in enforcing the challenged ban.

The members of the Board of Regents of the University of North Texas ("UNT") System have a role in enforcement of the ban because they have "direct supervisory authority" over Chancellor Williams, whose enforcement authority Texas does not dispute. *See Jackson*, 82 F.4th at 368; *see also* Tex. Educ. Code § 105.051 (vesting "organization, control, and management" of the UNT System in the Board); UNT Sys. Bd. of Regents Rules, Rule 04.101 (2007), https://perma.cc/W8KK-T9PT ("The Chancellor reports to and is responsible to the Board."). Texas suggests that supervisory authority is insufficient, MTD 10, but the Fifth Circuit said just the opposite only a few weeks ago in *Jackson*. 82 F.4th 362. In that case the court considered a First Amendment retaliation claim brought by a UNT professor who alleged he had been sanctioned for his speech. The court held that the Board members were amenable to suit because they had "direct governing authority over the UNT officials" who were allegedly violating the professor's First Amendment rights, and because this authority encompassed the power to "countermand the decisions of subordinate UNT officials." *Id.* at 368. That analysis applies equally here.

DPS Director McCraw has the requisite connection to the enforcement of the ban because DPS reviews state agencies' implementation policies for compliance with the Model Plan. *See* Compl. Attach. 1 ("Directive") at 2 ("Upon approval by the DPS Cyber Security division, the state agency shall promptly implement that policy for its employees, contractors, and facilities."); Compl. Attach. 2 ("Model Plan") at 8 (under "Plan Compliance" heading, requiring each agency to upload its policy to DPS portal). It follows that Director McCraw can "constrain" public university faculty through DPS's approval or rejection of universities' implementation policies. *Compare TDP*, 978 F.3d at 178–81 (Secretary of State had "the authority to compel or constrain local officials based on actions she takes as to the application form" for mail-in ballots); *K.P.*, 627 F.3d at 125 (board members constrained abortion provider's rights where they "decid[ed] whether to have medical review panel consider abortion claims" and "whether to pay them"). Indeed, DPS appears already to have exercised its authority to approve many university implementation policies, including UNT's. Compl. ¶ 10. *Cf. Nat'l Press Photographers Ass'n v. McCraw*, 594 F. Supp. 3d 789, 803 (W.D. Tex. 2022) (finding that "a single arrest" constitutes a "scintilla" of enforcement).

DIR Director Crawford and Chief of Operations Richardson have the requisite connection to the enforcement of the ban for at least two reasons. First, DIR has a shared role in enforcing the Model Plan. DIR is statutorily tasked with "develop[ing] and publish[ing] policies, procedures, and standards relating to information resources management by state agencies, and ensur[ing] compliance with those policies, procedures, and standards." Tex. Gov't Code § 2054.051(b). The Model Plan is such a policy or standard. As a result, DIR may "ensure compliance" with it through a variety of means, including by holding up an agency's funding for information resources, if it

determines that the agency failed to fully implement the Model Plan.[3] *Compare Air Evac*, 851 F.3d at 519 (finding that, although officials did not "direct[ly] enforce[]" the scheme, they satisfied *Ex parte Young* because they could "effectively ensure" the scheme's enforcement through rate-setting authority and their role in the administrative process). Second, DIR "block[s] access to [TikTok] on the state network." Model Plan at 6. While it is not entirely clear what "the state network" means in this context, it seems that blocking access to TikTok on this network has the effect of foreclosing faculty from accessing the service on university networks, even in the absence of any further action by universities themselves. *See id.* (noting that the requirement that agencies block access to TikTok on their networks is meant "[t]o ensure *multiple* layers of protection" (emphasis added)); *compare Hope*, 861 F. App'x at 578 (holding that defendants had "the authority to compel or constrain [an inmate]'s conditions of confinement by maintaining those conditions and his placement within them").

Finally, Governor Abbott has a connection to the enforcement of the ban because he appears to have a role in allowing or disallowing exceptions to the ban. Compl. ¶¶ 9, 37. This said, the amenability of the other Defendants to suit is clear, and the Court can grant all of the relief that the Coalition has requested without issuing an injunction against the Governor.

**B.      The Coalition has standing to challenge the ban.**

Texas concedes that the Coalition has standing to challenge UNT's implementation of the ban, but it contests the Coalition's standing to challenge "other Texas universities'

---

[3] State law provides that DIR must report a list of agencies that fail to comply with "department standards" to the state legislature's budget board; each non-compliant agency must then develop a corrective action plan that is approved by the department before the board can approve the agency's biennial operating plan. Tex. Gov't Code § 2054.102(c). Agencies that fail to timely submit a board-approved biennial operating plan to the governor and state auditor may be denied appropriations relating to the management of information resources. *Id.* § 2054.104.

implementations of th[e] ban." MTD 1–2. Texas's objection is based on a misunderstanding of the relief the Coalition is seeking. The Coalition seeks:

1. A declaration that the Directive, Model Plan, and S.B. 1893 violate the First Amendment "as applied to public university faculty," and that UNT's implementation of the ban violates the First Amendment as applied to UNT faculty. *See* Compl. at 23 (Prayer for Relief).

2. An injunction directing Defendants to exempt public university faculty from the ban (including from UNT's implementation of it, in the case of UNT faculty) "unless and until Defendants provide them a constitutionally adequate means of accessing TikTok for research and teaching purposes." *Id.*[4]

The Coalition has standing to seek the relief described above because it has members whose First Amendment rights are affected by the Directive, Model Plan, and S.B. 1893, and by UNT's implementation of the ban. These Coalition members are suffering injuries that are traceable to the ban and that would be redressed by the requested relief. To the extent that Texas's argument is that the Coalition lacks standing to challenge the ban "as applied to public university faculty" generally (rather than as applied to UNT faculty in particular), the argument appears to be based on the misimpression that the Coalition has not asserted that it has members at Texas universities other than UNT. MTD 10. In fact the Coalition has "members at multiple public universities in Texas," and the Complaint says so. Compl. ¶ 46. And while Texas is correct that the Coalition is not entitled to a declaration that the implementation policies of universities *other* than UNT are unconstitutional, or to an injunction directed at universities other than UNT, the Coalition has not asked the Court for that relief.[5]

---

[4] In Paragraph (C) of the Complaint's Prayer for Relief, the Coalition sought injunctive relief only as to its members. But Paragraph (D) requests "any additional relief as the Court deems just and proper," and, for reasons explained below, it would be just and proper here for the Court to grant injunctive relief for the benefit of all public university faculty, and not just for the Coalition's members.

[5] The injuries of non-UNT faculty would be redressed by the relief sought here. A declaration that the Directive, Model Plan, and S.B. 1893 violate the First Amendment as applied to public

Perhaps Texas's real objection is that the relief that the Coalition has requested would benefit individuals not before the Court—namely, public university professors who are not members of the Coalition. But this is not unusual. The Fifth Circuit's recent en banc decision in *Feds for Medical Freedom v. Biden* is instructive. 63 F.4th 366 (5th Cir. 2023). That case involved a challenge to President Biden's vaccine mandate for federal employees. Although the plaintiff organization did not represent employees at all federal agencies, the court held that the district court did not abuse its discretion by granting an injunction against enforcement of the mandate that was not limited to the plaintiff's members. *Id.* at 388. The plaintiff had members at "numerous federal agencies," *id.* at 369, was actively adding new ones, and the court credited the district court's fears that "limiting the relief to only those before it would prove unwieldy and would only cause more confusion," *id.* at 388 (citation omitted)*; see also Missouri v. Biden*, No. 23-30445, 2023 WL 6425697, at *32 (5th Cir. Oct. 3, 2023) (stating that relief is not necessarily overbroad merely because it "afford[s] protections that extend beyond just [the plaintiffs]"), *cert. granted sub nom.*, *Murthy v. Missouri*, No. 23-411, 2023 WL 6935337 (U.S. Oct 20, 2023).

The same concerns the Fifth Circuit described in *Feds for Medical Freedom* warrant the entry of broader relief here. Limiting the relief to the Coalition's members would be unwieldy and cause unnecessary confusion. And the Directive, Model Plan, and S.B. 1893 are unconstitutional as to public university faculty generally for the same reasons they are unconstitutional as to the Coalition's members specifically. *Cf. Hoover v. Morales*, 164 F.3d 221 (5th Cir. 1998) (enjoining enforcement of state university policy and state appropriations rider against state employees rather

---

university faculty would "force" Defendants to revise the ban, either by exempting faculty from the ban, or by providing faculty with a constitutionally adequate means of accessing TikTok for teaching or research purposes. *Fusilier v. Landry*, 963 F.3d 447, 454 n.3 (5th Cir. 2020). Because universities are required to comply with the ban, those changes would necessarily impact other universities' implementations of it.

than against plaintiffs specifically, after determining that the policy and rider failed *NTEU* scrutiny); *see also Sanjour v. EPA*, 56 F.3d 85, 92 (D.C. Cir. 1998) (en banc) (explaining that the "facial"/"as applied" distinction is inapt in *NTEU* cases because *NTEU* requires courts to consider the interests of *all* employees whose speech is or will be restricted, as well as the interests of their audiences in hearing what they have to say).[6]

## II.     The Coalition has stated a First Amendment claim.

### A.     The ban is unconstitutional as applied unless it survives scrutiny under *NTEU*.

Texas's TikTok ban is subject to First Amendment scrutiny because it burdens the ability of public university faculty to engage in teaching and research on matters of public concern. As the Supreme Court has recognized, "citizens do not surrender their First Amendment rights by accepting public employment." *Lane v. Franks*, 573 U.S. 228, 231 (2014). Rather, public employees retain their right, as citizens, to "comment[] upon matters of public concern." *Id.* at 235–36 (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). In *Garcetti*, the Supreme Court held that, as a general matter, public employees speak as employees, rather than as citizens, when they speak "pursuant to their official duties," but the Court expressly reserved the question of whether this rule should apply to public university faculty engaged in "scholarship or teaching." *Garcetti v. Ceballos*, 547 U.S. 410, 421, 425 (2006). Every circuit to have addressed the question since *Garcetti* has concluded that it does not. *See Meriwether v. Hartop*, 992 F.3d 492, 505 (6th Cir. 2021) ("[P]rofessors at public universities retain First Amendment protections at least when

---

[6] The question of the scope of relief is not, in any event, a matter of standing, but a matter of the court's equitable discretion. *See Jackson Women's Health Org. v. Dobbs*, 945 F.3d 265, 275 (5th Cir. 2019), *rev'd on other grounds,* 142 S. Ct. 2228 (2022); *Feds for Med. Freedom*, 63 F.4th at 387 (addressing the "scope of injunctive relief" separately from standing and reviewing for abuse of discretion).

engaged in core academic functions, such as teaching and scholarship."); *Demers v. Austin*, 746

F.3d 402, 412 (9th Cir. 2014) (similar); *Porter v. Bd. of Tr. of N.C. State Univ.*, 72 F.4th 573, 582

(4th Cir. 2023) (similar); *see also Buchanan v. Alexander*, 919 F.3d 847, 852 (5th Cir. 2019)

(suggesting that *Garcetti*'s "official duties" rule does not apply to public university faculty, writing

that "classroom discussion" is protected by the First Amendment).[7]

The reason why *Garcetti*'s "official duties" rule does not apply to the core teaching and

research activities of public university faculty is, of course, that applying the rule in this context

would threaten academic freedom, which is "a special concern of the First Amendment." *Keyishian*

*v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967); *see also Garcetti*, 547 U.S.

at 425; *id.* at 438–39 (Souter, J., dissenting). The Supreme Court explained the importance of

academic freedom to our democracy, and to our society, in *Sweezy v. New Hampshire*:

> The essentiality of freedom in the community of American universities is almost
> self-evident. . . . To impose any strait jacket upon the intellectual leaders in our
> colleges and universities would imperil the future of our Nation. . . . Teachers and
> students must always remain free to inquire, to study and to evaluate, to gain new
> maturity and understanding; otherwise our civilization will stagnate and die.

354 U.S. 234, 250 (1957). Since *Sweezy*, both the Supreme Court and the lower courts have

repeatedly reaffirmed the value of academic freedom and the necessity of protecting it against

government encroachment. *See, e.g.*, *Keyishian*, 385 U.S. at 603 ("[T]he First Amendment . . .

does not tolerate laws that cast a pall of orthodoxy over the classroom."); *Meriwether*, 992 F.3d at

506 ("If professors lacked free-speech protections when teaching, a university would wield

---

[7] A panel of the Fifth Circuit arguably suggested, in a terse footnote to a later opinion, that the court had not yet fully resolved the question of whether public university faculty are covered by *Garcetti*'s "official duties" rule. *Trudeau v. Univ. of N. Tex.*, 861 F. App'x 604, 609 n.5 (5th Cir. 2021). But that opinion was unpublished and therefore without precedential value, 5th Cir. R. 47.5.4, and, indeed, it would not control even if it had been published, *Tech. Automation Servs. Corp. v. Liberty Surplus Ins. Corp.*, 673 F.3d 399, 405 (5th Cir. 2012) (discussing prior-panel-precedent rule).

alarming power to compel ideological conformity."); *see also In re Dinnan*, 661 F.2d 426, 430 (5th Cir. 1981).

Because Texas's TikTok ban burdens the teaching and research activities of public university faculty on matters of public concern, it is subject to First Amendment scrutiny. The nature of that scrutiny is dictated by the nature of the burden. As the Supreme Court explained in *Lane*, the First Amendment protection of public employees' speech requires a "careful balance." 573 U.S. at 231. When an employee challenges a post hoc disciplinary action, courts balance "the interests of [the employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). But where the challenge is to a broad, ex ante restraint on speech, a more demanding test applies—one that "more closely resembles exacting scrutiny than the traditional *Pickering* analysis." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2472 (2018) (discussing *NTEU*, 513 U.S. at 468); *accord Amawi v. Pflugerville Indep. Sch. Dist.*, 373 F. Supp 3d 717, 753 (W.D. Tex. 2019), *vacated as moot*, 956 F.3d 816 (5th Cir. 2020).

The TikTok ban operates as a broad, ex ante restraint, and accordingly the relevant analytical framework is the one the Supreme Court set out in *NTEU*. Under that framework, the State "must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *NTEU*, 513 U.S. at 468 (quoting *Pickering*, 391 U.S. at 571). It must also "demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and

material way." *Id.* at 475 (quoting *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 664 (1994)). For the reasons discussed below, Texas cannot satisfy these requirements here.

      **B.**      **The ban fails *NTEU* scrutiny.**

The Coalition has plausibly alleged that the ban does not satisfy *NTEU* scrutiny. As an initial matter, the ban imposes a serious burden on activities at the heart of academic freedom. It prevents faculty from pursuing research that relates to TikTok. Compl. ¶¶ 1, 47–48. It undermines their ability to supervise student work, and to access and review the work of other researchers, including as part of the peer-review process. *Id.* ¶¶ 48–49. It also makes it nearly impossible for faculty to use TikTok in their classrooms, whether to teach about TikTok or to use content from the platform to teach about other subjects. *Id.* ¶¶ 1, 49. The experiences of UNT Professor Jacqueline Vickery are illustrative: the ban has forced her to suspend research projects and alter her research agenda, *id.* ¶ 48, change her teaching pedagogy, *id.* ¶ 49, and eliminate course materials, *id.* By curtailing the academic expression of public university faculty, the ban deprives students, researchers around the country, and the general public of their rights "to read and hear what [faculty] would otherwise have written and said." *NTEU*, 513 U.S. at 470.

    Texas would not be able to defend this burden on First Amendment rights even with the benefit of an evidentiary record, and it certainly cannot do so without one.[8] To start, the interests Defendants have cited in defense of the ban are not the kinds of interests that can justify restrictions

---

[8] On a motion to dismiss, the question for the court is whether the complaint "contain[s] sufficient factual matter, [if] accepted as true, to 'state a claim to relief that is plausible on its face.'" *Anderson v. Valdez*, 845 F.3d 580, 589 (5th Cir. 2016) (citation omitted). It is "rarely, if ever, appropriate" to dismiss a First Amendment challenge at the pleading stage, because factual development is generally "indispensable to an assessment of whether a [challenged law] is constitutionally permissible." *Bruni v. City of Pittsburgh*, 824 F.3d 353, 357 (3d Cir. 2016); *see also Cornelio v. Connecticut*, 32 F.4th 160, 173–74 (2d Cir. 2022) (denying 12(b)(6) motion for lack of evidence that speech restrictions "materially advance[d]" the state's interest).

on the protected speech of public employees, because they do not implicate the State's mission *as employer*. *See Hoover*, 164 F.3d at 226 (quoting *Pickering*, 391 U.S. at 568). Significantly, Texas does not claim any material disruption to its operations arising from the restrained speech. *See Smith v. Acevedo*, No. A-09-CA-620-SS, 2010 WL 11512363, at *5 (W.D. Tex. Sept. 20, 2010) (finding the failure to show such disruption fatal). In addition, Defendants cannot show without an evidentiary record—or even with one, *see* PI Mot. 15–18— that the harms the ban seeks to address are "real" rather than "conjectural," and that the ban addresses those harms in a "direct and material way." *NTEU*, 513 U.S. at 475.

Nor can Defendants establish that they cannot achieve their goals without imposing such a profound burden on First Amendment rights. As the Complaint makes clear, the state has at its disposal a variety of other methods to ensure network security and user privacy. Texas's universities could make dedicated laptops and a separate WiFi network available to faculty who require access to TikTok for their teaching and research. Compl. ¶ 53; *see also* Model Plan at 7 (stating that "devices granted an exception should only be used . . . on non-state or specifically designated separate networks"). Texas could enact comprehensive privacy legislation that would restrict TikTok and other platforms from gathering users' sensitive data. Compl. ¶ 53. Again, the Complaint plausibly alleges that Texas could achieve its goals with measures that would impose far less of a burden on First Amendment rights. *See also* MTD 19 (acknowledging, in passing, that accommodating the rights of public university faculty would require only a "narrow exception" to the ban).[9]

---

[9] Texas asserts that its TikTok ban is of a piece with the bans that have been adopted by governments around the world. MTD 1. Of course, those governments are not bound by the First Amendment, as Texas is. But Texas is wrong, in any event, because most of the bans Texas references do not reach public university professors.

C.      **This is a public-employee speech case, not a public forum case.**

Defendants ignore all of the caselaw relating to public employees' First Amendment rights and instead address this case as if the Coalition were asserting a right of access to a public forum. But this is not a public forum case. Forum analysis is appropriate when outsiders assert a right to speak on government property. Unlike members of the general public, however, public employees are necessarily invited onto and authorized to use government workplaces, including for expressive purposes. In this context, the Supreme Court has consistently applied employee speech doctrine, not forum analysis. *See, e.g.*, *Garcetti*, 547 U.S. at 418 (applying employee speech framework to views expressed by employee in the office); *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (2022) (same to teacher's prayer on school grounds). Lower courts have followed suit. *See, e.g.*, *Malin v. Orleans Parish Commc'ns Dist.*, 718 F. App'x 264, 269 (5th Cir. 2018) (applying employee speech doctrine to email sent by employee from work email address); *Johnson v. Poway Unified Sch. Dist.*, 648 F.3d 954 (9th Cir. 2011) ("[T]he Supreme Court has held that where the government acts as both sovereign *and employer*, th[e] general forum-based analysis does not apply. Instead, the Court applies a distinct *Pickering*-based analysis . . . ." (emphasis in original) (citations omitted)); *Tucker v. State of Cal. Dep't of Educ.*, 97 F.3d 1204, 1209–10 (9th Cir. 1996) (concluding, in a challenge to rule prohibiting public employees from engaging in religious advocacy "in the workplace," that the "applicable doctrine . . . is found in the case law governing employee speech," and rejecting, as a "red herring[]," the attempt to characterize the workplace as a forum).[10]

---

[10] A number of courts, including the Fifth Circuit, have made the same point in the context of student speech. *See, e.g.*, *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 777 F.2d 1046, 1050, 1053 (5th Cir. 1985) (explaining that forum doctrine applies when "outside visitors" seek access to schools, but that "[r]egulations on the speech of those who teach within the schools obviously must be drawn more narrowly" under *Tinker*); *K.A. ex rel. Ayers v. Pocono Mountain*

The cases that Defendants cite do not actually support their argument. Most of these cases simply underscore the proposition that forum analysis applies when an outside speaker seeks access to government property.[11] Indeed, Defendants cite only two cases that involve public employees. In one of them the court applied the employee speech doctrine before applying forum analysis in the alternative. *Pichelmann v. Madsen*, 31 F. App'x 322 (7th Cir. 2002). In the other, *Loving v. Boren*, 956 F. Supp. 953 (W.D. Okla. 1997), the court applied forum doctrine, but neither party had suggested to the court that it shouldn't.[12]

---

*Sch. Dist.*, 710 F.3d 99, 106 (3d Cir. 2013) (holding that because the "critical distinction is the identity of the speaker," *Tinker* and its progeny—not forum doctrine—"plainly apply to student expression"); *Gilio ex rel. J.G. v. Sch. Bd. of Hillsborough Cnty.*, 905 F. Supp. 2d 1262, 1271 (M.D. Fla. 2012) (concluding that "where the speaker is a student who is entitled to be on school property," rather than an "outside group" seeking access to school events or school facilities, "forum analysis is not relevant"); *Flege v. Williamstown Indep. Sch.*, No. 06-47-DLB, 2007 WL 679022, at *9 (E.D. Ky. Mar. 1, 2007) (explaining that during school hours, "school grounds would likely constitute a nonpublic forum as to outsiders, such as parents," but not to teachers and students, who are meant to be there).

[11] *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672 (1992) (private group sought to speak inside airport terminal); *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876 (2018) (voters sought to speak inside polling station); *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330 (5th Cir. 2001) (parents sought to speak on school property and using school resources); *NAACP v. City of Philadelphia*, 834 F.3d 435 (3d Cir. 2016) (private group sought to display advertisement at city airport); *Freedom From Religion Found., Inc. v. Abbott*, 955 F.3d 417 (5th Cir. 2020) (private group sought to display exhibit at Texas Capitol); *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788 (1985) (private group sought to be included in a government-controlled charity drive); *United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194 (2003) (library patrons sought access to certain materials at public library); *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666 (1998) (political candidate sought to be included in candidate debate aired by a public broadcaster); *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37 (1983) (non-representative teachers' union sought access to school property and use of school resources); *Witzke v. Bouchard*, No. 22-13070, 2023 WL 3919303 (E.D. Mich. June 9, 2023) (members of the public sought to communicate with jail detainees using a government-provided communications platform); *Nickolas v. Fletcher*, No. 3:06-CV-00043, 2007 WL 1035012 (E.D. Ky. Mar. 30, 2007) (member of the public sought to unblock his blog from state computers); *Collins v. Putt*, No. 3:17-CV-01621, 2019 WL 8501541 (D. Conn. Mar. 28, 2019) (student sought access to class Blackboard page).

[12] *Loving* is distinguishable in other ways as well—for example, the plaintiff had failed to show that he was harmed by the policy he challenged, and the defendant had "effectively mooted" the First Amendment question by amending the policy, *see* 956 F. Supp. at 955, considerations that

Defendants' reliance on forum doctrine suggests a more fundamental misunderstanding about the nature and significance of the First Amendment interests at issue in this case. As the Supreme Court explained in *Lane v. Franks*, employee speech doctrine attempts to strike a "careful balance" between, on one hand, the First Amendment rights of public employees and the broader public, and, on the other, the government's need, as an employer, to efficiently manage its operations. 573 U.S. at 231. Applying forum doctrine to government workplaces would have the effect of displacing this careful balance with a regime that would subject many governmental restrictions on public employees' speech to only reasonableness review. *Compare Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985) (explaining that to create a public forum the government must "intentionally open [a forum] for public discourse."), *with id.* at 805 ("The federal workplace, like any place of employment, exists to accomplish the business of the employer.").

And adopting Defendants' theory would have far-reaching implications. The Supreme Court has emphasized that public employees retain their rights as citizens to speak on matters of public concern, including in the workplace. *Lane*, 573 U.S. at 231; *see also Kennedy*, 142 S. Ct. at 2425 (observing that it would be wrong to "treat[] everything [government employees] say in the workplace as government speech subject to government control" or else "a school could fire a Muslim teacher for wearing a headscarf in the classroom or prohibit a Christian aide from praying quietly over her lunch in the cafeteria"). The Court has made clear that the speech of public employees can be *particularly* valuable because public employees often have specialized knowledge and expertise. *See Lane*, 573 U.S. at 240 (noting that such speech "holds special value

---

ultimately led the Tenth Circuit to conclude that the plaintiff lacked standing, 133 F.3d 771 (10th Cir. 1998).

precisely because those employees gain knowledge of matters of public concern through their employment"); *Pickering*, 391 U.S. at 572; *see also Sanjour*, 56 F.3d at 94. To accept Defendants' suggestion that the First Amendment should draw no distinction between public university professors asserting a right to teach, or to engage in research, at institutions of higher learning, and ordinary members of the public seeking access to restricted government property would have dire results not just for the speech rights of public employees but for public discourse as well.

### D.      The ban fails even under forum analysis.

The ban cannot survive First Amendment scrutiny even if it is analyzed under public forum doctrine. Defendants contend that university networks and university-issued devices are nonpublic forums, MTD 12–13, but "a nonpublic forum . . . is not a private forum," and as a "government-sponsored medium of communication, [a nonpublic forum] is still subject to First Amendment constraints." *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 347 (5th Cir. 2001). As Defendants acknowledge, the government can restrict speech in a nonpublic forum only if the restriction is "(1) reasonable in light of the purpose served by the forum and (2) does not discriminate against speech on the basis of viewpoint." *Freedom From Religion Found., Inc. v. Abbott*, 955 F.3d 417, 427 (5th Cir. 2020). The ban cannot satisfy this test because it is not reasonable in light of the relevant forums' expressive purposes.[13]

As Texas concedes, university-provided Internet and other information technology resources are tools for advancing universities' educational "mission." MTD 15. Universities "exist to serve the common good in the production and distribution of expert knowledge, as well as in

---

[13] Employees' personal devices simply are not susceptible to public forum analysis. Forum analysis applies to property "owned or controlled by the government." *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 132 (1981). Personal devices are neither, and using them to "conduct state business" does not make them so. Model Plan at 5.

the pedagogical inculcation of a mature independence of mind." American Association of University Professors, *In Defense of Knowledge and Higher Education* 5 (Jan. 2020), https://perma.cc/U5CX-MA2D. Universities provide (and limit) access to the internet and computer services to further these purposes. *See* MTD 15 ("UNT provides IT resources mainly 'for the purpose of conducting University business'" (quoting MTD Ex. 4)); *see id.* 16 (acknowledging that "UNT *must* provide these services to fulfill its mission of 'advancing educational excellence and preparing students to become thoughtful, engaged citizens of the world.'" (quoting MTD Ex. 5)).[14]

Because Texas's TikTok ban restricts teaching and research, it does not further these purposes; it subverts them. Compl. ¶¶ 46–50. It impedes public university professors from studying subjects of public significance, and from accessing the scholarship of other researchers. *Id.* ¶¶ 46-48. It undermines their ability to share information and insight with students, to answer students' questions, and to evaluate their work. *Id.* ¶ 49. It also deprives researchers outside Texas "of the scholarship and insights that would otherwise be produced by public-university researchers within the state." *Id.* ¶ 50. This is decidedly not a case in which the challenged restrictions have the effect of "confining" the relevant forums to their intended purposes. *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995). For that reason, Defendants' reliance on *Loving* is entirely misplaced. The court in that case upheld a policy that limited use of a university's network to "research and academic purposes," in circumstances where those purposes were "the very ones"

---

[14] Because public universities make their networks and devices available for expressive purposes, there is a good argument those resources are limited public forums, not nonpublic forums, under forum doctrine. *Freedom From Religion Found., Inc.*, 955 F.3d at 426 ("Limited public forums are places that the government has opened for public expression of particular kinds by particular groups."). The Court need not resolve this question, however, because speech restrictions in both kinds of forum are subject to the same standard of review. *Id.* at 426–27.

for which the network was purchased, and where adults' use of the network within those purposes was "plenary." 956 F. Supp. at 955. The Coalition would of course have no complaint about Texas's TikTok ban if it, too, contemplated that university networks and devices should be used for "research and academic purposes." The Coalition's complaint is that the ban compromises its members ability to use the networks and devices for exactly those ends.

Defendants' arguments relating to network security and data collection fail for reasons already discussed above. *See supra* p. 12. The Complaint plausibly alleges both that the ban is ineffective in achieving the State's goals, and that the State could achieve its goals without imposing such a heavy burden on First Amendment rights. And Defendants' other arguments are equally unpersuasive. Defendants argue that the ban "leaves open ample alternative channels for communication" for public university faculty, MTD 17, but the Complaint plausibly alleges that these channels are not meaningful alternatives. Other social media platforms are not substitutes for TikTok because, although "TikTok is similar in some respects to other social media platforms," the "combination of its design, features, user base, and content make TikTok distinctive." Compl. ¶ 21; s*ee also City of Ladue v. Gilleo,* 512 U.S. 43, 57 (1994) (ban on residential signs did not leave open ample alternative channels of communication because signs were "unusually cheap and convenient form of communication," allowed speakers to more effectively reach a specific audience, and had "no practical substitute"); *Linmark Assocs., Inc. v. Twp. of Willingboro*, 431 U.S. 85, 93 (1977) (similar). Defendants' argument that faculty can continue their research and teaching using personal devices rather than university-issued ones is also wrong. As the Complaint makes clear, public university faculty are foreclosed from accessing TikTok on their personal devices if these devices are also used to access university data, applications, or email accounts. Compl. ¶ 47. Some faculty simply do not have personal devices they could feasibly use for research

18

or teaching. *Id.* The absence of ample alternative channels for communication reinforces the ban's unreasonableness. *See Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 53–54 (1983) (reasonableness of limitations supported by the existence of "substantial alternative channels"); *Cornelius*, 473 U.S. at 809 (similar).

Defendants' remaining arguments rely on factual claims that the Court cannot properly consider on a motion to dismiss. In any event, most of those claims do not actually address the questions that are before the Court. It bears emphasis that there is no dispute here that some of Texas's concerns about TikTok—its concern about data-collection and misinformation, for example—are legitimate. For good reasons, however, the First Amendment limits the ways in which Texas can respond to those concerns. To prevail here, Texas must show not only that its concerns are legitimate but that the ban, *as applied to public university faculty*, is effective, necessary, and tailored to the State's interests—or, at least, that it is reasonable in relation to the purposes of the relevant forums. The Complaint plausibly alleges that the ban does not satisfy these tests. For purposes of Defendants' Motion to Dismiss, this is all that matters.

## Conclusion

For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss.

Dated: October 23, 2023

Respectfully submitted,

/s/ *Peter B. Steffensen*

Peter B. Steffensen
Texas Bar No. 24106464
SMU Dedman School of Law First
  Amendment Clinic
P.O. Box 750116
Dallas, TX 75275
(214) 768-4077
psteffensen@smu.edu

/s/ *Jameel Jaffer*

Jameel Jaffer (*Pro Hac Vice*)
Ramya Krishnan (*Pro Hac Vice*)
Xiangnong Wang (*Pro Hac Vice*)
Knight First Amendment Institute
  at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
jameel.jaffer@knightcolumbia.org

*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 23rd day of October, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Todd A. Dickerson

Office of the Attorney General of Texas

P.O. Box 12548-Capitol Station

Austin, TX 78701

Dated: October 23, 2023

/s/ *Jameel Jaffer*

Jameel Jaffer (*Pro Hac Vice*)
Knight First Amendment Institute
  at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
jameel.jaffer@knightcolumbia.org

*Counsel for Plaintiff*

20