# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| COALITION FOR INDEPENDENT TECHNOLOGY RESEARCH,<br>    *Plaintiff*, | § § § § | |
| v. | § § | No. 1:23-cv-00783 |
| GREG ABBOTT, in his official capacity as Governor of the State of Texas, STEVEN C. MCCRAW, in his official capacity as Director and Colonel of the Texas Department of Public Safety, AMANDA CRAWFORD, in her official capacity as Executive Director of the Texas Department of Information Resources and Chief Information Officer of Texas, DALE RICHARDSON, in his official capacity as Chief Operations Officer of the Texas Department of Information Resources, ASHOK MAGO, LAURA WRIGHT, LINDY RYDMAN, CARLOS MUNGUIA, MARY DENNY, MILTON B. LEE, MELISA DENIS, DANIEL FEEHAN, and JOHN SCOTT, JR., in their official capacities as members of the Board of Regents of the University of North Texas System, and MICHAEL WILLIAMS, in his official capacity as Chancellor of the University of North Texas System,<br>    *Defendants*. | § § § § § § § § § § § § § § § § § § § § § § § § | |

---

### DEFENDANTS' OPPOSITION TO PLAINTIFF'S
### MOTION FOR A PRELIMINARY INJUNCTION

---

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

JAMES LLOYD
Deputy Attorney General for Civil Litigation

KIMBERLY GDULA
Acting Division Chief, General Litigation Division

TODD A. DICKERSON
Attorney-in-Charge
Assistant Attorney General
Texas Bar No. 24118368
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120 | FAX: (512) 320-0667
Todd.Dickerson@oag.texas.gov

### COUNSEL FOR DEFENDANTS

# TABLE OF CONTENTS

Table of Contents .................................................................................................................. iii

Table of Authorities ............................................................................................................... v

Introduction ........................................................................................................................... 1

Background ............................................................................................................................. 2

   I.   TikTok Has Deep Ties to the Chinese Government ................................................... 2

   II.  The CCP Has Tremendous Power Over Chinese-Based Companies. ....................... 2

   III. The Chinese Government Codified its Power to Access Companies' User Data. ..................... 3

   IV. ByteDance Covertly Tracked U.S. Reporters Using TikTok. .................................. 4

   V.  Numerous States and Countries Restrict Access to TikTok. .................................... 4

   VI. An Overview of Texas's Partial TikTok Ban. ......................................................... 6

Standard of Review ................................................................................................................ 7

Argument ................................................................................................................................ 7

   I.   Coalition is Not Likely to Succeed on the Merits. .................................................... 7

     A.  Most of Coalition's Claims are Nonjusticiable. ................................................... 7

     B.  Coalition did Not Assert Viable First Amendment Claims .................................. 8

       1.  UNT's IT Resources are Nonpublic Forums. .................................................. 8

         (a)  UNT Heavily Regulates its IT Resources. ................................................ 8

         (b)  The "Nature of the Government Property" Further Supports a Finding that UNT's IT Resources Are Nonpublic Forums. ..................... 9

       2.  The Partial TikTok Ban is Reasonable ............................................................ 10

       3.  Texas's Partial TikTok Ban Would Survive Even More Rigorous Scrutiny ................... 11

       4.  Coalition's Arguments do Not Change the Analysis Above. ........................... 13

         (a)  "*NTEU*" Scrutiny does Not Apply to Nonpublic Forums. ..................... 13

         (b)  Coalition's "Interests" Analysis is Deeply Flawed. ................................. 15

       5.  Schneier's Declaration does Not Meaningfully Impact this Litigation; if Anything, His Writings Hurt Coalition's Position. ..................... 16

         (a)  All Parties Agree that the CCP's Ability to Exploit TikTok Poses a Significant Risk to the United States' Interests. ..................... 16

         (b)  If Texas's Partial TikTok Ban is Unconstitutional, So Too is the Biden Administration's. ..................... 17

         (c)  Texas is Not Required to Fix *All* Privacy Issues Before Acting to Stop the CCP from Exploiting its Access to TikTok. ..................... 18

(d)   Schneier's Narrower Proposals are Legally Irrelevant...................................................19

II.   The Remaining Preliminary Injunction Factors Favor Defendants. ...........................................20

Conclusion ...................................................................................................................................20

**TABLE OF AUTHORITIES**

<u>Cases</u>

*Amawi v. Pflugerville Indep. Sch. Dist.*,
    373 F. Supp. 3d 717 (W.D. Tex. 2019) ........................................................................19

*Ark. Educ. Television Comm'n v. Forbes*,
    523 U.S. 666 (1998) .................................................................................................... 8, 9

*Catholic Leadership Coal. of Tex. v. Reisman*,
    764 F.3d 409 (5th Cir. 2014) .......................................................................................14

*City of Los Angeles v. Alameda Books, Inc.*,
    535 U.S. 425 (2002) .....................................................................................................12

*Clarke v. Commodity Futures Trading Comm'n*,
    74 F.4th 627 (5th Cir. 2023) .........................................................................................7

*Collins v. Putt*,
    No. 3:17-CV-01621(AVC), 2019 WL 8501541 (D. Conn. Mar. 28, 2019) .....................10

*Digerati Distribution & Marketing, LLC v. Sarl*,
    No. 1:22-CV-01302-DII, 2023 WL 5687040 (W.D. Tex. Aug. 2, 2023)..........................20

*Doe I v. Landry*,
    909 F.3d 99 (5th Cir. 2018) .........................................................................................12

*Feds for Med. Freedom v. Biden*,
    63 F.4th 366 (5th Cir. 2023) .........................................................................................7

*Fla. Bar v. Went For It, Inc.*,
    515 U.S. 618 (1995) ............................................................................................... 11, 12

*Forsyth Cnty., Ga. v. Nationalist Movement*,
    505 U.S. 123 (1992) .....................................................................................................14

*Garcetti v. Ceballos*,
    547 U.S. 410 (2006) .....................................................................................................15

*GEFT Outdoor, LLC v. Monroe Cnty., Indiana*,
    62 F.4th 321 (7th Cir. 2023).........................................................................................14

*Gibson v. Collier*,
    920 F.3d 212 (5th Cir. 2019) .......................................................................................11

*Hous. Chron. Pub. Co. v. City of League City*,
    488 F.3d 613 (5th Cir. 2007) .......................................................................................12

*Int'l Soc. for Krishna Consciousness, Inc. v. Lee*,
    505 U.S. 672 (1992) .......................................................................................................8

*Loving v. Boren*,
    956 F. Supp. 953 (W.D. Okla. 1997) ...........................................................................10

*Martinez v. Mathews*,
    544 F.2d 1233 (5th Cir. 1976) .......................................................................................7

*Matter of Subpoena 2018R00776*,
  947 F.3d 148 (3d Cir. 2020) ....................................................................................14

*Milwaukee Police Ass'n v. Jones*,
  192 F.3d 742 (7th Cir. 1999) ...................................................................................13

*Minn. Voters All. v. Mansky*,
  138 S. Ct. 1876 (2018)......................................................................................8, 9, 11

*Moore v. Brown*,
  868 F.3d 398 (5th Cir. 2017) ...................................................................................13

*Nickolas v. Fletcher*,
  No. 3:06 CV 00043 KKC, 2007 WL 1035012 (E.D. Ky. Mar. 30, 2007) ...............10

*Peavy v. WFAA-TV, Inc.*,
  221 F.3d 158 (5th Cir. 2000) ...................................................................................12

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
  460 U.S. 37 (1983) ............................................................................... 10, 11, 13, 14

*Piazza's Seafood World, LLC v. Odom*,
  448 F.3d 744 (5th Cir. 2006) ...................................................................................19

*Pichelmann v. Madsen*,
  31 F. App'x. 322 (7th Cir. 2002) .............................................................................10

*Rankin v. McPherson*,
  483 U.S. 378 (1987) .................................................................................................15

*Seattle Times Co. v. Rhinehart*,
  467 U.S. 20 (1984) ...................................................................................................14

*Thomas v. Chicago Park Dist.*,
  534 U.S. 316 (2002) .................................................................................................14

*U.S. WeChat Users All. v. Trump*,
  488 F. Supp. 3d 912 (N.D. Cal. 2020) .....................................................................12

*United States v. Albertini*,
  472 U.S. 675 (1985) ...........................................................................................12, 13

*United States v. Am. Libr. Ass'n, Inc.*,
  539 U.S. 194 (2003) ..........................................................................................8, 9, 10

*United States v. Green*,
  293 F.3d 855 (5th Cir. 2002) ...................................................................................12

*Ward v. Rock Against Racism*,
  491 U.S. 781 (1989) .......................................................................................12, 13, 20

*Waters v. Churchill*,
  511 U.S. 661 (1994) .................................................................................................15

*Williams-Yulee v. Florida Bar*,
  575 U.S. 433 (2015) .................................................................................................18

*Witzke v. Bouchard*,
No. 22-13070, 2023 WL 3919303 (E.D. Mich. June 9, 2023) ............................................10

<u>Statutes</u>

40 U.S.C § 11101(6) ..............................................................................................................18

Tex. Gov't Code §§ 620.001 *et seq.* ......................................................................................6

Tex. Gov't Code § 620.001(1) ...............................................................................................6

Tex. Gov't Code § 620.003(a) ...............................................................................................6

<u>Other Authorities</u>

Alex Hern, *Canada Bans TikTok on Government Devices over Security Risks*, GUARDIAN
(Feb. 28, 2023) ..................................................................................................................5

Andrew Adams, *Updated: Where is TikTok Banned? Tracking State by State*, GOV'T TECH.
(last updated Apr. 6, 2023) ...............................................................................................5

*Banning TikTok*, SCHNEIER ON SECURITY (Feb. 27, 2023) .................................................16

*Belgium Bans TikTok from Government Phones After US, EU*, APNEWS (Mar. 10, 2023) ..........5

Cecilia Kang, *ByteDance Inquiry Finds Employees Obtained User Data of 2 Journalists*, N.Y. TIMES
(Dec. 22, 2022) ..................................................................................................................4

Charlie Campbell, *Where is Alibaba Founder Jack Ma? What the Saga of One of the World's Richest Men
Reveals About China Under Xi Jinping*, TIME (Jan. 4, 2021) .............................................3

*China Criticizes Possible US Plan to Force TikTok Sale*, APNEWS (Mar. 23, 2023) .................5

Danielle Drora Greenstein, *A Landlord's Obligation to Protect the Sensitive Information of Potential and
Current Lessees' from Identity Theft*, 28 U. FLA. J.L. & PUB. POL'Y 519, 523 (2017) ...............4

Emily Baker-White, *Exclusive: TikTok Spied on Forbes Journalists*, FORBES (Dec. 22, 2022) .............. 2, 4

Executive Order 13942, 85 FR 48637 (Aug. 6, 2020) .........................................................5

*Feb. 27, 2023 Memorandum for the Heads of Executive Departments and Agencies*,
OFF. MGMT. & BUDGET ..................................................................................................5, 18

*Former Exec at TikTok's Parent Company Says Communist Party Members had a 'God Credential' that
let them Access Americans' Data*, BUS. INSIDER (June 7, 2023) .........................................2

Gary Corn, Jennifer Daskal, Jack Goldsmith, Chris Inglis, Paul Rosenzweig, Samm Sacks,
Bruce Schneier, Alex Stamos & Vincent Stewart, *Chinese Technology Platforms Operating in the
United States*, HOOVER INST. ....................................................................................16, 17, 19

Glenn Thrush and Sapna Maheshwari, *Justice Dept. Investigating TikTok's Owner Over Possible
Spying on Journalists*, N.Y. TIMES (Mar. 17, 2023) ...........................................................4

*High-Impact Ransomware Attacks Threaten U.S. Businesses and Organizations*, FBI (Oct. 2, 2019) ...............11

*Jack Ma Isn't Back*, WIRED (June 15, 2023) ......................................................................3

Jeanne Whalen, *Chinese Government Acquires Stake in Domestic Unit of TikTok Owner ByteDance in
Another Sign of Tech Crackdown*, WASH. POST (Aug. 17, 2021) ......................................2, 3

Kelvin Chan, *Here are the Countries that have Bans on TikTok*, APNEWS (Apr. 4, 2023) ............................5

Laura He, *China Still Wants to Control Big Tech, It's Just Pulling Different Strings*, CNN (Jan. 27, 2023) ....................................................................................................................2

Lingling Wei, *China's New Way to Control Its Biggest Companies: Golden Shares*, WALL ST. J. (Mar. 8, 2023) ......................................................................................................................2

Mark Sweney, *Alibaba Founder Jack Ma Hiding Out in Tokyo, Reports Say*, GUARDIAN (Nov. 29, 2022) ......................................................................................................................3

Mark Sweney, *China to Take 'Golden Shares' in Tech Firms Alibaba and Tencent*, GUARDIAN (Jan. 13, 2023) .......................................................................................................................3

Michelle Toh, *Jack Ma Loses More than Half of His Wealth After Criticizing Chinese Regulators*, CNN (July 12, 2023) ......................................................................................................................3

Mike Corder, *Dutch Gov't Staff Discouraged from Apps such as TikTok*, APNEWS (Mar. 21, 2023) ............5

*Minister Jarvan: TikTok to be Banned on State Officials' Work Phones*, ERR (Mar. 29, 2023) ........................5

Nicholas Confessore, *The Unlikely Activists Who Took On Silicon Valley—and Won*, N.Y. TIMES MAGAZINE (Aug. 14, 2018) ................................................................................................18

*Overview*, TEX. AUDITOR'S OFFICE ........................................................................................13

Paul Mozur et al., *TikTok Browser Can Track Users' Keystrokes, According to New Research*, N.Y. TIMES (Aug. 19, 2022) ......................................................................................................................4

*Privacy Policy*, TIKTOK (last updated May 22, 2023) ........................................................................4

Salvador Rodriguez, *TikTok Insiders Say Social Media Company is Tightly Controlled by Chinese Parent ByteDance*, CNBC (June 25, 2021) ........................................................................................2

Sapna Maheshwari and Amanda Holpuch, *Why Countries are Trying to Ban TikTok*, N.Y. TIMES (Aug. 16, 2023) ......................................................................................................................5

Sapna Maheshwari et al., *Bans on TikTok Gain Momentum in Washington and States*, N.Y. TIMES (Dec. 20, 2022) ..................................................................................................................2, 5

*The TikTok Wars—Why the US and China are Feuding Over the App*, GUARDIAN (Mar. 16, 2023) ............3

*TikTok Banned on U.S. Government Devices, and the U.S. is Not Alone. Here's Where the App is Restricted*, CBSNEWS (Mar. 1, 2023) ........................................................................................5

*TikTok: Why do Countries Think Chinese Tech Firms are a Security Risk?*, BBC (Mar. 24, 2023) ...................3

*Which Countries have Banned TikTok and Why?*, EURONEWS (Apr. 4, 2023) ................................................5

Regulations

Tex. Admin. Code § 202.20(a) ...............................................................................................6

Tex. Admin. Code § 202.70(a) ...............................................................................................7

**INTRODUCTION**

The U.S. government, 36 states, and 14 countries have banned TikTok on government devices due to it being a national security threat. One main concern is the Chinese Communist Party ("CCP") can exploit its ties to TikTok to access its extensive user data. Indeed, Chinese law *requires* TikTok to hand over this sensitive information upon request. And TikTok, through its parent company ByteDance, has used this data to spy on U.S. journalists in the past. Put simply, there are good reasons other states and governments around the world are limiting access to TikTok.

Coalition for Independent Technology Research sued Texas over its partial TikTok ban, which restricts access to TikTok on state-issued devices and personal devices that use state information networks. Coalition argues that Texas's partial ban violates the First Amendment, even though this ban is indistinguishable from those passed by many other state and foreign governments. Coalition's claims are baseless, and no U.S. court has ever invalidated a partial TikTok ban such as Texas's.

This Court should deny Coalition's motion for a preliminary injunction. To begin, Coalition did not assert viable First Amendment claims, so it will not succeed on the merits. Texas's partial ban reaches only nonpublic forums (state-owned devices and networks), so it need only be "reasonable" to be constitutional. Texas's ban easily meets this light standard as it: (1) tracks the restrictions imposed by other states and countries; (2) plugs a vulnerability in state agencies' systems and networks; (3) focuses on a company with troubling ties to a foreign adversary; and (4) leaves open ample alternative methods for expression. Coalition also has justiciability challenges, as Defendants will explain below.

The other preliminary injunction factors also favor Defendants. The harm to Coalition's members is minimal—Coalition identified only one member whose scholarship is allegedly limited by the ban. And the harm to Texas if the ban is lifted is significant; it would open a vulnerability in Texas's network that could be exploited by CCP-sponsored hackers. Finally, this Court has held that an unjustified six-month delay in seeking emergency relief weighs against issuing a preliminary injunction.

1

Coalition waited longer than that here, without good cause for its delay.

**BACKGROUND**

## I.     TikTok Has Deep Ties to the Chinese Government.

The CCP looms large over any Chinese-based company, and it has exploited its authority over Chinese tech companies in the past.[1] The CCP can exert state power over TikTok through its corporate structure. TikTok is owned by ByteDance, a Chinese company.[2] ByteDance's executives are "heavily involved in TikTok's decision-making," so much so that the two companies' boundaries are "almost non-existent."[3] ByteDance, in turn, has deep ties to the Chinese government. For instance, one former ByteDance executive reported that the CCP has a "superuser credential" at ByteDance, giving it access to "all data collected by ByteDance including those of U.S. users."[4] And Forbes found that 300 ByteDance employees "previously worked for Chinese state media publications."[5]

## II.    The CCP Has Tremendous Power Over Chinese-Based Companies.

The "Douyin" and "Jack Ma" incidents highlight the CCP's broad power over Chinese companies. In 2021, the Chinese government took a 1% stake in Douyin, which is China's version of TikTok run by another ByteDance subsidiary.[6] This is known as a "golden share," a nominal interest that "allow[s] government officials to be directly involved in [the business]."[7] Through this 1%

---

[1] Lingling Wei, *China's New Way to Control Its Biggest Companies: Golden Shares*, WALL ST. J. (Mar. 8, 2023), https://tinyurl.com/587yf2e8.

[2] Sapna Maheshwari et al., *Bans on TikTok Gain Momentum in Washington and States*, N.Y. TIMES (Dec. 20, 2022), http://tinyurl.com/2nyv8nxt.

[3] Salvador Rodriguez, *TikTok Insiders Say Social Media Company is Tightly Controlled by Chinese Parent ByteDance*, CNBC (June 25, 2021), http://tinyurl.com/53rcytbf.

[4] *Former Exec at TikTok's Parent Company Says Communist Party Members had a 'God Credential' that let them Access Americans' Data*, BUS. INSIDER (June 7, 2023), http://tinyurl.com/3pywsfbb.

[5] Emily Baker-White, *Exclusive: TikTok Spied on Forbes Journalists*, FORBES (Dec. 22, 2022), http://tinyurl.com/y426c6p8.

[6] Jeanne Whalen, *Chinese Government Acquires Stake in Domestic Unit of TikTok Owner ByteDance in Another Sign of Tech Crackdown*, WASH. POST (Aug. 17, 2021), http://tinyurl.com/yf233pbw.

[7] Laura He, *China Still Wants to Control Big Tech, It's Just Pulling Different Strings*, CNN (Jan. 27, 2023), http://tinyurl.com/3ab2r23n.

interest, the Chinese government controlled *one-third* of the subsidiary's board seats, meaning the CCP could exert influence well beyond its small equity stake.[8]

The Chinese government can devastate even its richest private citizens. Take Jack Ma, the founder of the wildly successful tech company Alibaba. Ma lightly criticized Chinese regulations during a speech in October 2021.[9] He was "summoned by Chinese authorities for questioning" a week later.[10] The day after that, the Chinese government nixed a record-breaking IPO for one of Ma's companies, despite approving it earlier.[11] Ma disappeared from public life for years after this incident, and his fortune has since been cut in half.[12] Following two years of "hefty fines and sanctions," the CCP took its "golden share" of Alibaba.[13] Ma ceded control of the company soon after.[14]

## III.   The Chinese Government Codified its Power to Access Companies' User Data.

In 2017, the CCP implemented a law that "requires companies to give the government any personal data relevant to the country's national security."[15] As FBI Director Christopher Wray explained, this law forces Chinese companies "to do whatever the government wants them to do in terms of showing them information or serving as a tool for the Chinese government."[16] This means TikTok's extensive user data is at the CCP's fingertips. This includes users': (1) personal messages; (2)

---

[8] Whalen, *supra* note 6.

[9] Charlie Campbell, *Where is Alibaba Founder Jack Ma? What the Saga of One of the World's Richest Men Reveals About China Under Xi Jinping*, TIME (Jan. 4, 2021), http://tinyurl.com/4jv7cjz3.

[10] *Id.*

[11] *Id.*

[12] Michelle Toh, *Jack Ma Loses More than Half of His Wealth After Criticizing Chinese Regulators*, CNN (July 12, 2023), http://tinyurl.com/2p4zjcb7; *Jack Ma Isn't Back*, WIRED (June 15, 2023), http://tinyurl.com/2p9w7txk; Mark Sweney, *Alibaba Founder Jack Ma Hiding Out in Tokyo, Reports Say*, GUARDIAN (Nov. 29, 2022), http://tinyurl.com/5cbccw3r.

[13] Mark Sweney, *China to Take 'Golden Shares' in Tech Firms Alibaba and Tencent*, GUARDIAN (Jan. 13, 2023), http://tinyurl.com/58zx37su.

[14] *Id.*

[15] *The TikTok Wars—Why the US and China are Feuding Over the App*, GUARDIAN (Mar. 16, 2023), http://tinyurl.com/2a8kejuz.

[16] *TikTok: Why do Countries Think Chinese Tech Firms are a Security Risk?*, BBC (Mar. 24, 2023), http://tinyurl.com/crreue7w.

credit card information; (3) phone and social network contacts; (4) watched videos; (5) search history; (6) "keystroke patterns or rhythms"; and (7) location data.[17]

## IV.    ByteDance Covertly Tracked U.S. Reporters Using TikTok.

In late 2022, Forbes published a series of articles exposing TikTok's ties to the CCP. ByteDance responded by secretly tracking Forbes journalists' user data from TikTok to unearth the source of the leaks.[18] ByteDance later admitted "that its employees had inappropriately obtained the data" of the American users in question.[19] Nothing stops the Chinese government from doing the same tracking, or more, by exploiting its access to TikTok.

In fact, recent media reports indicate that "[t]he web browser used within the TikTok app can track every keystroke made by its users."[20] This practice, also known as "keylogging," is often used by hackers to "intercept a victim's usernames, passwords, and other sensitive information."[21] Per the New York Times, it is "not common" for a major commercial application to contain this function.[22]

Let that sink in. It's possible that, through the Trojan horse of an addictive social media platform, the CCP has effectively tricked over 100 million Americans into downloading malicious hacking software that can be used to invade their most intimate secrets and ruin their lives.

## V.    Numerous States and Countries Restrict Access to TikTok.

Given the issues above, it should be no surprise that states and governments across the world are starting to restrict access to TikTok. Both the Biden and Trump Administrations banned TikTok

---

[17] *Privacy Policy*, TIKTOK (last updated May 22, 2023), http://tinyurl.com/27rbp89v.

[18] *Exclusive: TikTok Spied on Forbes Journalists, supra* note 5; Cecilia Kang, *ByteDance Inquiry Finds Employees Obtained User Data of 2 Journalists*, N.Y. TIMES (Dec. 22, 2022), http://tinyurl.com/r3bk3btw.

[19] Glenn Thrush and Sapna Maheshwari, *Justice Dept. Investigating TikTok's Owner Over Possible Spying on Journalists*, N.Y. TIMES (Mar. 17, 2023), http://tinyurl.com/3wa3rayn.

[20] *See, e.g.*, Paul Mozur et al., *TikTok Browser Can Track Users' Keystrokes, According to New Research*, N.Y. TIMES (Aug. 19, 2022), http://tinyurl.com/2bfyv7rh.

[21] Danielle Drora Greenstein, *A Landlord's Obligation to Protect the Sensitive Information of Potential and Current Lessees' from Identity Theft*, 28 U. FLA. J.L. & PUB. POL'Y 519, 523 (2017).

[22] Paul Mozur et al., *supra* note 20.

on government devices due to national security concerns,[23] and 36 states in this country have similarly restricted TikTok.[24] As Representative Raja Krishnamoorthi explained, there is "widespread concern [about TikTok] at this point—it's not just Republicans, it's not just Democrats."[25]

Looking beyond our nation's borders, each of the "five eyes" intelligence-sharing partners—U.S., Canada, Britain, New Zealand, and Australia—banned TikTok on governmental devices within weeks of each other.[26] So too did Belgium,[27] Denmark,[28] Estonia,[29] the European Union,[30] India,[31] Latvia,[32] Netherlands,[33] Norway,[34] and Taiwan.[35] Texas is not jumping at its shadow. TikTok is a worldwide danger for reasons well beyond it being an addictive social media application. And it is alarming that many of the best intelligence agencies on the planet agree on this point.

---

[23] Executive Order 13942, 85 FR 48637 (Aug. 6, 2020); *Feb. 27, 2023 Memorandum for the Heads of Executive Departments and Agencies*, OFF. MGMT. & BUDGET (the "*February 27th Memorandum*"), *available at* http://tinyurl.com/4mw7s48e.

[24] Andrew Adams, *Updated: Where is TikTok Banned? Tracking State by State*, GOV'T TECH. (last updated Apr. 6, 2023), https://tinyurl.com/bdfu46tf.

[25] *Bans on TikTok Gain Momentum in Washington and States*, *supra* note 2.

[26] *Which Countries have Banned TikTok and Why?*, EURONEWS (Apr. 4, 2023), http://tinyurl.com/2fwa732h.

[27] *Belgium Bans TikTok from Government Phones After US, EU*, APNEWS (Mar. 10, 2023), http://tinyurl.com/mrxr832k.

[28] *Id.*

[29] *Minister Jarvan: TikTok to be Banned on State Officials' Work Phones*, ERR (Mar. 29, 2023), http://tinyurl.com/yc2ucfnj.

[30] Alex Hern, *Canada Bans TikTok on Government Devices over Security Risks*, GUARDIAN (Feb. 28, 2023), http://tinyurl.com/r35kp6fn.

[31] Sapna Maheshwari and Amanda Holpuch, *Why Countries are Trying to Ban TikTok*, N.Y. TIMES (Aug. 16, 2023), http://tinyurl.com/3uad5h58.

[32] Kelvin Chan, *Here are the Countries that have Bans on TikTok*, APNEWS (Apr. 4, 2023), http://tinyurl.com/5hybrh3w.

[33] Mike Corder, *Dutch Gov't Staff Discouraged from Apps such as TikTok*, APNEWS (Mar. 21, 2023), http://tinyurl.com/ms65d4k2.

[34] *China Criticizes Possible US Plan to Force TikTok Sale*, APNEWS (Mar. 23, 2023), http://tinyurl.com/yc8knfdv.

[35] *TikTok Banned on U.S. Government Devices, and the U.S. is Not Alone. Here's Where the App is Restricted*, CBSNEWS (Mar. 1, 2023), http://tinyurl.com/3c3jux3j.

**VI.     An Overview of Texas's Partial TikTok Ban.**

In December 2022, Governor Abbott banned the use of TikTok on state-issued devices.[36] In this Directive, he explained that media reports had exposed TikTok's close ties to the CCP and revealed that this application was a threat to Texas's "sensitive information and critical infrastructure."[37] Governor Abbott also instructed the Department of Information Resources ("DIR") and the Department of Public Safety ("DPS") "to develop a model plan that other state agencies can deploy" covering whether the ban should extend to personal devices.[38]

DIR and DPS issued the Model Plan in January 2023.[39] The plan proposed that the TikTok ban should extend to personal devices used "to conduct state business."[40] The plan defined "state business" to "include[] accessing any state-owned data, applications, email accounts, or non-public facing communications."[41]

The Texas Legislature then passed SB 1893, which codified most of the Directive.[42] Under SB 1893, government entities must adopt a policy "prohibiting the installation or use of [TikTok] on any device owned or leased by the governmental entity and requiring the removal of covered applications from these devices."[43] Taken together, state employees are barred from accessing TikTok on (1) state-issued devices and (2) personal devices used to connect to state networks. The Directive, Model Plan, and SB 1893 contemplate that state agencies are responsible for banning TikTok at their respective agencies.[44] This tracks Tex. Admin. Code § 202.20(a), which states: "The agency head of each state

---

[36] ECF 1-2, 2.

[37] *Id.*

[38] *Id.* at 3.

[39] ECF 1-3.

[40] *Id.* at 6.

[41] *Id.*

[42] Tex. Gov't Code §§ 620.001 *et seq.*

[43] *Id.* at § 620.003(a); *see also id.* at § 620.001(1).

[44] *See* ECF 1-2, 3; ECF 1-3, 4, 8–9; Tex. Gov't Code § 620.003(a).

agency is ultimately responsible for the agency's information resources." Tex. Admin. Code § 202.70(a) similarly provides: "The agency head of each state institution of higher education is ultimately responsible for the security of state information resources."

### STANDARD OF REVIEW

To obtain a preliminary injunction, the moving party must show: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable harm if the injunction does not issue, (3) that the threatened injury outweighs any harm that will result if the injunction is granted, and (4) that granting the injunction is in the public interest."[45] The purpose of a preliminary injunction "is to maintain the status quo until the parties have the chance to adjudicate the merits."[46] Such an injunction is an "extraordinary" and "drastic" remedy that is "not to be granted routinely."[47]

### ARGUMENT

**I.     Coalition is Not Likely to Succeed on the Merits.**

**A.     Most of Coalition's Claims are Nonjusticiable.**

Coalition's claims are largely nonjusticiable for the reasons previously explained in Defendants' motion to dismiss. Coalition can't establish the *Ex parte Young* exception for all Defendants except Chancellor Williams as (1) these Defendants are not the statutorily tasked enforcement officers and (2) they do not have the requisite enforcement connection to the laws and policies in question.[48] Further, Coalition lacks standing to challenge Texas's ban as applied against any public universities other than UNT as Coalition did not: (1) sue officials from universities other than UNT; (2) allege

---

[45] *Clarke v. Commodity Futures Trading Comm'n*, 74 F.4th 627, 640–41 (5th Cir. 2023).

[46] *Feds for Med. Freedom v. Biden*, 63 F.4th 366, 389 (5th Cir. 2023); *see also Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976) ("Mandatory preliminary relief, which goes well beyond simply maintaining the status quo pendente lite, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party.") (citation omitted).

[47] *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989).

[48] ECF 21, 18–19.

that it has members from these other schools who would have standing to sue; and (3) allege that the challenged ban has been applied to its members at any other schools.[49]

### B.      Coalition did Not Assert Viable First Amendment Claims.

First Amendment rights are more limited in the context of government-owned property.[50] Courts "recognize three types of government-controlled spaces: traditional public forums, designated public forums, and nonpublic forums."[51] The level of scrutiny turns on the type of forum involved. For nonpublic forums, "[t]he government may reserve such a forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view."[52]

#### 1.      UNT's IT Resources are Nonpublic Forums.

Per Coalition, Professor Vickery cannot use her (1) "university-owned laptop" or her "university-owned on-campus desktop" to access TikTok on "university-managed internet networks" and (2) personal cellphone because she "also uses it to access" UNT services such as her "university email" and "university Zoom account."[53]All these devices fall under the umbrella of "IT resources."[54] These IT resources are not traditional public forums—i.e., forums that "immemorially" have been held open for First Amendment purposes.[55] Thus, the question is whether UNT's IT resources are designated or nonpublic forums. As shown below, only a nonpublic forum is implicated here.

##### (a)      UNT Heavily Regulates its IT Resources.

The government creates a nonpublic forum when it requires individuals to "obtain

---

[49] *Id.* at 19–20.
[50] *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992).
[51] *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018).
[52] *Id.* (quotations omitted).
[53] ECF 1, ¶¶ 46–49.
[54] *See* Ex. 3, 9.
[55] *United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 205–06 (2003); *see also Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 678 (1998).

permission" to access its property or otherwise regulates use of that property.[56] Supreme Court precedent distinguishes "'general access,' which indicates the property is a designated public forum, and 'selective access,' which indicates the property is a nonpublic forum."[57]

UNT heavily regulates its IT resources. The evidence shows that UNT: (1) specifies that its "information resources are a non-public forum";[58] (2) allows only "authorized" users to access its resources;[59] (3) retains the "sole discretion" to "revoke authorization at any time" and to "limit the use of Information Resources";[60] and (4) restricts its IT resources in many other ways.[61] Thus, UNT restricts use of and access to its IT resources, which means the nonpublic forum analysis applies here.

**(b)     The "Nature of the Government Property" Further Supports a Finding that UNT's IT Resources Are Nonpublic Forums.**

In *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, the Supreme Court noted that a government workplace forum is more likely to be considered nonpublic. The Court explained that "[t]he Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs."[62] Here, Coalition admits UNT provides IT resources to professors like Vickery to facilitate their work for UNT.[63] That UNT is largely acting as an employer in this regard "strengthens the conclusion" that UNT's IT resources are nonpublic forums.[64]

Relevant caselaw shows that UNT's IT resources are nonpublic forums. In *United States v. American Library Association Inc.*, the Supreme Court found that a public library's system of computers

---

[56] *Ark. Educ. Television Comm'n*, 523 U.S. at 679–80; *Mansky*, 138 S. Ct. at 1886.
[57] *Ark. Educ. Television Comm'n*, 523 U.S. at 679 (citations omitted).
[58] Ex. 4, 2–3. This policy is publicly available at the following website: http://tinyurl.com/mff4p5un.
[59] Ex. 3, 18, 24, 40; Declaration of Richard Anderson ("Anderson Decl."), ¶¶ 9–10. UNT System's Information Security Handbook is publicly available at http://tinyurl.com/488rfn6v.
[60] Ex. 4, 3; Anderson Decl., ¶ 10.
[61] *See, e.g.*, Ex. 3, 40, 64; Ex. 4, 7–9.
[62] *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 805 (1985) (quotations omitted).
[63] *See* ECF 1, ¶¶ 46–49.
[64] *See Cornelius*, 473 U.S. at 805.

furnishing internet access was a nonpublic forum.[65] And courts have found the following to be

nonpublic forums: (1) a school's internal mail system (including email); (2) a prison's electronic system

for communicating with inmates; (3) a college's electronic system for attending virtual classes and

submitting assignments; (4) state computer internet terminals; and (5) university computer services.[66]

This Court should follow all others and find that UNT's IT resources are nonpublic forums.

### 2. The Partial TikTok Ban is Reasonable.

It is undisputed that Texas's partial ban is not a viewpoint-based restriction. Thus, the question

is whether this ban is "reasonable in light of the purpose served by the forum[s]."[67] It clearly is.

UNT provides IT resources mainly "for the purpose of conducting University business."[68]

Other "purposes" include the need for privacy, the safety of its users, and the security of the system.

UNT's IT resources would be useless if shut down by a cyberattack. And individuals would not utilize

these resources if use carried a significant risk of being hacked.

The partial TikTok ban is reasonably related to these purposes. Again, the CCP can use its

access to TikTok or its 2017 national security law to exploit users' location data, passwords, and other

sensitive data. This threat carries obvious dangers. Stolen passwords could be used to access UNT's

network. Sensitive cyber-defense research could be funneled directly to the CCP. And so on. The risks

are especially salient for government entities, which are "particularly visible targets" for cyberattacks

---

[65] 539 U.S. 194, 205–07 (2003).

[66] *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46–48 (1983); *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 350 (5th Cir. 2001); *Pichelmann v. Madsen*, 31 F. App'x. 322, 327 (7th Cir. 2002); *Witzke v. Bouchard*, No. 22-13070, 2023 WL 3919303, at *6 (E.D. Mich. June 9, 2023); *Collins v. Putt*, No. 3:17-CV-01621(AVC), 2019 WL 8501541, at *1, 4 (D. Conn. Mar. 28, 2019); *Nickolas v. Fletcher*, No. 3:06 CV 00043 KKC, 2007 WL 1035012, at *1, 5–6 (E.D. Ky. Mar. 30, 2007); *Loving v. Boren*, 956 F. Supp. 953, 954 (W.D. Okla. 1997).

[67] *Cornelius*, 473 U.S. at 806.

[68] Ex. 4, 3; *see also* Ex. 5, *publicly available at* http://tinyurl.com/mrh9wjx2.

according to the FBI.[69] And there have been numerous recent hacks against government entities.[70]

Texas's partial ban is reasonably aimed at closing a vulnerability to its IT system. Texas was not required to wait for the CCP to hack state agencies before acting to prevent this threat: "[T]he Government need not wait until havoc is wreaked to restrict access to a nonpublic forum."[71] Also, Texas's partial ban leaves open ample alternative channels for communication. State employees and students can still use TikTok on personal devices that do not connect to state networks. Also notable, state employees and students can use practically any other social media application other than TikTok.

Finally, Texas was allowed to credit the wisdom and judgment of the many other governments that have also restricted access to TikTok.[72] As the Fifth Circuit noted in *Gibson v. Collier:* "There is no reason why—as a matter of either common sense or constitutional law—one state cannot rely on the universally shared experiences and policy determinations of other states."[73] *Gibson's* statement has more force here. Our federal government and its allies—with their sophisticated intelligence resources and network of confidential sources—classify TikTok as a national security threat. A ruling against Defendants here amounts to a finding that these governments are *all* being unreasonable.

### 3. Texas's Partial TikTok Ban Would Survive Even More Rigorous Scrutiny.

Coalition's claims fail under even the higher scrutiny applied to designated and traditional public forums. It is undisputed that Texas's ban is not a viewpoint- or content-based restriction. Thus, the question is whether this ban is "narrowly tailored to serve a significant government interest[] and leave[s] open ample alternative channels of communication."[74]

---

[69] *High-Impact Ransomware Attacks Threaten U.S. Businesses and Organizations,* FBI (Oct. 2, 2019), http://tinyurl.com/2axw4r53.
[70] ECF 21, 25–26.
[71] *Cornelius,* 473 U.S. at 810.
[72] *See Fla. Bar v. Went For It, Inc.,* 515 U.S. 618, 628 (1995).
[73] 920 F.3d 212, 224 (5th Cir. 2019).
[74] *Perry Educ. Ass'n,* 460 U.S. at 45; *see also Mansky,* 138 S. Ct. at 1885.

Texas's ban serves at least three interests: privacy, security, and public safety. These are significant government interests under binding precedent.[75] And the consensus that TikTok poses a security threat, coupled with media reports showing the CCP's troubling ties to this company, satisfy the government's light burden on the "interest" issue.[76]

As to tailoring, Texas's partial ban is narrowly tailored for the same reasons it is "reasonable." As one court recently explained, limiting a security-related restriction to government devices is the "obvious alternative" to fully banning a Chinese-based application.[77] Texas did not violate the First Amendment when it adopted the "obvious alternative" here.

The Supreme Court's *Ward v. Rock Against Racism* decision is instructive. First, *Ward* found, in the intermediate scrutiny context, that a regulation is valid so long as the government entity "could reasonably have determined that its interests overall would be served less effectively without the [regulation] than with it."[78] Here, Texas's interests in privacy, security, and safety would be "served less well" absent the partial TikTok ban. Coalition doesn't dispute that this ban makes it somewhat harder for the CCP to exploit its ability to access TikTok to the state's detriment. Even a minor reduction in risk would justify Texas's actions. *Ward* also advises that this Court should be hesitant to second-guess Texas's and the federal government's responses on the TikTok issue.[79]

Second, Coalition argues that Texas's partial ban is unconstitutional as it lacks a narrow exception for certain university professors. Yet *Ward* shows that intermediate scrutiny does not require this level of fine tuning, as the Supreme Court found that a content-neutral regulation "need not be

---

[75] *Hous. Chron. Pub. Co. v. City of League City*, 488 F.3d 613, 622 (5th Cir. 2007); *United States v. Green*, 293 F.3d 855, 859 n.20 (5th Cir. 2002); *Peavy v. WFAA-TV, Inc.*, 221 F.3d 158, 192 (5th Cir. 2000).

[76] *See, e.g., City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438 (2002); *Went For It, Inc.*, 515 U.S. at 628; *Doe I v. Landry*, 909 F.3d 99, 109–10 (5th Cir. 2018).

[77] *U.S. WeChat Users All. v. Trump*, 488 F. Supp. 3d 912, 917, 927 (N.D. Cal. 2020).

[78] *Ward v. Rock Against Racism*, 491 U.S. 781, 801 (1989).

[79] *See id.* at 800; *United States v. Albertini*, 472 U.S. 675, 689 (1985).

the least restrictive or least intrusive means" to achieve the state's interests.[80]

Third, Coalition wants to invalidate Texas's partial ban due to its impact on a small fraction of the state workforce. *Ward* shows that this Court's analysis must instead (1) focus "on the relation [Texas's partial ban] bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interests in an individual case" and (2) judge the effectiveness of this ban "by considering all the varied groups" impacted by this policy.[81] Coalition did not show that Texas's partial ban is overbroad when considering that the state employs hundreds of thousands of individuals,[82] each of whom is a potential vector for a CCP-sponsored cyberattack.[83]

Finally, *Ward* found the alternative channels requirement "easily met" when the regulation "d[id] not attempt to ban any particular manner or type of expression at a given place or time."[84] The same is true here: Texas's partial ban leaves users free to say anything they want on or about TikTok, and they can still access this platform through personal devices not connected to state networks. In sum, there are no grounds for finding that Texas's limited TikTok ban violates the First Amendment.

### 4. Coalition's Arguments do Not Change the Analysis Above.

#### (a) "*NTEU*" Scrutiny does Not Apply to Nonpublic Forums.

Coalition likens Texas's partial ban to a prior restraint on speech, and thus it asks this Court to apply a higher level of constitutional scrutiny known as "*NTEU*" scrutiny.[85] It missed that prior restraints *in nonpublic forums* are still subject only to a "reasonableness" review.[86] Thus, in *Freedom From*

---

[80] *Ward*, 401 U.S. at 799.
[81] *Ward*, 401 U.S. at 801; *see also Albertini*, 472 U.S. at 688–89; *Moore v. Brown*, 868 F.3d 398, 404 (5th Cir. 2017).
[82] *See Overview*, TEX. AUDITOR'S OFFICE, https://tinyurl.com/3beham52.
[83] *See* ECF 21, 28–29; *see also* Frkuska Decl., ¶ 6.
[84] *Ward*, 401 U.S. at 802.
[85] ECF 20, 10–24.
[86] *Perry v. McDonald*, 280 F.3d 159, 171 (2d Cir. 2001); *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 749 (7th Cir. 1999).

*Religion Foundation v. Abbott*, which involved a prior restraint in a nonpublic forum, the Fifth Circuit applied the lower "reasonableness" standard, as opposed to something resembling strict scrutiny.[87] The reasoning is simple. Nonpublic forums exist only when the government places limits in advance on what or where speech can occur on government property. Considering every such limit to be a "prior restraint" would eviscerate decades of Supreme Court precedent (1) distinguishing between public and nonpublic forums and (2) applying lighter scrutiny to the latter.[88]

For similar reasons, a content-neutral time, place, or manner regulation in a traditional or designated forum receives only intermediate scrutiny, not the more exacting scrutiny applied to other prior restraints. As the Supreme Court explained in *Thomas v. Chicago Park Dist.*, prior restraints on the subject matter of speech raise censorship concerns that warrant strict scrutiny.[89] "[B]ut [a] content-neutral time, place, and manner regulation of the use of a public forum" generally does not raise such concerns as it does not restrict "what a speaker might say."[90] Thus, such content-neutral regulations, even when considered a "prior restraint," still receive only intermediate scrutiny.[91]

Another problem for Coalition is this case involves *access*, not *speech*, and "[t]he right of access does not enjoy the broad protections offered to the right of free speech."[92] Further, the fact that Texas's ban leaves individuals free to say *anything* they want on or about TikTok weighs heavily against Coalition's claims.[93]

---

[87] 955 F.3d 417, 429 (5th Cir. 2020); *see also Catholic Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 438–39 (5th Cir. 2014).
[88] *See, e.g., Perry*, 280 F.3d at 171.
[89] 534 U.S. 316, 321–22 (2002).
[90] *Id.* at 322.
[91] *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 130 (1992); *GEFT Outdoor, LLC v. Monroe Cnty., Indiana*, 62 F.4th 321, 327 (7th Cir. 2023).
[92] *Matter of Subpoena 2018R00776*, 947 F.3d 148, 155–56 (3d Cir. 2020).
[93] *See, e.g., Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32–34 (1984).

**(b)**     **Coalition's "Interests" Analysis is Deeply Flawed.**

Coalition uses the balancing test designed for First Amendment retaliation claims in the employment context.[94] This test is a bad fit here, as Texas's ban is not limited to employees (it bars *anyone* from accessing TikTok on state networks).[95] And the ban lets state employees say anything they want on or about TikTok, in contrast to the normal First Amendment employment case where the government retaliates against an employee for his or her speech on a particular issue.

Regardless, Coalition loses even under an employment-based First Amendment test. As explained above, Texas's ban survives the generally applicable forum analysis. This means the ban *must* be constitutional under an employment-based test, as "[a] government entity has broader discretion to restrict speech when it acts in its role as employer."[96] Put differently, that a government workplace is implicated *lessens*, not *raises*, the government's burden in this context.

What's more, Texas's asserted interests for its partial ban—public safety, privacy, and security—fit comfortably within the First Amendment employment test. Were the law otherwise CIA employees could not be stopped from using harmful software, as national security would not be a viable government interest in the employment context. U.S. Social Security Administration employees could not be barred from disclosing individuals' social security numbers to the world, as the federal government could not restrict employee speech due to privacy concerns, and so on.

Further, the Supreme Court has recognized the "effective functioning of the public employer's enterprise" as a viable government interest in the employment context.[97] This category is broad enough to encompass well-recognized interests like the ones Texas asserts here. And Coalition's argument on this point—that national security, public safety, and privacy are no longer valid

---

[94] *See* ECF 20, 10–23.
[95] *Id.* at 15–16.
[96] *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006); *see also Waters v. Churchill*, 511 U.S. 661, 671–72 (1994).
[97] *Rankin v. McPherson*, 483 U.S. 378, 388 (1987).

government interests in the employment free speech context—borders on the absurd.

The dangers from TikTok are real—the actions of many states and countries that have partially banned this application prove that point better than words ever could. While Coalition believes *all* these governments are unreasonable, it didn't offer facts plausibly supporting this conclusion.

> **5.    Schneier's Declaration does Not Meaningfully Impact this Litigation; if Anything, His Writings Hurt Coalition's Position.**

Coalition leans on a declaration from its cybersecurity expert, Bruce Schneier.[98] Yet Schneier's declaration and other writings ultimately show why Texas's partial TikTok ban is constitutional.

> **(a)    All Parties Agree that the CCP's Ability to Exploit TikTok Poses a Significant Risk to the United States' Interests.**

Per Schneier, TikTok and ByteDance are "shady" companies that "operate at the pleasure of the Chinese government."[99] A report he co-authored for the Hoover Institution (the "Hoover Report")—cited multiple times in his declaration[100]—clarifies the scope of the threat at issue here.[101]

The Hoover Report found that a "foreign adversary like the Chinese government" could use user data to "discover highly granular information about particular individual[s] or group attributes."[102] This creates "significant risks" for the United States, as the CCP could use this data "for identity exploitation, influence, and control."[103] The Hoover Report identified ByteDance as having a particularly "immense data set" that could be exploited by the CCP.[104]

In the opening paragraph of its complaint, Coalition contends that Texas's TikTok ban is

---

[98] *See* ECF 20-3.
[99] *Banning TikTok*, SCHNEIER ON SECURITY (Feb. 27, 2023), https://tinyurl.com/4f4xh66p; *see also* ECF 20-3, ¶ 5 (in which Schneier admits that "Schneier on Security" is his blog).
[100] ECF 20-3, ¶¶ 5, 21, 24, 37, 44, 50.
[101] *See* Gary Corn, Jennifer Daskal, Jack Goldsmith, Chris Inglis, Paul Rosenzweig, Samm Sacks, Bruce Schneier, Alex Stamos & Vincent Stewart, *Chinese Technology Platforms Operating in the United States*, HOOVER INST. (the "Hoover Report"), *available at* https://tinyurl.com/2zvprv4y.
[102] *Id.* at 4.
[103] *Id.*
[104] *Id.* at 6.

overbroad as it is not limited to "state employees who have access to especially sensitive information or locations."[105] The Hoover Report undercuts this point. Per this Report, even data belonging to individuals without access to classified information "can be collected and aggregated" in a way that creates "national security risks."[106] For instance, if an individual is "connected with" or "linked to" a person with sensitive information, the individual and his connected devices become "potential vectors for a malicious actor to gain access to sensitive data and systems."[107] For another example, the data of an individual who "is not a valuable source or target . . . can be combined with others—thus becoming a data point that subsequently enables an actor to carry out better targeting [and] analysis."[108] Per the Report, this could "enable[] a foreign adversary like China to glean valuable information about patterns of behavior, interests, and predispositions that could in turn be used to inform future intelligence, cyber, and information operations."[109]

In sum, all parties agree that the CCP's ability to exploit Chinese-controlled technology platforms like TikTok presents a significant risk to United States' interests. And while Schneier calls a partial TikTok ban "ineffective,"[110] he really means that it is *not as effective* as more comprehensive measures. Put simply, Coalition does not meaningfully dispute that Texas's partial ban will at least make it harder for the CCP to access state networks, harvest state employees' data, or otherwise influence state employees' actions. This is all that is needed to survive a narrow tailoring analysis.

> **(b)    If Texas's Partial TikTok Ban is Unconstitutional, So Too is the Biden Administration's.**

One problem with Schneier's arguments is that they apply equally to the Biden

---

[105] ECF 1, ¶ 1.

[106] *Hoover Report*, *supra* note 101, 5.

[107] *Id.*

[108] *Id.*

[109] *Id.*

[110] ECF 20-3, ¶ 16.

Administration's TikTok ban. Schneier claims that the federal ban "appear[s] to cover a narrower set of employees or contain important exceptions that are missing from the Texas ban."[111] This is false. The Biden Administration's ban "applies to *all* executive agencies."[112] Further, the federal ban covers the "use or presence" of TikTok on all "information technology," which is defined broadly enough to cover the use of TikTok on a personal device connected to federal networks.[113] Moreover, the federal's exceptions ban are limited only to "law enforcement activities, national security interests and activities, and security research" and they are granted only when an exception is "critical to [the agencies'] mission."[114] None of these exceptions apply here, for obvious reasons.

### (c) Texas is Not Required to Fix *All* Privacy Issues Before Acting to Stop the CCP from Exploiting its Access to TikTok.

Schneier claims that Texas could have: (1) enacted comprehensive privacy legislation; (2) required TikTok to store Americans' data in the U.S.; (3) tried to mitigate the spread of disinformation; and (4) established evaluation and testing centers for TikTok.[115] He acts as if Texas cannot stop the CCP from exploiting TikTok unless the state fundamentally reforms the trillion-dollar enterprise of mining personal data.[116] Our country would grind to a halt if federal and state governments could only fix one problem by solving all other associated issues. Of course, that is not how our Constitution works: "The First Amendment does not put a State to [an] all-or-nothing choice."[117]

Equally troubling, Schneier does not account for the obvious constitutional problems with his identified "solutions." For instance, he proposes that Texas "require TikTok and other platforms to

---

[111] *Id.* at ¶ 14.
[112] *February 27th Memorandum*, *supra* note 23, at II (emphasis added).
[113] *Id.* at II–III; 40 U.S.C § 11101(6).
[114] *February 27th Memorandum*, *supra* note 23, at IV.A.
[115] ECF 20-3, ¶¶ 21, 44–47, 50.
[116] *See* Nicholas Confessore, *The Unlikely Activists Who Took On Silicon Valley—and Won*, N.Y. TIMES MAGAZINE (Aug. 14, 2018), https://tinyurl.com/y946nj6n.
[117] *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 452 (2015).

disclose its contacts and connections with foreign governments."[118] This could raise First Amendment compelled speech issues.[119] And he says Texas could comprehensively test TikTok or otherwise require it to store data in the U.S.[120] This is problematic in part due to the Foreign Commerce Clause.[121]

Also, Schneier never explains how much time, money, and manpower his comprehensive proposals would cost Texas. And he admitted elsewhere that one of his proposals—storing TikTok's data in the U.S.—wouldn't even work.[122] If Schneier's alternatives were so obvious and easy, state and federal governments would have adopted them a long time ago. But the devil is in the details. And there are a whole lot of "devils" in Schneier's proposals.

(d)      **Schneier's Narrower Proposals are Legally Irrelevant.**

Schneier proposes that Texas (1) limit its ban to employees with especially sensitive information or (2) allow access to TikTok on dedicated devices or networks not connected to the state agency at large.[123] Yet the Hoover Report found that limiting a ban to employees with sensitive information would not work, and it noted some ways a foreign adversary could exploit such a vulnerability. Also, this solution is impractical here as most UNT employees have access to sensitive data in at least some way—like information protected by the Family Educational Rights and Privacy Act.[124] As to Schneier's "dedicated device" proposal, state employees would still be giving their personal information to TikTok, and the Hoover Report found that the Chinese government could exploit such data for "future intelligence, cyber, and information operations."[125]

---

[118] ECF 20-3, ¶ 47.

[119] *See, e.g., Amawi v. Pflugerville Indep. Sch. Dist.*, 373 F. Supp. 3d 717, 754 (W.D. Tex. 2019), *vacated and remanded sub nom. Amawi v. Paxton*, 956 F.3d 816 (5th Cir. 2020).

[120] ECF 20-3, ¶¶ 46, 50.

[121] *See Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 750 (5th Cir. 2006).

[122] *Hoover Report, supra* note 101, 2–3.

[123] ECF 20-3, ¶¶ 48–49.

[124] *See* Anderson Decl., ¶¶ 16–18.

[125] *Hoover Report, supra* note 101, 5.

More importantly, Schneier's alternatives are irrelevant. As explained above, *Ward* shows that Texas's partial ban isn't invalid just because there are hypothetical less restrictive means to achieve the state's interests. *Ward* also rejected Schneier's narrow framing of the issue—as he focuses on how the ban impacts a sliver of state employees, instead of on the "overall problem" Texas is trying to solve.

## II.   The Remaining Preliminary Injunction Factors Favor Defendants.

The harm to Coalition's members is minor. Coalition identified only one member whose scholarship about TikTok is limited by Texas's partial ban. And this one person admits she can access TikTok and teach about this platform in other ways.[126] Further, a wrongful injunction could be catastrophic. It would open a vulnerability in Texas's network that the CCP could exploit to wreak havoc on the state's operations and employees. The status quo also favors Defendants, as Coalition's members have operated under a partial TikTok ban ever since the December 7, 2022 Directive. Finally, this Court has held that an unjustified six-month delay in seeking emergency relief weighs against issuing a preliminary injunction.[127] Coalition delayed longer than that here.

**CONCLUSION**

For the reasons above, this Court should deny Coalition's motion for a preliminary injunction.

Date: October 25, 2023                    Respectfully Submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

JAMES LLYOD
Deputy Attorney General for Civil Litigation

---

[126] ECF 20-2, ¶¶ 53–56.
[127] *See Digerati Distribution & Marketing, LLC v. Sarl*, No. 1:22-CV-01302-DII, 2023 WL 5687040, at *3 (W.D. Tex. Aug. 2, 2023).

KIMBERLY GDULA
Acting Division Chief, General Litigation Division

*/s/ Todd Dickerson*
TODD A. DICKERSON
Attorney-in-Charge
Texas Bar No. 24118368
Todd.Dickerson@oag.texas.gov
Assistant Attorney General
Office of the Attorney General
P.O. Box 12548-Capitol Station
Austin, Texas 78711-2548
(512) 463-2120
FAX: (512) 320-0667
COUNSEL FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I hereby certify that on October 25, 2023, a true and correct copy of the foregoing instrument has been served electronically through the electronic-filing manager to:

Peter B. Steffensen
SMU Dedman School of Law
First Amendment Clinic
P.O. Box 750116
Dallas, TX 75275
(214) 768-4077
psteffensen@smu.edu

Jameel Jaffer*
Ramya Krishnan*
Stacy Livingston*
Knight First Amendment Institute
at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
jameel.jaffer@knightcolumbia.org
COUNSEL FOR PLAINTIFF

*/s/ Todd Dickerson*

21